# EXHIBIT 1

**General Civil and Domestic Relations Case Filing Information Form**

☒ Superior or ☐ State Court of  Forsyth  County

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**25CV-1688-1**

Judge Jeffrey S. Bagley

SEP 19, 2025 07:22 PM

Greg G. Allen, Clerk
Forsyth County, Georgia

| For Clerk Use Only | |
|---|---|
| Date Filed 09-19-2025 | Case Number 25CV-1688-1 |
| MM-DD-YYYY | |

| Plaintiff(s) | | | | | Defendant(s) | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Ashwood Gap Partners, LLC | | | | | Wesco Insurance Company | | | | |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
| Ashwood Gap, LLC | | | | | Interstate Fire & Casualty Company | | | | |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
| | | | | | Liberty Mutual Insurance Europe, SE | | | | |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
| | | | | | Fidelis Underwriting Limited | | | | |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |

**Plaintiff's Attorney** Bersinger, D. Austin      **Bar Number** 144792      **Self-Represented** ☐

**Check one case type and, if applicable, one sub-type in one box.**

| General Civil Cases | Domestic Relations Cases |
|---|---|
| ☐ Automobile Tort | ☐ Adoption |
| ☐ Civil Appeal | ☐ Contempt |
| ☒ Contract | ☐ Non-payment of child support, medical support, or alimony |
| ☐ Contempt/Modification/Other Post-Judgment | ☐ Dissolution/Divorce/Separate Maintenance/Alimony |
| ☐ Garnishment | ☐ Family Violence Petition |
| ☐ General Tort | ☐ Modification |
| ☐ Habeas Corpus | ☐ Custody/Parenting Time/Visitation |
| ☐ Injunction/Mandamus/Other Writ | ☐ Paternity/Legitimation |
| ☐ Landlord/Tenant | ☐ Support – IV-D |
| ☐ Medical Malpractice Tort | ☐ Support – Private (non-IV-D) |
| ☐ Product Liability Tort | ☐ Other Domestic Relations |
| ☐ Real Property | |
| ☐ Restraining Petition | |
| ☐ Other General Civil | |

☐ Check if the action is related to another action(s) pending or previously pending in this court involving some or all of the same parties, subject matter, or factual issues. If so, provide a case number for each.

_____     _____
        Case Number                    Case Number

☒ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in O.C.G.A. § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____ **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

_____

⚖ **EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**25CV-1688-1**

Judge Jeffrey S. Bagley
SEP 19, 2025 07:22 PM

Greg G. Allen, Clerk
Forsyth County, Georgia

## IN THE SUPERIOR COURT OF FORSYTH COUNTY
### STATE OF GEORGIA

| | | |
|---|---|---|
| ASHWOOD GAP PARTNERS, LLC and ASHWOOD GAP, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| WESCO INSURANCE COMPANY; INTERSTATE FIRE & CASUALTY COMPANY; LIBERTY MUTUAL INSURANCE EUROPE, SE; FIDELIS UNDERWRITING LIMITED; and VOLANTE SPECIALTY RISK, LLC, | ) ) ) ) ) ) ) ) | CASE NO. |
| Defendants. | ) ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Ashwood Gap Partners, LLC ("Ashwood Partners") and Ashwood Gap, LLC ("Ashwood Gap") (collectively "Plaintiffs") file this Complaint against Defendants Wesco Insurance Company ("Wesco"), Interstate Fire & Casualty Co. ("Interstate"), Liberty Mutual Insurance Europe SE ("Liberty Mutual"), Fidelis Underwriting Limited ("Fidelis"), and Volante Specialty Risk, LLC ("Volante Specialty"), and allege as follows:

### SUMMARY OF ACTION

This case involves Wesco and Interstate's (the "Insurers") breach of their respective contractual obligations under a 170(h) Liability Insurance Policy (No. VFP/FL/13849/2020/1) (the "Policy"). The Policy serves one purpose—insuring losses resulting from adjustments to the tax deduction that Ashwood Gap claimed for the donation of a conservation easement over certain real property. The Insurers understood the transaction at issue, were provided relevant due diligence documents during the underwriting process, knew the asserted value of the conservation easement,

and understood how the appraiser reached that value. The Insurers fully understood the risk that they insured, including the risk that the IRS might attempt to reduce or disallow the claimed deduction, and took handsome premiums in excess of half a million dollars from the partnership reflective of the risk they agreed to insure. Now that this precise risk is coming to pass, the Insurers are refusing to either allow Ashwood Gap to accept a reasonable, in-limits settlement offer from the IRS or to indemnify Ashwood Partners and its investors for the insured loss resulting from the settlement.

For more than a year, the Plaintiffs have sought in good faith to obtain the Insurers' consent to accept the IRS's reasonable settlement offer and to secure a clear coverage position under the Policy. Despite repeated requests, the Insurers have refused to consent (or, alternatively, to waive the consent requirement) and, even more fundamentally, have refused to provide any formal coverage determination at all. This refusal appears calculated: by declining to either consent or deny coverage, the Insurers are engaging in delay and strategic ambiguity designed to manufacture policy defenses that would otherwise be unavailable had they acted in good faith. Their prolonged inaction has left the Plaintiffs with no choice but to file this lawsuit—one of at least nineteen lawsuits necessitated by similar conduct—in order to protect their rights under the Policy and ensure that the coverage for which they paid substantial premiums is honored.

As explained below, the Insurers have breached their contractual obligations by unreasonably withholding their consent to accept the IRS's settlement offer, delaying payment under the Policy, failing to timely or adequately respond to Plaintiffs' claims, refusing to provide substantive coverage positions or adequately investigate the claims, and deliberately interfering with Plaintiffs' efforts to recover losses under the Policy. The Plaintiffs are entitled to damages from the Insurers as a result of these breaches.

2

## PARTIES, JURISDICTION, VENUE

1.      Plaintiff Ashwood Partners is a Delaware limited liability company with its principal place of business located at 2207 2nd Ave N., Birmingham, Alabama 35203. Ashwood Partners is the Named Insured under the Policy. Ashwood Partners' investors are citizens of multiple states throughout the country, including Georgia and New York.   The investors in Ashwood Partners are also insureds under the Policy.

2.      Plaintiff Ashwood Gap is an Alabama limited liability company with its principal place of business located at 2207 2nd Ave N., Birmingham, Alabama 35203. Ashwood Gap is also an insured under the Policy.

3.      Wesco is a foreign surplus lines insurer registered in Delaware with its principal place of business located at 59 Maiden Lane, 43rd Floor, New York, New York, 10038.  Wesco is registered to do business in Georgia and can be served through its Registered Agent, United Agents Group, Inc., at 2985 Gordy Parkway, 1st Floor, Marietta, Georgia 30066.

4.      Interstate is a foreign surplus lines insurer registered in Illinois with its principal place of business located at 225 West Washington Street, Suite 1800, Chicago, Illinois 60606. Interstate is a non-admitted insurance company that insures risks in the United States through its managing general agent, Volante Specialty, which is domiciled in Georgia. Volante Specialty had authority (actual or apparent) to bind Interstate to contracts in the United States and bound the Policy at issue in this action on behalf of Interstate. Interstate is subject to personal jurisdiction in Georgia, where its managing general agent is domiciled and operates to bind coverage for risks in the United States.

5.      Alternatively, Interstate is subject to personal jurisdiction in Georgia pursuant to the Georgia Surplus Lines Act, O.C.G.A. § 33-5-26 *et seq.* because it is a non-admitted insurer

3

offering surplus lines coverage through Volante Specialty in Georgia. Moreover, the invoice for the Policy stated that the contract was "delivered as a surplus lines coverage under the Surplus Lines Insurance Law, Chapter 33-5 [33-5-26]." Therefore, pursuant to O.C.G.A. § 33-5-34, Interstate may be served with process through the Georgia Commissioner of Insurance, John King, c/o Jeremy Betts, 2 Martin Luther King Jr. Dr. SE, Suite 704 West Tower, Atlanta, Georgia 30334, with a copy to Interstate at 225 W. Washington Street, Suite 1800, Chicago, Illinois 60606-3484.

6.     Liberty Mutual is a foreign surplus lines insurer registered in Luxembourg with its principal place of business located at 5-7 rue Leon Laval, L-3372, Leudelange, Grand Duchy of Luxembourg. Liberty Mutual continuously and systematically transacted the business of insurance in Georgia through Volante International Limited ("Volante International") and Volante Specialty. Liberty Mutual is a non-admitted insurance company that insures risks in the United States through its managing general agents, Volante International and Volante Specialty, which is domiciled in Georgia. Representatives of Volante Specialty and Volante International signed the purported endorsement to the Policy on behalf of Liberty Mutual and had authority (actual or apparent) to bind Liberty Mutual to contracts in the United States. Because its managing general agent is present in Georgia, Liberty Mutual is subject to personal jurisdiction in this state.

7.     Liberty Mutual is subject to personal jurisdiction in Georgia pursuant to the Georgia Surplus Lines Act O.C.G.A. § 33-5-26 *et seq.* because it is a non-admitted insurer offering surplus lines coverage in Georgia through Volante Specialty, which is domiciled in Georgia. Therefore, pursuant to O.C.G.A. § 33-5-34, Liberty Mutual may be served with process through the Georgia Commissioner of Insurance, John King, c/o Jeremy Betts, 2 Martin Luther King Jr. Dr. SE, Suite 704 West Tower, Atlanta, Georgia 30334, with a copy to Liberty Mutual c/o Locke Lord LLP, 200 Vesey Street, Brookfield Place, New York, New York 10281.

4

8.      Fidelis is a foreign surplus lines insurer registered in the United Kingdom with its principal place of business in London, England. Fidelis continuously and systematically transacted the business of insurance in Georgia through Volante Specialty. Fidelis insures risks in the United States through its managing general agent, Volante Specialty, which is domiciled in Georgia. Volante Specialty had authority (actual or apparent) to bind Fidelis to contracts in the United States and executed a purported endorsement for the Policy in this action on behalf of Fidelis. Fidelis is subject to personal jurisdiction in Georgia, where its managing general agent is domiciled and operates to bind coverage for risks in the United States.

9.      Finally, Fidelis, as a non-admitted insurer offering surplus lines coverage through Volante Specialty in Georgia, is subject to jurisdiction under O.C.G.A. § 33-5-34, or, in any event, plainly understood that it could be sued in Georgia based on the surplus lines coverage it sold in the United States through its Georgia agent. Therefore, pursuant to O.C.G.A. § 33-5-34, Fidelis may be served with process through the Georgia Commissioner of Insurance, John King, c/o Jeremy Betts, 2 Martin Luther King Jr. Dr. SE, Suite 704 West Tower, Atlanta, Georgia 30334, with a copy to Fidelis c/o Locke Lord LLP, 200 Vesey Street, Brookfield Place, New York, New York 10281.

10.     Volante Specialty is a limited liability company organized under the laws of the state of Delaware with a principal place of business at 1595 Peachtree Parkway, Suite 204-376, Cumming, Georgia, 30041. Volante Specialty possesses an active Georgia Principal Agency license (License Number 208812). Volante Specialty may be served through its registered agent, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

11.     Venue is proper in this Court pursuant to GA. CONST. Art. 6, s. 2, para. IV, O.C.G.A. § 14-2-510(b)(1) & (4), and O.C.G.A. § 33-47-6. Alternatively, venue is proper pursuant

5

to O.C.G.A. § 33-5-34. Volante Specialty maintains its principal office in Forsyth County, and, as alleged above, Defendants have insured surplus lines coverages in the United States through their managing general agent, Volante Specialty, which is domiciled in Georgia, and maintains its registered office in this County. Venue in this action is proper in the County where the Defendants' managing general agent is present, and where the policy was written, sold, paid for, and notice of loss was provided.

### FACTUAL ALLEGATIONS

**I.    Conservation Easements**

12.    A conservation easement is a nonpossessory interest in real property that restricts the use of the subject property to preserve the conservation values of the property.

13.    In 1980, Congress codified taxpayers' ability to claim a federal tax deduction for the donation of a conservation easement at 26 U.S.C. § 170(h).

14.    Under 26 U.S.C. § 170(h), if a taxpayer donates a conservation easement to a qualified organization exclusively for conservation purposes, the taxpayer may claim a deduction equal to the fair market value ("FMV") of a donated conservation easement.

15.    The FMV of a conservation easement generally is determined using the "before-and-after" valuation method.

16.    The "before-and-after" valuation method requires an appraiser to determine (i) the FMV of the subject property before the donation, and (ii) the FMV of the subject property after the donation. The difference between these two values is the FMV of the donated conservation easement. *See* Treas. Reg. § 1.170A-14(h)(3).

## II.    *The Underlying Conservation Easement Donation*

17.    Ashwood Gap acquired 205.39 acres of primarily unimproved real property in Jackson County, Alabama (the "Property") through a capital contribution in connection with its analysis of the Property's mineral resources for potential development or conservation.

18.    Ashwood Partners was created in November 2020 to raise funds from investors to purchase an interest in Ashwood Gap.

19.    After assessment of the Property's mineral reserves, the investors in Ashwood Partners were given three options with respect to the Property: (i) develop a limestone mine on the Property, (ii) donate a conservation easement over the Property, or (iii) hold the Property for long-term appreciation.

20.    As part of this purpose, the Plaintiffs retained independent experts to determine the Property's highest and best use ("HBU") and FMV.

21.    The due diligence performed by these experts indicated the Property's HBU was the development of a crushed stone quarry and processing operation due to the Property's significant mineral reserves.

22.    An independent appraiser valued the Property at its HBU using the discounted cash flow ("DCF")/income valuation methodology.

23.    Using the DCF/income valuation methodology, the appraiser determined the FMV of the Property was approximately $53,650,000.

24.    The appraiser further determined that, if Ashwood Gap donated a conservation easement over the Property that prohibited mining, the FMV of the Property would be $280,000.

7

25.    Using the "before-and-after" valuation methodology for conservation easements, the appraiser accordingly determined that the FMV of the conservation easement would be worth approximately $53,370,000.

26.    To participate in the transaction, the investors of Ashwood Partners contributed, in aggregate, $10,300,100 for interests in Ashwood Partners through a private placement.

27.    Ashwood Partners purchased a 98% interest in Ashwood Gap by agreement dated December 10, 2020.

28.    On or about December 21, 2020, the investors in Ashwood Partners voted to donate a conservation easement under 26 U.S.C. § 170(h) over the Property, which Ashwood Gap donated to the Heritage Preservation Trust, Inc., on December 22, 2020.

29.    Following the donation of the conservation easement, the appraiser prepared a qualified appraisal dated February 9, 2021, for tax purposes to substantiate the FMV of the donated conservation easement.

30.    The appraiser concluded in the qualified appraisal that the FMV of the donation conservation easement was $53,370,000.

31.    Ashwood Gap reported a $53,370,000 noncash charitable deduction on its 2020 Form 1065 for the donation of the conservation easement based on the appraisal.

32.    Because Ashwood Gap is a partnership for federal tax purposes, 98% of the reported deduction, or $52,302,600, was reported on Ashwood Partners' 2020 Form 1065.

33.    Because Ashwood Partners is also a partnership for federal tax purposes, the investors in Ashwood Partners claimed the full deduction reported by Ashwood Partners on their respective tax returns in 2020 and later years.

8

### III.    *The Policy*

34.    In connection with the conservation easement donation, the investors in Ashwood Partners were presented with the opportunity to purchase a specialized insurance policy that serves one fundamental purpose—to protect and indemnify Ashwood Partners and its investors if the IRS rejected or reduced the amount of the deduction claimed by Ashwood Gap for its donated conservation easement.

35.    Volante Specialty was formed in November 2019 for the primary purpose of placing 170(h) policies with partnerships that had donated conservation easements.

36.    Volante Specialty was at all relevant times acting as an agent of Volante Global Limited ("Volante Global") and Volante International Limited ("Volante International").

37.    In December 2020, Ashwood Partners contacted Volante Specialty to secure the requested 170(h) policy.

38.    In connection with the underwriting process for the requested policy, Volante Specialty was provided with significant due diligence and background materials regarding Ashwood Gap's conservation easement donation, including the corporate documents of the partnerships, the private placement memorandum explaining the transaction and identifying its risks, and the appraisal used to determine the value of the deduction.

39.    When the investors in Ashwood Partners voted to conserve the Ashwood Gap Property, they voted to require Ashwood Partners to use partnership funds to acquire the Policy to insure the claimed deduction for Ashwood Gap's donated conservation easement.

40.    On December 21, 2020, Ashwood Partners informed Volante Specialty that the private placement had closed and that the majority of Ashwood Partners' investors had voted to obtain a 170(h) insurance policy.

9

41.     On December 21, 2020, Volante Specialty issued an Investor 170(h) Liability Quote and an invoice for the required premiums for the requested 170(h) policy.

42.     On December 22, 2020, Volante Specialty received the executed Quote to bind coverage as outlined therein. A copy of the executed Quote and Invoice is attached as **Exhibit A.**

43.     On December 24, 2020, Ashwood Partners paid the full premium pursuant to the invoice.

44.     In return for the payment of a $721,000 premium, Wesco and Interstate issued the Policy (No. VFP/FL/13849/2020/1). The Policy is attached as **Exhibit B.** (Policy at p. 1.)

45.     David Hamilton of Volante Specialty is listed in the Policy declarations as the authorized representative of Wesco and Interstate.

46.     The policy period is from December 31, 2020 through October 15, 2021, with an extended reporting period to October 15, 2024. (*Id.* at p. 1.)

47.     The "**Named Insured**" on the Policy is Ashwood Partners. (*Id.*)

48.     Ashwood Gap and the investors in Ashwood Gap and Ashwood Partners are insureds under the Policy. (*Id.* at p. 1, 4-5.)

49.     The Policy's Insuring Agreement provides:

> **We** will indemnify you for **loss** in excess of any applicable **retention** resulting from any **proceeding** against **you** seeking to hold you liable for a **wrongful act**, provided the **loss** results from a **proceeding** first initiated against **you** and reported to **us** during the **policy period**.
>
> 1. On behalf of an **insured person**, **we** will pay **loss** that the **insured person** becomes legally obligated to pay and that is not indemnified by an **insured organization**.
> 2. On behalf of an **insured organization**, **we** will pay **loss** that the **insured organization** pays as indemnification to an **insured person** to the extent permitted or required by law or the applicable operating agreement.

(*Id.* at p. 4.)

10

50.     "**Loss**" means "damages, judgments and settlements incurred by an **insured** as a result of a **wrongful act** by such **insured** causing a reduction in tax savings to an **investor** by reason of an **adjustment**." (*Id.* at p. 5.)

51.     "**Insured**" means "each **insured person** and each **insured organization**." (*Id.* at p. 4.)

52.     "**Insured person**" means "a person or entity who, at any time during the **policy period**, is: 1. an **investor**; or 2. a **member** in a **company**." (*Id.*)

53.     "**Insured organization**" means "at any time during the **policy period**: 1. the **named insured**; 2. any **company**; and 3. any **controlled entity**." (*Id.* at p. 5.)

54.     "**Wrongful act**" means "any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty by an **insured** or third party retained by an **insured** for whose conduct the **insured** can be held legally liable concerning a report or filing with a **taxing authority** with respect to the purpose, value, partnership tax treatment, or any other aspect of the **named insured's** conservation easement or fee simple donation of real property." (*Id.* at p. 6.)

55.     "**Company**" means "any entities or partnerships as stated in Item 1 of Declarations page or identified as such by endorsement to this policy." (*Id.* at p. 4.)

56.     "**Investor**" means "an individual or entity that is a **member** of at least one **controlled entity** or **company** at any time during the **policy period**." (*Id.*)

57.     "**Member**" means "the individuals or entities identified as such for any **insured organization** by the articles of incorporation, bylaws, operating agreement, or partnership agreement of such **insured organization** at any time during the **policy period**." (*Id.* at p. 5.)

11

58.    "**Controlled entity**" means "any entity which: 1. the **named insured** controls or otherwise has the ability to direct the managerial decisions of such entity at any time during the performance of the business operations giving rise to the **proceeding**; and 2. is created for the purpose of owning and controlling a specific property from which a conservation easement donation or a fee simple donation of real property pursuant to 26 U.S.C. § 170 is made." (*Id.* at p. 4.)

59.    "**Proceeding**" means "an investigation, audit, administrative action, or judicial action against **you**, initiated or brought by any **taxing authority**, concerning the tax treatment of a conservation easement donation or a fee simple donation of real property pursuant to 26 U.S.C. § 170. A mere inquiry by a **taxing authority** is not a **proceeding**. An inquiry will become a **proceeding** only after **you** have received a "Notice of Beginning of Administrative Proceedings" or equivalent notice." (*Id.* at p. 5.)

60.    Through their agent Volante Specialty, the Insurers were provided due diligence related to the purchase of the Ashwood Gap interest, the donation of the conservation easement, and the valuation of that donation.

61.    At the time of binding, the Insurers were aware of the risks associated with transactions involving conservation easement donations, including IRS scrutiny of transactions identified as Syndicated Conservation Easement Transactions ("SCETs"), which were identified as listed transactions by the IRS in its Notice 2017-10, 2017-4 I.R.B. 544, which was issued on December 23, 2016.

62.    Ashwood Partners received an "endorsement" from Volante Specialty by email on May 6, 2022 (the "Endorsement"), which notified Plaintiffs of a reinsurance agreement between

12

Wesco and Interstate (the "Insurers") and Fidelis and Liberty Mutual (the "Reinsurers"). A copy of the Endorsement is attached as **Exhibit C**.

63.     The Endorsement is notable as Plaintiffs did not request a change in coverage to the Policy, sign the Endorsement, pay any additional premium, or receive a refund of any premium previously paid.

64.     Plaintiffs are not parties to the reinsurance agreements.

65.     The Endorsement did not change the relationship between Plaintiffs and the Insurers nor affect their respective obligations.

### IV.     The IRS Audit

66.     Ashwood Gap received notice that the IRS selected its 2020 tax return for examination on or about June 21, 2022.

67.     By letter dated August 10, 2023, the IRS issued a preliminary report to Ashwood Gap that detailed the reasons that the IRS intended to disallow or, in the alternative, significantly reduce Ashwood Gap's deduction for its conservation easement donation.

68.     Between October 1, 2023 and October 1, 2024, the United States Tax Court ("Tax Court") issued seven opinions resolving twelve cases that involved the valuation of conservation easements.

69.     In each of these seven opinions, the Tax Court (i) found in favor of the IRS on the valuation of the subject conservation easement, allowing the taxpayer to claim no more than 10.07% of the reported deduction, (ii) rejected the taxpayer's use of the DCF/income valuation methodology to value the subject easement, and (iii) imposed a 40% strict liability penalty on the taxpayer.

70.    By notice IR-2024-174 dated June 26, 2024, the IRS announced a time-limited settlement offer for certain taxpayers under examination who participated in SCETs ("Nondocketed Settlement Program").

71.    The IRS issued a letter to Ashwood Gap dated July 11, 2024 inviting it to resolve its tax dispute in full through the participation in the Nondocketed Settlement Program ("Election Letter"). The Election Letter is attached as **Exhibit D**.

72.    Under the terms of the Nondocketed Settlement Program, the IRS proposed to (i) disallow the $53,370,000 noncash charitable deduction for the conservation easement donation; (ii) instead, allow an "other deduction" of $10,300,100; (iii) set the applicable tax rate for establishing the liability to 21%, (iv) reduce the applicable tax penalty from 40% to 5%, and (v) require statutory interest to continue to accrue until the liability is paid in full ("IRS Settlement").

73.    The Plaintiffs provided the Insurers with notice of the proposal outlined in the IRS Settlement by email on July 31, 2024, and requested that the Insurers consent to the acceptance of the offer.

74.    The IRS Settlement guarantees Ashwood Gap a deduction of $10,300,100, or 19.30% of Ashwood Gap's reported deduction (a higher percentage of deduction than allowed in any of the recently decided Tax Court cases), and a reduced penalty rate of 5% (a lower penalty rate than the rate imposed in any of the recently decided Tax Court cases).

75.    Based on the terms of the IRS Settlement and the current status of case law regarding the valuation of conservation easements, including the recent Tax Court decisions adopting the IRS's valuation methodology for similarly situated conservation easement cases, the investors in Ashwood Partners voted to elect into the Nondocketed Settlement Program.

14

76.     Since October 1, 2024, the Tax Court has issued eight additional opinions resolving fourteen additional cases that involved the valuation of conservation easements.

77.     In each of these eight opinions, the Tax Court once again (i) found in favor of the IRS on the valuation of the subject conservation easement, allowing the taxpayer to claim no more than 13.36% of the reported deduction, (ii) rejected the taxpayer's use of the DCF/income valuation methodology to value the subject easement, and (iii) imposed a 40% strict liability penalty on the taxpayer.

## V.    *The Claim and Claim Communications*

78.     Plaintiffs notified the Insurers of the start of the IRS examination on July 27, 2022 by email and provided the Insurers with regular updates regarding the IRS examination throughout the examination process.

79.     At the end of the examination, Plaintiffs were provided with the IRS Settlement, which, as stated, offered to resolve the examination by fixing Ashwood Gap's allowable deduction at $10,300,100, applying a reduced 5% penalty, and otherwise establishing Plaintiffs' tax liability on terms significantly more favorable than those imposed in recent Tax Court decisions.

80.     Plaintiffs notified the Insurers of the IRS Settlement on July 31, 2024 and requested that the Insurers consent to the acceptance of the settlement offer.

81.     Plaintiffs detailed the reasons that the IRS Settlement is a reasonable settlement offer in a letter dated August 27, 2024 and reiterated their request that the Insurers consent to Ashwood Gap's acceptance of the IRS Settlement and agree to fund the amounts that would be due resulting from the IRS Settlement. A copy of the correspondence is attached as **Exhibit E**.

82.     Plaintiffs communicated the investors' vote to elect into the Nondocketed Settlement Program to the Insurers on September 19, 2024.

83.     Plaintiffs responded to requests for information from the counsel for Insurers regarding the IRS Settlement on August 30, 2024, September 5, 2024, and November 11, 2024. Copies of the correspondence are attached as **Exhibits F, G,** and **H**, respectively.

84.     By email dated February 10, 2025, the Insurers indicated to Ashwood Partners that the Insurers did not view election into the Nondocketed Settlement Program to be a settlement that required Insurers' consent under the Policy but nonetheless provided a limited conditional waiver of consent to allow Ashwood Gap to engage in non-binding settlement discussions with the IRS. A copy of the correspondence is attached as **Exhibit I**.

85.     Based on the Insurers' determination that the Nondocketed Settlement Production was not a settlement that required Insurers' consent under the Policy, Ashwood Gap elected into the Nondocketed Settlement Program.

86.     On March 20, 2025, Ashwood Gap received the Form 906 (Closing Agreement on Final Determination Covering Specific Matters) for the final resolution of the IRS Settlement ("Form 906").

87.     By letter dated April 4, 2025, Ashwood Partners provided the Insurers with a copy of the Form 906 and demanded that the Insurers provide their coverage position with respect to the IRS Settlement and further reiterated Ashwood Partners' prior request that the Insurers either consent to Ashwood Gap's acceptance of the IRS Settlement or waive the consent requirement with respect to the same. A copy of the correspondence is attached as **Exhibit J**.

88.     By letter dated April 24, 2025, counsel for the Insurers indicated that (i) the Insurers would not provide a position regarding the substantive coverage aspects of the IRS Settlement, and (ii) the Insurers would not accommodate Ashwood Partners' request for consent or an

agreement not to raise lack of consent as to the IRS Settlement. A copy of the correspondence is attached as **Exhibit K**.

89.     Counsel for Insurers further discussed the IRS Settlement with tax counsel for Ashwood Gap and other partnerships on July 22 and 23, 2025, who unanimously confirmed the reasonableness of the IRS Settlement in light of the state of the law in the Tax Court regarding the valuation of conservation easements.

90.     By letter dated August 8, 2025, Ashwood Partners demanded that, within 30 days, the Insurers (i) provide either consent to the IRS Settlement or agree to waive the consent requirement for the IRS Settlement, (ii) agree to fund the amounts that would be due under the Policy as a result of the IRS Settlement, (iii) provide their coverage position with respect to the IRS Settlement, and (iv) provide copies of any policy for this matter that purports to affect the rights of any insurer under the Policy ("Demand Letter"). A copy of the Demand Letter is attached as **Exhibit L**.

91.     The Insurers never responded to the Demand Letter.

92.     To date, Insurers have not been able to articulate a reasonable theory of success in this case or identify an expert who will opine on the reasonableness of Insurers' position.

93.     Since receiving the Election Letter, Plaintiffs have consistently communicated with the Insurers regarding relevant IRS deadlines related to the settlement offer. The current deadline for accepting the IRS Settlement and paying the liability owed is October 31, 2025.

94.     The amount due to accept the IRS Settlement exceeds the aggregate limits of the Policy.

17

95.     Plaintiffs have sufficient funds to pay the $309,000 retention under the Policy and the difference between the aggregate limits payable under the Policy and the liability due under the IRS Settlement.

96.     In light of the plain reasonableness of the IRS Settlement, the Insurers have violated their obligations under the Policy by baselessly refusing to provide the coverage Plaintiffs purchased. The Insurers knew of the risks associated with conservation easement donations when they issued the Policy and accepted over half a million dollars in premiums. Having assumed that risk, the Insurers must be held accountable to honor their bargain and indemnify Plaintiffs under the clear terms of the Policy.

## COUNT I – BREACH OF CONTRACT
(Against Wesco & Interstate)

97.     The Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 96 of this Complaint as if fully restated herein.

98.     The insuring provision of the Investor 170(h) Liability Policy obligates Wesco and Interstate to indemnify Plaintiffs' loss resulting from a proceeding, as defined in the policy, that was reported to the Insurers during the policy period, so long as the loss is determined by either a final, non-appealable order or "the settlement of a proceeding with [the Insurers] prior written consent."

99.     Under the Policy, the Insurers promised as follows with respect to their consideration of any settlement offer:

> You agree not to undertake settlement negotiations or enter into any settlement agreements that would result in a loss without our prior written consent, ***which we agree not to withhold unreasonably***.

(Policy at p. 9) (emphasis added).

18

100.    The IRS Settlement is clearly reasonable as a potential resolution and should have been consented to by the Insurers. That reasonableness is blatantly obvious because the IRS Settlement provides Ashwood Gap with a larger percentage of its previously reported deduction than the Tax Court has allowed in any case since October 2023.

101.    Additionally, the IRS Settlement (i) reduces the applicable penalty percentage from the 40% strict liability penalty that the Tax Court has applied in every decided case since October 2023 to 5%, (ii) caps the effective tax rate for any tax liability to 21%, and (iii) allows Ashwood Gap to avoid the cost to litigate this matter and the continued accrual of interest on any potential liability.

102.    Tax Counsel for Ashwood Gap has advised the Insurers that the IRS Settlement is reasonable. Tax counsel for other similarly situated taxpayers have likewise advised the Insurers of the reasonableness of the IRS Settlement. To date, the Insurers and their counsel have not identified any authority suggesting that the IRS Settlement is somehow unreasonable.

103.    In the fifteen opinions that the Tax Court has issued since October 2023, the Tax Court has rejected each argument that the Insurers have raised as a basis for withholding their consent to settle this case, as well as other similar arguments.  Of those cases, the best outcome that any taxpayer received was *Seabrook Property, LLC v. Commissioner*, T.C. Memo. 2025-6, where the taxpayer was allowed a deduction of 13.36% of its reported deduction, was assessed a 40% strict liability penalty, and was subjected to a 39.6% maximum tax rate. By contrast, the IRS Settlement offered to Ashwood Gap secures a larger deduction of 19.30% of Ashwood Gap's reported deduction, imposes only a 5% penalty, and caps the applicable tax rate to 21%. This outcome is materially more favorable than even the most taxpayer-friendly Tax Court decision

19

issued in nearly 2 years, further confirming the reasonableness of the IRS Settlement, as illustrated in the chart below.

| Case Name | Percentage of Deduction Allowed | Penalty Percentage Applied | Maximum Potential Tax Rate |
|---|---|---|---|
| IRS Settlement Offer for Ashwood Gap | 19.30% | 5% | 21% |
| *Seabrook Property, LLC v. Commissioner*, T.C. Memo. 2025-6 | 13.36% | 40% | 39.6% |

104.    The Insurers have failed to provide any rational basis, let alone the required reasonable basis, for withholding their consent to allow Ashwood Gap to settle this case.

105.    Ashwood Gap's deadline for accepting the IRS Settlement is October 31, 2025.

106.    The Insurers have the duty to perform their obligations under the Policy with good faith and fair dealing and have express obligation to consent to a reasonable settlement agreement between Ashwood Gap and the IRS.

107.    The Insurers breached this duty to the Plaintiffs by withholding consent Ashwood Gap's acceptance of the IRS Settlement when such a withholding of consent is unreasonable considering the circumstances, particularly since the Insurers' actions appear calculated in hope of causing Ashwood Gap to lose the opportunity to accept the IRS Settlement.

108.    Plaintiffs suffered damages as a direct and proximate result of Insurers' breach, including but not limited to incurring additional defense costs and fees related to it negotiations with the IRS and the failure to receive the benefit of its bargain, including the insurance policy limits that were purchased by payment of the policy premiums.

## COUNT II – DECLARATORY JUDGMENT
(Against Wesco & Interstate)

109.    The Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 108 of this Complaint as if fully restated herein.

110.    This Court is authorized to grant declaratory judgment relief under the Georgia Declaratory Judgment Act, O.C.G.A. § 9-4-2 *et seq.*

111.    In Georgia, insurance contracts are liberally construed in favor of coverage, and conditions and provisions of insurance contracts are strictly construed against the insurer.

112.    Under the Policy, the Insurers promised as follows:

> We will indemnify you for loss in excess of any applicable retention resulting from any proceeding against you seeking to hold you liable for a wrongful act, provided the loss results from a proceeding first initiated against you and reported to us during the policy period.

(Policy at p. 4.)

113.    Ashwood Gap's acceptance of the IRS Settlement would trigger a covered "Loss" under the Policy, as the definition of "Loss" includes "damages, judgments and settlements incurred by an insured as a result of a wrongful act by such insured causing a reduction in tax savings to an investor by reason of an adjustment." (*Id.* at p. 5.)

114.    A "wrongful act" is

> any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty by an insured or third party retained by an insured for whose conduct the insured can be held legally liable concerning a report or filing with a taxing authority with respect to the purpose, value, partnership tax treatment, or any other aspect of the . . . conservation easement.

(*Id.* at p. 6.)

115.    An "adjustment" is:

> a reduction in the allowable tax deduction ordered by a taxing authority claimed by an insured that causes the actual tax deduction allowed by such taxing authority multiplied by 41% to be less than the sum of (a) such insured's original contribution to a company or the controlled entity that granted the conservation easement or fee simple donation of real property pursuant to 26 U.S.C. § 170 upon which such tax deduction was based, and (b) penalties and interest where insurable by law imposed by any taxing authority due to such a covered reduction in tax savings.

(*Id.* at p. 4.)

21

116. The losses are due to alleged errors related to the valuation of the donated conservation easement and in the reporting of the Ashwood Gap deduction.

117. Acceptance of the IRS Settlement would result in a reduction in the investors' tax savings from the conservation easement donation by reason of an "adjustment." The allowed deduction under the IRS Settlement of $10,300,100, multiplied by 41%, is $4,233,041. This is less than $13,531,171, which represents the investors' original capital contribution, plus any penalties and interest resulting from the settlement.

118. Despite the Policy's clear language, the Insurers have expressly not acknowledged that liabilities resulting from an adjustment to Ashwood Gap's reported deduction for the conservation easement, including the liability that would result from Ashwood Gap's acceptance of the IRS Settlement, would trigger a covered "Loss" under Policy. In fact, it is the Plaintiffs' understanding that at least one of the Defendants actively contest whether the acceptance of the IRS Settlement would trigger a covered loss.

119. If such liabilities do not result in a covered Loss, the Policy could not bind the Insurers to any risk at all, transforming the parties' agreement into an improper, illusory insurance policy.

120. By reason of the foregoing, an actual, justiciable, and substantial controversy exists between Plaintiffs and Insurers, and a declaratory judgment order pursuant to O.C.G.A. § 9-4-5 is warranted to declare liabilities resulting from an adjustment to Ashwood Gap's reported deduction for the conservation easement, including liability that would result from Ashwood Gap's acceptance of the IRS Settlement, constitutes a covered "Loss" under the Policy.

## COUNT III – COMMON LAW BAD FAITH

121.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 120 of this Complaint as if fully restated herein.

122.    At all relevant times, a valid contract of insurance existed between Plaintiffs and Insurers, as set forth in the Policy.

123.    At all relevant times, the Insurers owed Plaintiffs a duty to act reasonably and prudently when presented with an opportunity to settle, and to give Plaintiffs' interests the same faithful consideration they give their own interests.

124.    Plaintiffs complied with all conditions precedent under the Policy and provided timely notice of their claim, including notice of the IRS Settlement, the investor vote to elect into the Nondocketed Settlement Program, and Closing Agreement to accept the IRS Settlement. Plaintiffs also responded in good faith to all requests for information from Insurers and their representatives, including providing relevant documentation and making tax counsel available to facilitate Insurers' evaluation of the claim.

125.    The IRS Settlement constitutes a reasonable opportunity to resolve Plaintiffs' liability within the Policy's aggregate limits, as Plaintiffs have sufficient funds to satisfy the $309,000 retention under the Policy and to cover any liability above the Policy's aggregate limits.

126.    The IRS Settlement further substantially mitigates Plaintiffs' exposure to losses and was objectively reasonable based on then-available legal authority and factual developments.

127.    Plaintiffs repeatedly requested that the Insurers consent to the IRS Settlement or, alternatively, waive the consent requirement under the Policy so that Plaintiffs can protect themselves from further loss.

128.    Despite full knowledge of the relevant facts, and despite repeated requests by Plaintiffs, the Insurers have unreasonably refused to consent to the IRS Settlement (or, alternatively, waive the consent requirement), have deliberately withheld providing a formal coverage position, and have failed and refused to provide the contractual indemnity afforded by the Policy for the IRS Settlement.

129.    The Insurers' refusal to act reasonably and as an ordinarily prudent insurer would under the circumstances—including their refusal to consent, refusal to provide a coverage position, and refusal to pay the covered loss—is a breach of their obligations of good faith and fair dealing under Georgia law.

130.    As a direct and proximate result of the Insurers' breaches, Plaintiffs have suffered damages.

## COUNT IV – NEGLIGENT MISREPRESENTATION
### (In the alternative)

131.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 130 of this Complaint as if fully restated herein.

132.    Volante Specialty served as the managing agent for the Insurers.

133.    Prior to the procurement of the Policy, Plaintiffs engaged in extensive conversations with Volante Specialty and its representatives as to the needs of the Plaintiffs and the intended purpose of the Policy was specifically a policy that would provide insurance coverage for tax deductions claimed under 26 U.S.C. § 170(h) for its donation of the conservation easement for the Property in 2020.

134.    Volante Specialty procured the quote for the Policy, presented the quote to the Plaintiffs, and expressly represented that the quote would be for a policy that would provide the requested coverage.

24

135.    Based on the representations of Volante Specialty, Plaintiffs agreed to purchase the Policy.

136.    Plaintiffs' reliance on the representations of Volante Specialty and its agent were reasonable as Volante Specialty served as the managing agent for the Insurers (and David Hamilton would be identified as the "Authorised Representative" on the declarations page of the Policy).

137.    Volante Specialty knew or should have known that the Insurers would deny this type of claim, or alternatively, that the requested coverage was not available under the Policy. Plaintiffs would not have purchased the Policy if no coverage existed for tax deductions claimed due to the donation of a conservation easement under 26 U.S.C. § 170(h). Rather, Plaintiffs would have sought an alternative insurance policy to insure the specific risks related to coverage for tax deductions claimed under 26 U.S.C. § 170(h) for its donation of the conservation easement for the Property.

138.    As a direct and proximate result of Volante Specialty's negligent misrepresentation, Plaintiffs suffered damages including and not limited to all potential benefits under the insurance policy plus any additional costs incurred by the Plaintiffs based on the Insurers' delay and failure to pay.

## COUNT V – NEGLIGENT PROCUREMENT
(In the alternative)

139.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 138 of this Complaint as if fully restated herein.

140.    Prior to the procurement of the Policy, Plaintiffs engaged in extensive conversations with Volante Specialty and its representatives regarding the needs of the Plaintiffs and the intended purpose of the Policy: to provide insurance coverage for tax deductions claimed under 26 U.S.C. § 170(h) for its donation of the conservation easement in 2020.

141.    Volante Specialty, in its capacity as an agent for Volante International Limited and Volante Global Limited, held itself out as an expert in the field of insurance and with respect to the specific coverage that Plaintiffs requested with respect to their 2020 conservation easement donation.

142.    Volante Specialty procured the quote for the Policy, presented the quote to the Plaintiffs, expressly represented that the quote would be for a policy that would provide the requested coverage, and procured the Policy for Plaintiffs.

143.    If the Court finds that the Policy does not provide the requested coverage, then Volante Specialty is liable for negligent procurement of the Policy.

144.    Plaintiffs were damaged by Volante Specialty's negligent procurement in the amount of the policy limits, plus its attorneys' fees.

## COUNT VI – DECLARATORY JUDGMENT
### (Regarding the Endorsement)

145.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 144 of this Complaint as if fully restated herein.

146.    This Court is authorized to grant declaratory judgment relief under the Georgia Declaratory Judgment Act, O.C.G.A. § 9-4-2 et seq.

147.    A purported "endorsement" memorializes a reinsurance agreement between Wesco and Interstate (the "Insurers") and Fidelis and Liberty Mutual (the "Reinsurers").

148.    The Endorsement was issued by Volante International on behalf of Liberty Mutual and by Volante Specialty on behalf of Fidelis.

149.    The Endorsement was not entered at the time of the purchase of the Policy, but rather more than a year after the Policy was issued.

26

150.    Plaintiffs neither paid for nor received any compensation for the purported endorsement.

151.    The Insurers and the Reinsurers have taken the position that the purported endorsement modifies the rights and benefits of Plaintiffs under the Policy.

152.    Plaintiffs disagree that a reinsurance agreement between insurance companies entered into more than a year after the Policy's issuance could unilaterally modify Plaintiffs' rights and benefits under the Policy.

153.    By reason of the foregoing, an actual, justiciable, and substantial controversy exists between Plaintiffs on the one side and the Insurers and the Reinsurers on the other, and a declaratory judgment order pursuant to O.C.G.A. § 9-4-5 is warranted and necessary to determine whether the purported endorsement modifies Plaintiffs' rights and benefits under the Policy.

## COUNT VII – ATTORNEYS' FEES AND EXPENSES OF LITIGATION

154.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 153 of this Complaint as if fully restated herein.

155.    As demonstrated above, the Defendants have acted in bad faith and have caused Plaintiffs unnecessary trouble and expense, requiring the institution of this litigation.

156.    Pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recover their costs and expenses of litigation, including reasonable attorney's fees.

157.    Therefore, Plaintiffs request that this Court award attorney's fees, court costs, and any other expenses as permitted under Georgia law.

## DEMAND FOR JURY TRIAL

The Plaintiffs hereby demand a jury trial on all issues so triable.

27

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs pray for relief as follows:

a.  The Plaintiffs request that this Court enter judgment in their favor and against the Defendants.

b.  The Plaintiffs request a declaration that the Plaintiffs' acceptance of the IRS Settlement would constitute a "Loss" under the Policy.

c.  The Plaintiffs request that this Court hold that the Insurers have breached their contractual obligations to the Plaintiffs by unreasonably withholding their consent to allow Ashwood Gap to accept the IRS Settlement, unreasonably refusing to agree to not raise lack of consent as a basis for denying any claim under the Policy, failing to indemnify them and award the Plaintiffs all legally recoverable damages proximately caused by the Insurers' breach and bad faith conduct, to include compensatory and punitive damages, costs of the action, attorneys' fees, and pre- and post-judgment interest;

d.  The Plaintiffs request that this Court hold that the Insurers have acted in bad faith and award all damages caused by the Insurers' bad faith conduct, including losses in excess of policy limits, interest accrual, reasonable attorneys' fees, and other damages proximately resulting from the Insurers' refusal to act reasonably in connection with the IRS Settlement.

e.  The Plaintiffs request, alternatively, that this Court hold that Volante Specialty negligently misrepresented the coverage of the insurance policy to the detriment of the Plaintiffs, and award Plaintiffs all legally recoverable resulting damages, to include

28

compensatory damages, costs of the action, attorneys' fees, and pre- and post-judgment interest.

f.   The Plaintiffs request, alternatively, that this Court hold that Volante Specialty negligently procured the insurance policy, and award Plaintiffs all legally recoverable resulting damages, to include the entire value of the claim, other compensatory damages, costs of the action, attorneys' fees, and pre- and post-judgment interest.

g.   The Plaintiffs further request a declaration that the Endorsement does not modify the rights of the Plaintiffs under the Policy but is merely a separate reinsurance agreement between the Insurers and the Reinsurers.

h.   The Plaintiffs further request an award of their costs and expenses of litigation, including reasonable attorney's fees, pursuant to O.C.G.A. § 13-6-11.

i.   The Plaintiffs request such other and further relief as the Court deems proper.

Respectfully submitted this 19th day of September 2025.

/s/ D. Austin Bersinger
D. Austin Bersinger
Georgia Bar No. 144792
Bradley Arant Boult Cummings LLP
Promenade Tower
1230 Peachtree Street NE, Suite 2100
Atlanta, Georgia 30309
Tel. 404.868.2042
ABersinger@bradley.com

*Counsel for Plaintiffs*

# Exhibit A

# VOLANTE
### SPECIALTY RISK

**INVESTOR 170(h) LIABILITY QUOTE**

Please find below Investor 170(h) Liability Quote for Ashwood Gap Partners, LLC. This is a summary of the terms and conditions:

NAMED INSURED:                  Ashwood Gap Partners, LLC

MAILING ADDRESS:                2015 3rd Ave N, Birmingham, AL 35203

CARRIER:                        As per VSR / VIL authority

PROPOSED POLICY PERIOD:         12/31/2020 – 10/15/2021
                                12:01 A.M. Standard Time at the Mailing Address shown above
                                Policy periods are based on Insureds Federal Tax Return being
                                filed on an extension basis

EXTENDED REPORTING PERIOD:      10/15/2024

PRIOR ACTS DATE:                1/1/2020

POLICY LIMIT:                   $10,300,000

POLICY RETENTION:               $309,000

POLICY PREMIUM:                 $721,000 (Plus applicable taxes)

MINIMUM EARNED PREMIUM:         100%



**SURPLUS LINES DISCLOSURE**

---

Alabama

"This contract is registered and delivered as a surplus line coverage under the Surplus Line Insurance Law, O.C.G.A. Chapter 33-5." [33-5-26]

## POLICY PREMIUM AND SURPLUS LINES TAXES SUMMARY

SURPLUS LINES TAX CALCULATION:

| Description | State | Taxable Premium | Stamping Fee | Rate | Tax |
|---|---|---|---|---|---|
| Surplus Lines Tax | Alabama | $721,000 | n/a | 6% | $43,260 |

Total Surplus Lines Taxes & Fees: $43,260

IMPORTANT NOTICE: THE NONADMITTED & REINSURANCE REFORM ACT (NRRA) WENT INTO EFFECT ON JULY 21, 2011. ACCORDINGLY, SURPLUS LINES TAX RATES AND REGULATIONS ARE SUBJECT TO CHANGE WHICH COULD RESULT IN AN INCREASE OR DECREASE OF THE TOTAL SURPLUS TAXES AND FEES OWED ON THIS PLACEMENT. IF A CHANGE IS REQUIRED, WE WILL PROMPTLY NOTIFY YOU. ANY ADDITIONAL TAXES OWED MUST BE PROMPTLY REMITTED TO VOLANTE.

# VOLANTE
## SPECIALTY RISK

# Request to Bind Coverage

**Ashwood Gap Partners, LLC**

We have reviewed the proposal and agree to the terms and conditions of the coverages presented. We are requesting coverage to be bound as outlined by coverage line below:

Coverage:
Investor 170(h) Liability Policy  ☑

This Authorization to Bind Coverage also acknowledges receipt and review of all disclaimers and disclosures, including exposures used to develop insurance terms, contained within this proposal

**Signature of Authorized Insurance Representative Date**

COO
**Title**

Chris Devine
**Print Name**

12/22/2020
**Date**

This proposal does not constitute a binder of insurance. Binding is subject to final carrier approval. The actual terms and conditions of the policy will prevail.

Alabama License #3000731652



**GREEN ROCK**

To Underwriter:

Re: Warranty Statement for Tax Liability Coverage – Ashwood Gap Partners, LLC

After inquiry, the Chief Executive, President and General Counsel has not had any claims or knowledge or information of any act, error or omission which might reasonably be expected to give rise to a claim. It is understood and agreed that if such knowledge or information exists any claim or action arising there from is excluded from this proposed coverage.

This warranty statement and all other information which is provided are incorporated into and form the basis of any contract of insurance.

I HEREBY DECLARE that the above statements and particulars are true and I have not suppressed or misstated any material fact and that I agree that this warranty statement shall be the basis of the contract with you, the Underwriters.

Signature: _____

Date: 12/22/2020 _____ (mm/dd/yy)

The signature must be of a person authorized to execute on behalf of the applicant. A copy of this should be retained for your records.

| 2015 3ʳᵈ AVE N BIRMINGHAM, AL 35203 | 205-580-1180 |
|---|---|



1595 Peachtree Parkway
Ste 204-376
Cumming, GA 30041

Email: annie@vsrlondon.com

| | | | | |
|---|---|---|---|---|
| Sponsor: | **Green Rock** | Invoice #: | **26457** |
| RE: | **Ashwood Gap Partners, LLC** | Invoice Date: | **12/22/2020** |
| Address: | **2015 3rd Ave N** | Contact: | **Chris Devine** |
| | **Birmingham, AL 35203** | | |

| Effective Date | Policy Type | Description | Total |
|---|---|---|---|
| 12/31/2020 | 170(h) Investor Liability | Premium | $721,000.00 |
| 12/31/2020 | 170(h) Investor Liability | Surplus Lines Taxes and Fees | $43,260.00 |
| | | **Total** | **$764,260.00** |

Wiring
Instructions:

(Include Invoice #)
Volante Specialty Risk, LLC
JP Morgan Chase Bank, N.A.
Account # ████████
Routing # ████████

# Exhibit B

Investor 170(h) Liability Insurance 

# Declarations

|  | **Policy Number:** | **VFP/FL/13849/2020/1** |
|---|---|---|
|  | **THIS POLICY IS ISSUED BY:** | Wesco Insurance Company (admitted)<br>Interstate Fire & Casualty Co (non-admitted) |
| **Item 1:** | **Named Insured:** | Ashwood Gap Partners, LLC |
|  | **Address:** | 2015 3rd Ave N, Birmingham, AL 35203 |
| **Item 2:** | **Policy Period:** | From: 12/31/2020 |
|  |  | To:    10/15/2021 |
|  |  | Both days at 12.01 a.m. Local Standard Time at the Insured's Principal Address |
| **Item 3:** | **Extended Reporting Period:** | From: 10/15/2021 |
|  |  | To:    10/15/2024 |
|  |  | Both days at 12.01 a.m. Local Standard Time at the Insured's Principal Address |

At the expiration of the **Policy Period** you will have an automatic **Extended Reporting Period** in which to give us written notice of loss arising from **Proceedings** that:

 - are first made against you and reported to us during the **Extended Reporting Period;** and

 - arise from your **Wrongful Acts** performed on or after the **Prior Acts/notice/knowledge** date as specified in Item 8 of the Declarations, but prior to the expiration of the **Extended Reporting Period.**

The premium in respect of the **Extended Reporting Period** is included in the original policy premium as specified in Item 6 of the Declarations and is fully earned at the inception of the **Policy Period**.

The Limit of Liability applicable during the **Extended Reporting Period** will be the remaining available **Limit of Liability**. There will be no separate or additional **Limit of Liability** available for the **Extended Reporting Period**.

| **Item 4** | **Limit of Liability:** | USD 10,300,000 | Policy Aggregate Limit of Liability |
|---|---|---|---|
|  | **Per Entity Limit of Liability:** | Not Applicable |  |

| Item 5: | **Retention:** | USD 309,000 | Any one claim |
| Item 6: | **Premium:** | USD 721,000 | for the period |
| Item 7: | **Continuity Date:** | 1/1/2020 | |
| Item 8: | **Prior Acts/notice/knowledge:** | 1/1/2020 | |
| Item 9: | **Notice of Loss:** | To Underwriters via: claims@volanteglobal.com | |
| Item 10: | **Endorsements:** | Not applicable | |

---

**THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY**

---

**Investor 170(h) Liability Insurance** VOLANTE GLOBAL

_Neil Hamilton_

02/23/2021

David Hamilton

**Signed**

**Date**

**Authorised Representative**

# Investor 170(h) Liability Form

| I. | **Insuring agreements** | **We** will indemnify you for **loss** in excess of any applicable **retention** resulting from any **proceeding** against **you** seeking to hold you liable for a **wrongful act**, provided the **loss** results from a **proceeding** first initiated against **you** and reported to **us** during the **policy period**. |
|---|---|---|

|  |  | 1. | On behalf of an **insured person**, **we** will pay **loss** that the **insured person** becomes legally obligated to pay and that is not indemnified by an **insured organization**. |
|---|---|---|---|
|  |  | 2. | On behalf of an **insured organization**, **we** will pay **loss** that the **insured organization** pays as indemnification to an **insured person** to the extent permitted or required by law or the applicable operating agreement. |

However, **we** will not pay any **loss** unless such **loss** is determined by the:

a.    final, non-appealable adjudication of a **proceeding**; or

b.    the settlement of a **proceeding** with **our** prior written consent.

| II. | **Definitions** | |
|---|---|---|
| A. | **Adjustment** | means a reduction in the allowable tax deduction ordered by a **taxing authority** claimed by an **insured** that causes the actual tax deduction allowed by such **taxing authority** multiplied by 41% to be less than the sum of (a) such **insured's** original contribution to a **company** or the **controlled entity** that granted the conservation easement or fee simple donation of real property pursuant to 26 U.S.C. § 170 upon which such tax deduction was based, and (b) penalties and interest where insurable by law imposed by any **taxing authority** due to such a covered reduction in tax savings. |
| B. | **Company** | any entities or partnerships as stated in Item 1 of Declarations page or identified as such by endorsement to this policy. |
| C. | **Claim** | Means **Proceeding** |
| D. | **Controlled entity** | means any entity which: |

|  |  | 1. | the **named insured** controls or otherwise has the ability to direct the managerial decisions of such entity at any time during the performance of the business operations giving rise to the **proceeding**; and |
|---|---|---|---|
|  |  | 2. | is created for the purpose of owning and controlling a specific property from which a conservation easement donation or a fee simple donation of real property pursuant to 26 U.S.C. § 170 is made. |

| E. | **Continuity date** | means the date stated as such in Item 7 of the Declarations |
|---|---|---|
| F. | **Extended Reporting Period** | means the dates stated as such in Item 3 of the Declarations |
| G. | **Insured** | means each **insured person** and each **insured organization**. |
| H. | **Insured person** | means a person or entity who, at any time during the **policy period**, is: |

|  |  | 1. | an **investor**; or |
|---|---|---|---|
|  |  | 2. | a **member** in a **company**. |

| I. | **Investor** | means an individual or entity that is a **member** of at least one **controlled entity** or **company** at any time during the **policy period**. |
|---|---|---|

# Investor 170(h) Liability Form

| J. | **Insured organization** | means, at any time during the **policy period**: |
|---|---|---|

        1.    the **named insured**;

        2.    any **company**; and

        3.    any **controlled entity**.

| K. | **Limit of Liability** | means the amount stated in Item 4 of the Declarations |
|---|---|---|
| L. | **Loss** | means damages, judgments and settlements incurred by an **insured** as a result of a **wrongful act** by such **insured** causing a reduction in tax savings to an **investor** by reason of an **adjustment**. |

**Loss** does not include:

1. amounts for which **you** are not liable;

2. the cost of complying with injunctive relief or any other form of non-monetary relief, compensation, severance, salary, wages, fees, benefits, or overhead of any **insured**;

3. unjust enrichment or the return, restitution, or disgorgement of any fees, costs, expenses, or profit to which **you** are not legally entitled,

4. any reduction in disbursements from tax deductions, dividends, profits, or similar payments due to an **insured person** from an **insured organization**;

5. any amounts paid to an insured person or insured organization in excess of the original capital contribution of that insured person or organization;

6. Amounts associated with defending any proceeding.

7. Fines and Penalties associated with economic gain. As defined in **Penalties & interest**

| M. | **Member** | means the individuals or entities identified as such for any **insured organization** by the articles of incorporation, bylaws, operating agreement, or partnership agreement of such **insured organization** at any time during the **policy period**. |
|---|---|---|
| N. | **Named insured** | means the entity identified in Item 1 of the Declarations. |
| O. | **Penalties & interest** | any penalties and interest, where insurable by law, levied upon an Insured by any authorized taxing authority and as determined by final non-appealable adjudication, for the understated amount of taxes which would have originally been owed on the investment amount prior to their investment. |
| P. | **Policy period** | means the period of time identified in Item 2 of the Declarations and any Extended Reporting Period identified in Item 3 of the Declarations. |
| Q. | **Pollutants** | means any solid, liquid, gaseous, biological, radiological, or thermal irritant or contaminant, including smoke, vapor, asbestos, silica, dust, nanoparticles, fibers, soot, fumes, acids, alkalis, chemicals, germs, and waste. Waste includes, but is not limited to, materials to be recycled, reconditioned, or reclaimed. |
| R. | **Prior Acts/notice/ knowledge** | Means the date shown in Item 8 of the Declarations. |
| S. | **Proceeding** | means an investigation, audit, administrative action, or judicial action against **you**, initiated or brought by any **taxing authority**, concerning the tax treatment of a conservation easement donation or a fee simple donation of real property pursuant to 26 U.S.C. § 170. A mere inquiry by a **taxing authority** is not a **proceeding**. An inquiry will become a **proceeding** only after **you** have received a "Notice of Beginning of Administrative Proceedings" or equivalent notice. |

# Investor 170(h) Liability Form

| | | |
|---|---|---|
| T. | **Related wrongful acts** | means **wrongful acts** that have as a common nexus of any fact, circumstance, event, situation, transaction, cause, or origin, or series of facts, circumstances, events, situations, transactions, causes, or origins. |
| U. | **Retention** | means the amount stated as such in Item 5 of the Declarations with respect to each Coverage Part **you** have purchased. |
| V. | **Taxing authority** | means the Internal Revenue Service (IRS), any State Department of Revenue (DOR), or any municipality or other local government agency. |
| W. | **We**, **us**, or **our** | means the Underwriters identified in the Declarations as issuing this policy. |
| X. | **Wrongful act** | means any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty by an **insured** or third party retained by an **insured** for whose conduct the **insured** can be held legally liable concerning a report or filing with a **taxing authority** with respect to the purpose, value, partnership tax treatment, or any other aspect of the **named insured's** conservation easement or fee simple donation of real property. |
| Y. | **You** or **your** | means each **insured**. |

## III.  Exclusions

**We** will have no obligation to pay any sums under this policy for **loss** incurred in connection with any **proceeding**:

| | | |
|---|---|---|
| A. | Antitrust/deceptive trade practices | based upon or arising out of any actual or alleged: |

    1.   false, deceptive, or unfair trade practices;

    2.   unfair competition, impairment of competition, restraint of trade, or antitrust violations; or

    3.   violation of the Sherman Anti-Trust Act, the Clayton Act, the Robinson-Patman Act, all including as may be amended, or any similar federal, state, or local statutes, rules, or regulations in or outside the U.S.; or

    4.   deceptive or misleading advertising.

| | | |
|---|---|---|
| B. | Bodily injury/property damage/personal injury | for any actual or alleged: |

    1.   bodily injury, sickness, disease, death, emotional distress, or mental anguish of any person;

    2.   physical damage to, destruction of, or loss of use of any tangible property; or

    3.   invasion of privacy, abuse of process, malicious prosecution, libel, slander, defamation, trespass, nuisance, wrongful entry or eviction, false arrest or imprisonment, assault, battery, or loss of consortium.

| | | |
|---|---|---|
| C. | Breach of contract | based upon or arising out of any actual or alleged breach of any contract or agreement, or any liability of others **you** assume under any contract or agreement; however, this exclusion will not apply to: |

    1.   liability **you** would have in the absence of the contract or agreement; or

    2.   any actual or alleged breach of the articles of incorporation, by-laws, operating agreement, partnership agreement, or other agreement on which the formation and/or management of an **insured organization** is based.

# Investor 170(h) Liability Form

D.  Controlled entity outside control of named insured

1.  based upon or arising out of **wrongful acts** committed by a past or present **controlled entity** while the **named insured** does not have majority ownership or management control of it; or

2.  made against a **controlled entity** or anyone acting on its behalf while the **named insured** does not ultimately have majority ownership or management control of it.

E.  Fraudulent/intentional acts

based upon or arising out of any actual or alleged fraudulent, intentional, malicious, or knowingly wrongful acts or omissions, if a final, non-appealable adjudication establishes that such act or omission was committed.

This exclusion will apply:

1.  to an **insured organization** only if the conduct was committed or known by the **manager**, General Partner, Chief Executive Officer, Chief Financial Officer, or General Counsel of the **insured organization**; and

2.  separately to each **insured person** and will not apply to any **insured person** who did not commit or have knowledge of such conduct committed by another **insured person**.

F.  Change in Law or Legislation

Any legislative changes in law or amended procedures and or guidance from any taxing authority that impacts the current, future or retroactive tax treatment of an insured person or insured organization

G.  Pollution

for any actual, alleged, or threatened existence, growth, release, discharge, dispersal, or escape of **pollutants**, including any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize **pollutants**,

H.  Prior acts/notice/ knowledge

based upon or arising out of any **wrongful act** that:

1.  was the subject of any notice given under any other policy of which this policy is a renewal or replacement;

2.  was the subject of, or is related to, any prior or pending litigation, **proceeding,** written demand, administrative or regulatory proceeding or investigation, or licensing proceeding that was filed or commenced against **you** and of which **you** had notice prior to the **policy period;** or

3.  you had knowledge of before the **Prior Acts/notice/knowledge date** as specified in Item 8 of the Declarations, and there was a reasonable basis to believe that the act, error, or omission could result in a **proceeding**.

This exclusion also applies to any **loss** arising out of the same **wrongful acts** or **related wrongful acts** related to the matters in 1, 2, or 3 above.

## Investor 170(h) Liability Form

| | | |
|---|---|---|
| **IV.** | **Order of payments** | In the event **loss** resulting from any **proceeding** covered by this policy exceeds the remaining available **Limit of Liability**, **we** will: |

    A.    first pay **loss** covered under Insuring agreement 1. If the **loss** owed under this policy to the **investors** in any one **insured organization** exceeds the remaining **Limit of Liability** applicable to that **insured organization**, **we** will pay **loss** to each **investor** on a pro rata basis according to its equity participation in the **insured organization**.

    B.    then pay **loss** covered under Insuring agreement 2. If the **loss** owed under this policy to multiple **insured organizations** exceeds the remaining **Limit of Liability**, **we** will pay **loss** to each **insured organization** on a pro rata basis in proportion to the ratio of the **Limit of Liability** applicable to each **insured organization.**

**Your** bankruptcy or insolvency will not relieve **us** of any of **our** obligations to prioritize payments under this section of the policy.

| | | |
|---|---|---|
| **V.** | **Limits of liability** | The maximum **we** will pay for covered **loss** resulting from all **proceedings** first initiated against **you** during the **policy period** or **extended reporting period**, will be as follows: |
| A. | Aggregate limit | The Policy Aggregate **Limit of Liability** stated in Item 4 of the Declarations is the maximum amount **we** will pay for all covered **loss** under this policy. **Our** obligations under the policy will cease once the Policy Aggregate **Limit of Liability** is exhausted. |
| B. | Per-entity limit | Coverage for each **company** and each **controlled entity** will be subject to the Per-Entity **Limit of Liability** stated in Item 4 of the Declarations, which the maximum amount **we** will pay for all covered **loss** incurred by that **company** or **controlled entity** and the **members** of such **company** or **controlled entity** in their capacities as such. The Per-Entity **Limit of Liability** will be in excess of any applicable **retention** and will be a part of the Policy Aggregate **Limit of Liability**. Only one Per-Entity **Limit of Liability** will apply to an entity and its **members** even if such entity constitutes both a **company** and a **controlled entity.** |
| C. | Retention | **Our** obligation to pay **loss** under this policy is in excess of any applicable **retention**, as stated in Item 5 of the Declarations, which **you** must pay before **we** will make any payment. Each **insured organization** is responsible for any amount within the **retention** applicable to any **loss** or **proceeding** that affects such **insured organization**. Payments **you** make to avoid or mitigate **loss** under this policy will be credited towards the **retention**, if such payments are made from an escrow account maintained for the benefit of an **investor** or an **insured organization**. Notwithstanding the above, if an **insured organization** affected by any covered **loss** or **proceeding** is unable to pay any applicable **retention** because it is insolvent, an **investor** in such **insured organization** may pay its proportionate share, based on its membership interest in such **insured organization**, of the **retention**. The maximum **we** will pay to any such **investor** is that **investor's** proportionate share, based on its membership interest in such **insured organization**, of the applicable **Limit of Liability.** |
| D. | Related proceedings/wrongful acts | All **proceedings** based upon or arising out of the same **wrongful act** or **related wrongful acts** will be treated as a single **proceeding**, and will be deemed to have been made against **you** on the date the first such **proceeding** was initiated. If, by operation of this provision, the **proceeding** is deemed to have been brought during any period when **we** insured **you**, it will be subject to only one **retention** and one applicable **Limit of Liability**, regardless of the number of claimants, **insureds**, or **proceedings** involved. |

# Investor 170(h) Liability Form

---

**VI.**    **Notice**

**We** must receive written notice of any **proceeding** or **loss** affecting an **insured organization** as soon as possible after that **insured organization's** Risk Manager, General Counsel, Chief Financial Officer, Managing Partner, or equivalent position, becomes aware of such **proceeding** or **loss**, but in any event, no later than 60 days after the end of the **extended reporting period**; provided.

All notices under this policy must be made in writing by one of the individuals identified above, include a copy of any documents provided to you with in connection with such **proceeding** or **loss**, and be submitted to **us** via the designated email address or mailing address identified in Item 9 of the Declarations.

---

**VII.**    **Defense and settlement**

A.    Defense    **We** will have no obligation to: defend any covered **proceedings**, even if such **proceeding** is groundless, false, or fraudulent, or to pay any costs associated with your defense, investigation, inquiry, or appeal as to any such **proceeding**. Each **insured** named in any **proceeding** shall undertake to defend such proceeding in good faith and shall not admit liability without Underwriters' prior written consent.

B.    Settlement    **You** agree not to undertake settlement negotiations or enter into any settlement agreements that would result in a **loss** without **our** prior written consent, which **we** agree not to withhold unreasonably.

---

**VIII.**    **Allocation**

1.    **We** will not make any payments on account of any portion(s) of **loss** not covered by this policy. If **you** incur both covered **loss** and uncovered loss in connection with the same **proceeding**, whether due to the presence of covered and uncovered persons or matters, **we** and **you** agree to allocate such amounts between covered **loss** and uncovered loss based on **our** and **your** relative exposures.

2.    If **you** incur both covered **loss** and uncovered loss as a result of the same **proceeding**, **we** and **you** agree to use reasonable best efforts to agree on an allocation. If **we** and **you** cannot agree on a fair allocation, no presumption as to allocation will exist in any proceeding to determine such allocation.

# Investor 170(h) Liability Form

| IX. | **Assistance and cooperation** | |
|---|---|---|
| A. | Named insured responsibilities | It will be the responsibility of the **named insured** to act on behalf of all **insureds** with respect to the following: |

1. timely giving and receiving notice of cancellation or non-renewal;

2. timely payment of premium;

3. receipt of return premiums;

4. timely acceptance of changes to this policy; and

5. the right to exercise the Extended Reporting Period.

Notwithstanding the above, an **investor** may exercise the Extended Reporting Period for its own benefit if the **named insured** is unable to meet that obligation. The maximum **we** will pay to any such **investor** is that **investor's** proportionate share, based on its membership interest in the **insured organization** of which it is a **member**, of the applicable limit of liability.

| B. | Duty to cooperate | **You** agree to provide **us** with such information, assistance, and cooperation as **we** may reasonably require in connection with **our** performance under this policy. **You** also agree not to take any action that increases **our** exposure under this policy, prejudices **our** position, or prejudices **your** rights of recovery from others. |
|---|---|---|
| C. | No voluntary payments | Except as it relates to defense of any **proceeding, you** agree not to incur any expense, admit any liability, or assume any obligation without **our** prior written consent. If **you** do so, it will be at **your** own cost and expense. However, this condition does not apply to payments **you** make to avoid or mitigate **loss** under this policy, if such payments are made from an escrow account maintained for the benefit of an **investor** or an **insured organization**. |

| XI. | **Other provisions affecting coverage** | |
|---|---|---|
| A. | Alteration and assignment | No change in, modification of, or assignment of interest under this policy will be effective unless made by written endorsement to this policy signed by **our** authorized representative. |
| B. | Bankruptcy or insolvency | **Your** bankruptcy or insolvency will not relieve **us** of any of **our** obligations under this policy. |
| C. | Cancellation | 1. This policy may be cancelled at any time by the **named insured** by giving written notice, which must include the date the cancellation will be effective, to **us** at the address stated in the Declarations. |

2. This policy may be cancelled by **us** by mailing to the **named insured** by registered, certified, or other first class mail, at the **named insured's** address stated in Item 1 of the Declarations, written notice which must include the date the cancellation will be effective. **We** will not cancel this policy for any reason other than non-payment of premium, and the effective date of the cancellation will be no less than ten days after the date of the notice of cancellation.

3. The mailing of the notice will be sufficient proof of notice, and this policy will terminate at the date and hour specified in the notice.

# Investor 170(h) Liability Form

D.  Change in control

If, during the **policy period**, the **named insured** consolidates with, merges into, or sells all or substantially all of its assets to any other person or entity, or any other person or entity acquires ownership or control of the **named insured**, then the **named insured** will provide **us** written notice no later than 30 days after the effective date of such change in control, together with any other information **we** may require.

Unless **you** and **we** agree in writing otherwise, after the effective date of any change in control, this policy will cover only **loss** arising from **wrongful acts** that took place prior to the change in control.

E.  Coverage territory

This Policy applies to **wrongful acts** that take place anywhere in the world.

F.  Estates, heirs, legal representatives, spouses, and domestic partners

In the event of an **insured person's** death or disability, this policy will also apply to a **proceeding** brought against the **insured person**:

1.  heirs, executors, administrators, trustees in bankruptcy, assignees, and legal representatives; or

2.  lawful spouse or lawful domestic partner,

but only:

1.  for a covered **proceeding** arising from the **insured person's wrongful acts**; or

2.  in connection with their ownership interest in property sought as recovery in a **covered proceeding** arising from the **insured person's** wrongful acts.

G.  Other insurance

Any payment due under this policy is specifically excess of and will not contribute with any other valid and collectible insurance, unless such other insurance is written specifically as excess insurance over this policy.

H.  Representations

**You** warrant that all representations made and all materials submitted by **you** or on **your** behalf in connection with the **application** for this policy are, to the best of your knowledge, true, accurate, and not misleading, and agree they were relied on by **us** and were material to **our** decision to issue this policy to **you**. If **you** were aware at the time they were submitted to **us** that any representations or materials were untrue, inaccurate, or misleading in any material respect, **we** are entitled to rescind this policy, but only as to persons or entities with actual knowledge, as follows:

1.  with respect to an **insured person**, **we** will not impute the knowledge of one **insured person** to any other **insured person**;

2.  with respect to an **insured organization**, only knowledge possessed by the Manager, Chief Executive Officer, Chief Financial Officer, or General Counsel of an **insured organization** will be imputed to the **insured organization**; and

3.  with respect to Insuring agreement 1 of the Investor 170(h) Liability Coverage Part only, **we** will not rescind the coverage otherwise available under that section except as to an **insured person** who had actual knowledge that the representations made or materials submitted were untrue, inaccurate, or misleading.

# Investor 170(h) Liability Form

| | | |
|---|---|---|
| I. | Subrogation | In the event of a payment by **us** under this policy, **we** will be subrogated to all of **your** rights of recovery to that payment. **We** will not, however, subrogate against any **insured** |
| | | **You** will do everything necessary to secure and preserve **our** subrogation rights, including but not limited to the execution of any documents necessary to allow **us** to bring suit in **your** name. |
| | | **You** will do nothing to prejudice **our** subrogation rights without **our** prior written consent. |
| J. | Titles | Titles of sections of and endorsements to this policy are inserted solely for convenience of reference and will not be deemed to limit, expand, or otherwise affect the provisions to which they relate. |
| K | Intended beneficiaries | Each **insured** is an intended beneficiary of this policy and has the right to enforce this policy with respect to his, her, or its own **Loss**. |

# Exhibit C



## INVESTOR 170(H) LIABILITY INSURANCE POLICY ENDORSEMENT

The policy (**Policy**) subject to this endorsement is:

| | |
|---|---|
| **Policy Number** | VFP/FL/13849/2020/1 |
| **Named Insured** | Ashwood Gap Partners, LLC |
| **Date of policy issue** | 23/02/2021 |
| **Issuer** | Volante International Limited on behalf of Liberty Mutual Insurance Europe SE (for an 80% participation) under UMR B087519V02Z5009; and

Volante Specialty Risk, LLC on behalf of Fidelis Underwriting Limited (for a 20% participation) under UMR VSRUS202104IN

This policy is issued on behalf of the above named insurers (each an Insurer and together the Insurers) on a proportional basis as set out in section XII and is issued for each Insurer only in respect of the percentage participation set out above (Percentage Participation). |

1. Capitalised terms used in this document (**Endorsement**) shall have the same meaning given to them in the Policy unless they are defined within this Endorsement (including in the above table).

2. The Policy was issued to the Named Insured by the Issuer on behalf of certain underwriters. Under section XI A of the Policy, the terms of the Policy may be changed or modified by written endorsement signed by an authorized representative of the underwriters.

3. In accordance with section XI A of the Policy and with effect on and from when it is duly executed, this Endorsement changes and modifies the Policy by endorsement in writing such that the declarations as set out in the Policy shall be disregarded and shall be replaced in their entirety with the declarations set out in the appendix to this Endorsement.

4. Save as expressly set out in this Endorsement, all other terms of the Policy shall remain unaffected and in full force and effect.

5. This Endorsement is effective on and from when it is duly executed.

6. This Endorsement is governed by and shall be construed in accordance with the laws of the State of Georgia.

**THIS ENDORSEMENT IS ISSUED TO THE NAMED INSURED AND FORMS PART OF THE POLICY**

—Signed

2/28/2022
**Date**

Andrew R. Pearson
**Name**

_Signed_    2/28/2022    _____David Hamilton_____
**Signed**    **Date**    **Name**

**For and on behalf of the Issuer an authorised representative of the underwriter under the Policy**

# APPENDIX

## Declarations

|  | |
|---|---|
| **Policy Number:** | VFP/FL/13849/2020/1 |

**THIS POLICY IS ISSUED ON BEHALF OF:**  Those insurers listed in Item 11

| | | |
|---|---|---|
| **Item 1:** | **Named Insured:** | **Ashwood Gap Partners, LLC** |
| | **Address:** | 2015 3rd Ave N, Birmingham, AL 35203 |
| **Item 2:** | **Policy Period:** | From:  31/12/2020<br>To:      15/10/2021<br>Both days at 12.01 a.m. Local Standard Time at the Insured's Principal Address |
| **Item 3:** | **Extended Reporting Period:** | From:  October 15th 2021<br>To:      October 15th 2024<br>Both days at 12.01 a.m. Local Standard Time at the Insured's Principal Address |

At the expiration of the **Policy Period** you will have an automatic **Extended Reporting Period** in which to give us written notice of loss arising from **Proceedings** that:

- are first made against you and reported to us during the **Extended Reporting Period**; and
- arise from your **Wrongful Acts** performed on or after the **Prior Acts/notice/knowledge date** as specified in Item 8 of the Declarations, but prior to the expiration of the **Extended Reporting Period**.

The premium in respect of the **Extended Reporting Period** is included in the original policy premium as specified in Item 6 of the Declarations and is fully earned at the inception of the **Policy Period**.
The **Limit of Liability** applicable during the **Extended Reporting Period** will be the remaining available **Limit of Liability**. There will be no separate or additional **Limit of Liability** available for the **Extended Reporting Period**.

| | | | |
|---|---|---|---|
| **Item 4:** | **Limit of Liability:** | USD 10,300,000 | Policy Aggregate Limit of Liability (split as per Item 11) |
| **Item 5:** | **Retention:** | USD  309,000 | Any one claim |
| **Item 6:** | **Premium:** | USD  721,000 | for the period (split as per Item 11) |
| **Item 7:** | **Continuity Date:** | Not applicable | |
| **Item 8:** | **Prior Acts/notice/ knowledge:** | January 1st 2020 | |
| **Item 9:** | **Notice of Loss:** | To Underwriters via: claims@volanteglobal.com | |
| **Item 10:** | **Endorsements:** | Not applicable | |
| **Item 11:** | **Underlying Polices:** | The below table provides details of the underlying policies | |

| No | Layer of Policy | Policy Number | Policy limit of liability (USD) | Insurer and participation | Policy Premium (USD) |
|---|---|---|---|---|---|
| A. | Primary | VFP/FL/13849/2020/1/PS/2 | 7,359,543 | (a) Liberty Mutual with 80% participation on this primary policy being USD 5,887,635.; and (b) Fidelis with 20% participation on this primary policy being USD 1,471,909.; | 558,687 |
| B. | First Excess | VFP/FL/13849/2020/1/PS/0 | 980,152 | Amtrust with 100% participation on this first excess policy | 54,104 |
| C. | Second Excess | VFP/FL/13849/2020/1/PS/1 | 1,960,304 | Allianz with 100% participation on this second excess policy | 108,209 |
| Total | - | | 10,300,000 | - | 721,000 |

Note: All original policies are held on file by VSR

**Item 12:**    **Insurer Liability and Participation:** Several participation

The maximum limit of liability of each insurer under the primary policy is their percentage participation of the policy limit of liability for the primary policy (as set out in Item 11A). The maximum limit of liability of each insurer in respect of any sub-limited cover provided under the primary policy is also their percentage participation of that sub-limited cover. In no circumstance shall any insurer under the primary policy be required to pay loss in excess of either and both of: (i) their percentage participation of the policy limit of liability for the primary policy; and (ii) their percentage participation of any sub-limited cover.

The insurers under the primary policy are each only liable for any loss payable under the primary policy (including in relation to any individual claim) on a proportional basis such that they shall each only be liable for their respective percentage participation of any loss (including in relation to any individual claim). No insurer under the primary policy shall in any circumstance be liable for the percentage participation of any other insurer (including in relation to any individual claim).

Each insurer's liability and obligations under any and all of the policies (as set out in Items 11A, 11B and 11C) are several only and are not: (i) joint; and are not (ii) joint and several. Each insurer's liability under any and all of the policies is limited solely to the extent of their participation in accordance with Item 11. Each insurer shall in no event be liable for the whole or any part of the participation of any other insurer who for any reason does not satisfy all or part of its liability or obligations under any policy set out in Item 11.

The risk of uncollectability (in whole or in part) of any loss, whether because of financial impairment or insolvency of any insurer under any policy, or for any other reason whatsoever, is expressly retained by the Named Insured and is not in any way or under any circumstances insured or assumed by any insurer under any policy

**Item 13:**    **Several Liability Notice (08/94 LSW1001)**

The subscribing insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions. The subscribing insurers are not responsible for the subscription of any co-subscribing insurer who for any reason does not satisfy all or part of its obligations. 08/94 LSW1001 (Insurance)

**Item 14: Service of Suit Clause (U.S.A.)**

This service of suit clause will not be read to conflict with or override the obligations of the parties to arbitrate their disputes as provided for in the arbitration provision within this Policy. This clause is intended as an aid to compelling arbitration or enforcing such arbitration or arbitral award, not as an alternative to such arbitration provision for resolving disputes arising out of this contract of insurance (or reinsurance).

It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, the Underwriters hereon, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this clause constitutes or should be

understood to constitute a waiver of Underwriters' rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any State in the United States.

It is further agreed that service of process in such suit may be made upon

California
Jonathan Bank
Locke Lord LLP
300 S. Grand Avenue, Suite 2600
Los Angeles, California 90071
Tel: 213-687-6700
Email: jbank@lockelord.com

Maine*
C T Corporation System
128 State Street, # 3
Augusta, Maine 04330
(*serves in the capacity of registered agent for service of process for Locke Lord)

All Other States
Locke Lord LLP
200 Vesey Street, Brookfield Place
New York, NY 10281

and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such court or of any appellate court in the event of an appeal.

The above-named are authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Named Insured to give a written undertaking to the Named Insured that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this Policy, and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

**Item 15: Arbitration Clause**

In the event of a dispute in connection with this Policy, the insurers and the Named Insured shall, in the first instance, try to resolve such dispute through mediation. The mediation will be commenced by either party providing written notice to the other party requesting such mediation ("the Mediation Request"). The parties will select a mediator by their mutual agreement, within 30 days. If there can be no such agreement, each party will submit a list of five mediator choices to the other, rank ordered by preference. The mediator will then be selected based on a further discussion, unless an individual is on both lists and then that person would have preference. If the process does not result in the selection of the mediator, then the parties agree to let the American Arbitration Association select the mediator. Subject to mutual agreement of the parties, the mediation will be held in the State of Georgia, not later than 60 days after the date of the Mediation Request and shall last for at least a one day session. Any settlement agreement reached at mediation and fully executed by all parties, however, will be binding on all parties. If the Mediation does not resolve the dispute within 60 days of the first mediation session or when the mediator declares an impasse, the parties agree that the dispute shall be resolved by final and binding arbitration in accordance with the Commercial Rules of the American Arbitration Association before a single Arbitrator, unless the amount of coverage in dispute exceeds five million dollars, in which case the parties may choose to have the arbitration before a panel of three arbitrators chosen pursuant to the rules of the AAA. The arbitration panel will all be neutral. The arbitration will be held within 100 miles of where the

insured resides or at an agreed upon location in the United States. The arbitrator(s) may award the prevailing party costs and/or attorneys' fees for the Arbitration. Any State's law invalidating this paragraph shall not affect the validity of the first paragraph herein. The parties understand that arbitration is final and binding and that they are waiving their rights to other resolution processes (such as court action or administrative proceeding).

**Item 16: Information relating to Liberty**

**Corporate information**

Liberty Mutual Insurance Europe SE (LMIE) trading as Liberty Specialty Markets, a member of the Liberty Mutual Insurance Group. Registered office: 5-7 rue Leon Laval, L-3372, Leudelange, Grand Duchy of Luxembourg, Registered Number B232280 (Registre de Commerce et des Sociétés). LMIE is a European public limited liability company and is supervised by the Commissariat aux Assurances and licensed by the Luxembourg Minister of Finance as an insurance and reinsurance company.

LMIE's UK branch registered address is 20 Fenchurch Street, London, EC3M 3AW which is authorised by the Commissariat aux Assurances and subject to limited regulation by the Financial Conduct Authority and Prudential Regulation Authority (registered number 829959). Details about the extent of regulation by the Financial Conduct Authority and Prudential Regulation Authority are available from LMIE on request.

**Complaints wording**

Insurance companies registered in Luxembourg are required to offer policyholders recourse to one of three independent dispute resolution bodies should the policyholder wish to escalate a complaint.

LMIE appreciates that unless the policyholder is itself resident in Luxembourg it is unlikely that they will exercise their right to refer their complaint to one of the applicable entities but it is a requirement that LMIE policy wordings contain this referral where they are legally obliged to provide customers with a complaints wording in the policy. Where policies are not required to contain a complaints process no changes are necessary.

As a result, where policyholders are already being offered the option of escalating their complaint to an external dispute resolution service (e.g. Financial Ombudsman Service (UK), Financial Services and Pensions Ombudsman (ROI), Insurance Ombudsman at the French Federation of Insurers (France) or Institute for the Supervision of Insurance (Italy) etc) customers also need to be referred to the Luxembourg dispute resolution entities as follows:

"Alternatively, as Liberty Mutual Insurance Europe SE is registered as a Luxembourg insurance company, you are also entitled to refer the dispute to any of the following dispute resolution bodies (instead of referring to the Financial Ombudsman Service): Commissariat aux Assurances (www.caa.lu), Service National du Médiateur de la consummation – consumers only - (www.mediateurconsommation.lu) or Médiateur en Assurances (www.ulc.lu/fr). "

Customers also need to be given the option of complaining to LMIE's registered office in Luxembourg as first point of contact.

As an example a wording sold to a UK domiciled policyholder will now look like the below:

"LMIE aims to provide a high quality service to all its customers. If you feel dissatisfied or if you have any questions about your contract or the handling of a claim, then in first instance you should contact your insurance broker or intermediary who arranged this insurance for you.

In the event that you are still dissatisfied please contact us so we can do what we can to help. We take complaints very seriously and aim to address all concerns fairly and efficiently.

If you are not satisfied with the service you have received and wish to make a complaint, you may do so in writing or verbally using the contact details below:

Compliance Officer

Liberty Mutual Insurance Europe SE
20 Fenchurch Street,
London EC3M 3AW
Tel +44 (0) 20 3758 0840
Email: complaints@libertyglobalgroup.com

quoting your Policy and/or claim number;

or

Compliance Officer
Liberty Mutual Insurance Europe SE
5-7 rue Leon Laval 3372 Leudelange, Luxembourg
Tel +352 28 99 13 00
Email  complaints@libertyglobalgroup.com
quoting your Policy and/or claim number.

If after making a complaint and you are still not satisfied you may be entitled to refer the dispute to the Financial Ombudsman Service (FOS) which is a free and impartial service, who may be contacted at:

Exchange Tower
Harbour Exchange
London, E14 9SR
Tel: 0800 023 4567
Email: enquiries@financial-ombudsman.org.uk

To confirm whether you are eligible to ask the FOS to review your complaint please contact them at www.financial-ombudsman.org.uk/consumer/complaints.htm.

Alternatively, as Liberty Mutual Insurance Europe SE is registered as a Luxembourg insurance company, you are also entitled to refer the dispute to any of the following dispute resolution bodies (instead of referring to the Financial Ombudsman Service):  Commissariat aux Assurances (www.caa.lu), Service National du Médiateur de la consummation – consumers only - (www.mediateurconsommation.lu) or Médiateur en Assurances (www.ulc.lu/fr). "

If you have any questions or would like further guidance as to what amendments you need to make to policy wordings please do not hesitate to contact your usual LMIE SE contact or kate.connolly@libertyglobalgroup.com.

**Privacy Notices** - How Liberty Specialty Markets uses your personal data

Liberty Specialty Markets takes the protection of your personal data seriously and is committed to protecting your privacy. There are a number of different companies within our group. The specific company within Liberty Specialty Markets which acts as the "data controller" of your personal data will be the organisation providing your policy as set out in the documentation that is provided to you. If you are unsure you can also contact us at any time by e-mailing us at dataprotectionofficer@libertyglobalgroup.com or by post at Data Protection Officer, Liberty Specialty Markets, 20 Fenchurch Street, London EC3M 3AW, UK.  Where you provide us or your agent or broker with details about other people, you must provide this notice to them.

In order for us to deliver our insurance services, deal with any claims or complaints that might arise and prevent and detect fraud, we need to collect and process personal data. The type of personal data that we collect will depend on our relationship with you: for example, as a policyholder, third party claimant or witness to an incident.  Your information will also be used for business and management activities such as financial management and analysis. This may involve sharing your information with, and obtaining information about you from, our group companies and third parties such as brokers, credit reference agencies, reinsurers, claims handlers and loss adjusters, professional advisors, our regulators or fraud prevention agencies. We also collect

personal data about our suppliers and business partners (such as brokers) for the purposes of business management and relationship development.

Please see the full privacy notice available at www.libertyspecialtymarkets.com/privacy-cookies for further information on how your personal data is used and the rights that you have in relation to the personal data we hold about you. Please contact us using the details above if you wish to see the privacy notice in hard copy.

# Exhibit D

**Department of the Treasury**
**Internal Revenue Service**
**Large Business and International - ECPA**
IRS 2888 Woodcock Blvd
Atlanta, GA  30341

Date:
07/11/2024
Taxpayer ID number (last 4 digits):

Tax years:
December 31, 2020
Person to contact:
Name: Melinda Mahoney
ID number:  1000677937
Telephone:216-750-6704

Ashwood Gap
Attn: Clayton Mobley, Partnership Representative
2207 2nd Avenue N
Birmingham, AL  35203-3805

Dear Clayton Mobley:

**Why you're receiving this letter**
This letter is a time-limited offer to resolve the tax consequences related to your syndicated conservation easement transaction. Our proposed resolution is based on the terms outlined in the enclosed Attachment 1, Syndicated Conservation Easement Resolution Terms and Election.

**Why we're proposing this resolution**
We've identified syndicated conservation easement transactions as a significant compliance concern. These transactions have appeared on the IRS "Dirty Dozen" list of tax scams several times.

We've litigated and won syndicated conservation easement cases for failures to meet the requirements of Internal Revenue Code (IRC) Section 170 and overvaluation of the conservation easement. Penalties asserted by the government have been sustained. The U.S. Tax Court and appellate courts have issued opinions favorable to the IRS in syndicated conservation easement cases where the true value of the easement was found to be a small fraction of the claimed value.

We expect we'll continue to prevail in syndicated conservation easement litigation. However, we're offering to resolve your transaction now in the interest of sound tax administration and considering recent legislation.

**What you need to do to accept our offer**
If you wish to accept the terms outlined in Attachment 1 and enter into a resolution for this transaction, please follow the steps outlined in Attachment 1, Section A. **You have 30 days from the date of this letter to confirm your acceptance and to provide the requested documents.**

**What will happen if you don't accept our offer**
We'll continue to examine and litigate the tax consequences of your transaction under our normal procedures.

Examination results may include:
- Full disallowance of your charitable contribution deduction, and
- Imposition of civil penalties, which could include the 40% gross valuation misstatement penalty under IRC Section 6662(h). Some cases may be subject to the 75% fraud penalty under IRC Section 6663.

You will have the right to petition the U.S. Tax Court or file an action in a U.S. District Court or the U.S. Court of Federal Claims if you disagree with the examination results.

**Letter 6532 (12-2023)**
Catalog Number 93125Q

We encourage you to speak with a qualified, independent advisor about this settlement offer.

If you have questions, you can call the contact person shown above.

Sincerely,

*Charles Daniel*

Digitally signed by Charles C.
Daniel
Date: 2024.07.11 09:44:43 -04'00'

Charles Daniel
Team Manager, EPCA; TTY 3

Enclosure:
Attachment 1
Form 875-M

Attachment 1
ASHWOOD GAP, 2207 2nd Avenue N, Birmingham, AL 35203-3805,
███████

## Syndicated Conservation Easement (Non-Docketed) Resolution Terms and Election

Below are the terms of the 2024 Syndicated Conservation Easement (Non-Docketed) Resolution. The Internal Revenue Service (IRS) will not entertain counteroffers to these terms.

This form provides ASHWOOD GAP, ████████ (Partnership) an opportunity to elect to participate in a settlement initiative to resolve a transaction described in Section 2 of Notice 2017-10[1], 2017-4 I.R.B. 544, or a substantially similar transaction (collectively, SCE transactions).

This resolution is being offered to the entity listed above and is not available to partners on an individual basis. The terms of the resolution are outlined below.

### A. Election to Participate

1. The election to participate must be received by the IRS within **30 calendar days** of the date of the offer letter.

2. To elect into the resolution:

    a. An Authorized Signer[2] must initial each page and sign the last page of this form in the spaces provided.

    b. Partnership must provide its Form 1065 or, if applicable, the Form 1065 of the entity in which individual investors purchased their interest and from whom the individual investors received a Schedule K-1 (investment-tier partnership) reflecting the claimed charitable contribution deduction.

    c. A Partnership with less than one year remaining on the statute of limitation must sign a consent to extend the statute for no less than one year. A statute extension is enclosed with this letter, if needed, and must be signed and returned within 30 calendar days of this letter to participate in the settlement resolution.

---

[1] A Notice of Proposed Rulemaking (NPRM) was issued on December 8, 2022, providing that certain syndicated conservation easement transactions are listed transactions.

[2] For cases governed by Tax Equity and Fiscal Responsibility Act (TEFRA) of 1982, the Authorized Signer is the Tax Matters Partners (TMP). For cases governed by the Bipartisan Budget Act of 2015 (BBA), the Authorized Signer is the Partnership Representative (PR) (or the Designated Individual of the PR, if the PR is an entity). For Non-TEFRA and BBA elect-out cases, the Authorized Signer is all partners. All partners must sign the supplemental signature page of the form to signal all partners wish to participate. They do not have to initial each page.

Initials _____

Attachment 1
ASHWOOD GAP, 2207 2nd Avenue N, Birmingham, AL 35203-3805,
███████

3. The items listed in A.2.a. through c. must be timely returned to the IRS by email[3] to sce.settlement@irs.gov or faxed to (855) 579-6647. A courtesy copy must be sent to the contact person listed on the offer letter.

4. Please refer any questions regarding the settlement to the contact person listed on the offer letter. Questions or other communications sent to the mailbox will not be addressed.

5. Failure to satisfy any portion of paragraphs A.1 through 3 will be treated as an invalid election.

6. The Authorized Signer's signature will be treated as a non-binding consent to participate in this resolution. Formal agreement will be memorialized as described in paragraph B.17.

## B. Resolution Terms

### Deduction, Tax, and Penalties

1. <u>Charitable Contribution Deduction</u>: The Partnership is not entitled to a charitable contribution deduction claimed for a conservation easement, donation of a fee simple interest in real property, or other noncash charitable contributions.

2. <u>Allowable Deduction (estimated out-of-pocket costs)</u>: The Partnership is entitled to a deduction for estimated out-of-pocket costs (i.e., the estimated amount the investors paid to either the Partnership or an investment-tier entity for an interest in the SCE transaction) allocable to the SCE transaction being settled. The IRS will calculate this amount. In general, the allowable deduction will be the amount reported on the Partnership's (or investment-tier partnership's) Schedule M-2, Capital Contributed (Cash).

3. <u>Tax Rate</u>: The IRS will calculate the tax due at the partnership level using a tax rate of 21%.

4. <u>Penalties</u>: An accuracy-related penalty for a gross valuation misstatement under section 6662(h) applies at a rate of 5%.

5. <u>Amount Due</u>: Once an election to participate is received, the IRS will provide the Authorized Signer with the necessary computational information, including the disallowed charitable contribution deduction, the estimated out-of-pocket costs allowed and the tax, penalties, and interest that will be aggregated into the Settlement Payment (as defined in section B.9.).

### Interest

6. Deficiency interest will be calculated as required by law.

---

[3] Communication by unencrypted email is not secure. Therefore, taxpayers, TMPs, and PRs electing via email should transmit any potentially sensitive information, including personally identifiable information (PII), only via encrypted, password-protected attachments. See IRS User Guide at irs.gov/usingemail for more information on signing and sending documents electronically.

Initials _____

Attachment 1
ASHWOOD GAP, 2207 2nd Avenue N, Birmingham, AL 35203-3805,

7. IRS will compute interest ending 30 calendar days after the date IRS sends the Form 906, Closing Agreement on Final Determination Covering Specific Matters (Closing Agreement). If Partnership fails to sign the Closing Agreement and pay the Settlement Payment within 30 calendar days of the date the IRS sends the Closing Agreement, additional interest will accrue.

8. Interest suspension under section 6404(g) is not permitted.

## Payment

9. The Partnership must make one payment (Settlement Payment) for all tax, penalties, and interest due as determined under this settlement agreement.

10. If a partner has made a section 6603 deposit, they can request a refund by following Revenue Procedure 2005-18.

11. A Partnership subject to the centralized partnership audit regime enacted by BBA must agree to be liable for an imputed underpayment equal to the Settlement Payment determined under paragraph B.9. For purposes of this resolution, the term Settlement Payment includes the imputed underpayment described in this paragraph. The Partnership cannot elect modification or push-out.

## General

12. The Partnership and partners must fully cooperate with the IRS, including meeting stringent deadlines, or face removal from the resolution.

13. In the case of an entity governed by TEFRA, all partners must participate in the resolution.

14. The Partnership and partners agree to fully cooperate with the IRS during the resolution, which includes, but is not limited to, providing additional information if requested by the IRS.

15. If the Partnership or partners take steps inconsistent with facilitating the resolution, the IRS reserves the right to remove the Partnership from the resolution. The removal determination is final.

16. The Partnership and partners agree that they are responsible for their own costs and fees associated with participation in this resolution and section 7430 does not apply.

17. To finalize the settlement:

   a. In the case of an entity governed by TEFRA, Non-TEFRA, and BBA Elect-Outs, the Partnership, and all direct partners, including spouses if married filing joint, will be required to execute a Closing Agreement, consistent with terms and conditions outlined herein. Among other terms, the Closing Agreement will provide that the amount paid will not be refundable or deductible for Federal income tax purposes under any circumstance.

   b. In the case of an entity governed by BBA, the Partnership will be required to execute a Closing Agreement, consistent with terms and conditions

Initials _____

Attachment 1
ASHWOOD GAP, 2207 2nd Avenue N, Birmingham, AL 35203-3805,

███████████████

outlined in this term sheet. The Closing Agreement must be signed by the PR for the taxable year at issue as well as an individual with authority under state law to bind the partnership. Among other terms, the Closing Agreement will also provide that the Settlement Payment will not be refundable or deductible for Federal income tax purposes under any circumstance.

18. Neither this resolution, nor any settlement executed therefrom, will have any effect, limitation or prohibition against the IRS asserting promoter, appraiser, or return preparer penalties or pursuing discipline under Circular 230.

19. The deduction allowed under paragraph B.2. cannot be inferred to represent a value of the property and/or the value of the conservation easement.

20. Nothing in this resolution precludes the IRS from investigating any associated criminal conduct or recommending prosecution of any individual or entity that participated in or assisted or advised others in participating in an SCE transaction for violation of any criminal statute.

21. The terms contained herein do not constitute an interpretation of the law as it applies to SCE transactions.

22. The parties agree that this settlement is limited to this specific case and may not be used in any court proceeding involving the United States and/or the Commissioner of the Internal Revenue Service as a party.

23. Permission to participate in this resolution in no manner indicates, nor should be interpreted as, an opinion as to whether there is fraud with respect to the Partnership's SCE transaction.

_____

Print Name and Title


_____     _____

Signature                              Date

Initials _____

**D. Austin Bersinger**
Partner
abersinger@bradley.com
Direct: 404.868.2042



August 27, 2024

<u>**VIA EMAIL ONLY**</u>

Joseph J. Stafford
Wilson Elser
55 West Monroe Street, Suite 3800
Chicago, Illinois 60603
Email: joseph.stafford@wilsonelser.com

Re:    **Demand for Coverage Position and Consent or Waiver of Consent for Acceptance IRS Settlement Offer**

|  |  |
|---|---|
| Insured: | Ashwood Gap Partners, LLC ("Ashwood Partners") |
| Insurer: | Wesco Insurance Company |
|  | Interstate Fire & Casualty Co |
| Policy No.: | VFP/FL/13849/2020/1 |
| Claimant: | Ashwood Gap Partners, LLC |

Dear Mr. Stafford:

The undersigned and this firm represent Ashwood Partners as coverage counsel in connection with the above referenced insurance policy. As you know, Ashwood Gap, LLC ("Ashwood Gap") is in an ongoing dispute with the Internal Revenue Service ("IRS"). Recently, the IRS has offered a settlement to Ashwood Gap. After consultation with its tax counsel, the Insured recognizes that this settlement offer is reasonable. Please accept this correspondence as the Insured's formal demand that the Insurer consent to the Insured's acceptance of the proposed settlement and that the Insurer agree to fund amounts under the Policy, up to the policy limit, that will be due to the IRS. In the event the Insurer cannot commit to providing consent or commit to fund the IRS settlement, the Insured respectfully requests that the Insurer agree not to raise lack of consent or other related policy provisions as an impediment to coverage. In order to meet the IRS deadline, the Insured requests that the Insurer provide a written response to this correspondence by September 2, 2024.

As you are aware, Ashwood Partners, Ashwood Gap, and other entities and individuals, are insureds under the above-referenced Investor 170(h) Liability Insurance Policy issued by Volante Global on behalf of Wesco Insurance Company and Interstate Fire & Casualty Co (collectively, "Insurers"). By letter dated July 11, 2024, the IRS extended a settlement offer to resolve its dispute with Ashwood Gap in full ("IRS Settlement"). A copy of the IRS Settlement is attached to this letter. The original deadline for accepting the IRS Settlement was August 10, 2024. The IRS has extended the deadline for considering the IRS Settlement to September 9, 2024.

Under the terms of the policy, an insured cannot enter into any settlement agreement "that would result in a **loss** without [the Insurers] prior written consent, which [the Insurers] agree not

Joseph J. Stafford
Wilson Elser
August 27, 2024
Page 2

to withhold unreasonably."[1]  Ashwood Partners provided the Insurers with notice of the IRS Settlement by email on July 31, 2024, and requested that the Insurers approve the acceptance of the offer. The Insurers responded by making several information requests. Ashwood Partners will be responding to those requests under separate cover. Ashwood Partners renews its request that the Insurers consent to Ashwood Gap's acceptance of the IRS Settlement or, in the alternative, waive the provision of the policy requiring the Insurer's consent for Ashwood Gap to accept the IRS Settlement.

## I.   Background: Conservation Easements and Current IRS Settlement Offer

The Named Insured was created to raise funds through a private placement and use the proceeds from the capital raise to purchase a controlling interest in Ashwood Gap. At the time, Ashwood Gap held a fee simple interest in 205.39 acres in Jackson County, Alabama ("Property"). The Named Insured then solicited investments through a private placement to purchase the interest in Ashwood Gap with the intention of using the Property in one of three ways: (1) develop it to its "highest and best use" ("HBU") as a limestone quarry, producing an income stream for the investors and a valuable asset that could be sold; (2) donate a conservation easement to protect the conservation values of the Property, producing a tax deduction for the investors; or (3) holding the Property for long term appreciation. The investors voted for the second option, and Ashwood Gap thereafter donated a conservation easement over the Property ("Conservation Easement") to a qualified organization.

As a result of the donation, Ashwood Gap claimed a deduction on its 2020 tax return under Section 170(h), which allows a taxpayer to deduct the value of a "qualified real property interest" donated to a "qualified organization" exclusively for a "conservation purpose." The amount of the deduction was based on the contemporaneous due diligence that Ashwood Gap commissioned regarding the Property. The Insurers reviewed this due diligence at the time of binding. As you are aware, this due diligence indicated that the fair market value ("FMV") of the Property before the donation date was $53,650,000 based on a discounted cash flow ("DCF") analysis of the expected cash flows of a mining operation on the Property. It further indicated that the FMV value of the Property after the donation of the Conservation Easement was $280,000. Using the "Before and After" methodology required for the valuation of conservation easements, Ashwood Gap reported a $53,370,000 deduction for the donation of the Conservation Easement. Based on its ownership in Ashwood Gap, a portion of this deduction passed through to the Named Insured to the investors according to their ownership interest in the Named Insured.

The IRS selected Ashwood Gap's 2020 tax return for examination and has indicated its intent to disallow the deduction through the issuance of the Letter 5895 dated August 2, 2024 ("Preliminary Report") and the issuance of the Notice of Proposed Partnership Adjustment dated January 25, 2024, asserting that (1) the donation did not satisfy Section 170 for various technical reasons, and (2) the FMV of the Conservation Easement was $250,000. In addition to disallowance

---

[1] Unless otherwise defined, all terms have the meanings ascribed to them in the policy. Bolded terms quoted from the policy are bolded in this letter for purposes of consistency.

Joseph J. Stafford
Wilson Elser
August 27, 2024
Page 3

of the deductions, the IRS asserted various penalties, including the strict liability 40% "gross valuation misstatement" penalty under I.R.C. § 6662(h). Based on the proposed adjustments in the Preliminary Report and assuming that the IRS does not raise additional issues or alternative positions, the Insureds' exposure for tax, penalties, and interest under the IRS's positions would range from $33,412,386 to $33,553,282 (each with interest estimated through September 9, 2024).

While the IRS has not yet disallowed the Insureds' deductions, it recently issued the IRS Settlement to Ashwood Gap, LLC and is requiring a response to its offer before it will complete its examination. The offer in this case is as follows: (1) the IRS will disallow the $53,370,000 noncash charitable deduction for the Conservation Easement donation; (2) instead, the IRS will allow an "other deduction" of $10,300,100; (3) the IRS will compute the tax due on the net disallowance of $43,069,900 at a tax rate of 21% instead the 37% highest marginal tax rate that would normally apply, (3) the IRS will reduce the application of the gross valuation misstatement penalty from 40% to 5%, and (4) statutory interest will continue to accrue until the liability is paid in full, as required by law. The Insureds' acceptance of this offer would result in a total liability of tax, penalties, and interest of approximately $11,531,933 (with interest calculated through September 9, 2024). The IRS has further indicated that if the Insureds do not accept its offer, it will move forward with litigating the case to decision.

## II.    Acceptance of the IRS Settlement Would Result in a Loss Under the Policy

As noted above, Ashwood Partners and Ashwood Gap are insureds for purposes of the policy. As the Insuring Agreements of the policy make clear, the Insurers promised as follows:

> **We** will indemnify you for **loss** in excess of any applicable **retention** resulting from any **proceeding** against **you** seeking to hold you liable for a **wrongful act**, provided the **loss** results from a **proceeding** first initiated against **you** and reported to **us** during the **policy period**.

Subject to certain exclusions that are not relevant here, a "loss" includes "damages, judgments and settlements incurred by an **insured** as a result of a **wrongful act** by such **insured** causing a reduction in tax savings to an **investor** by reason of an **adjustment**." Acceptance of the IRS Settlement would cause a reduction in the tax savings of all investors as a result of an "adjustment," which is "a reduction in the allowable tax deduction ordered by a **taxing authority** claimed by an **insured** that causes the actual tax deduction allowed by such **taxing authority** multiplied by 41% to be less than the sum of (a) such **insured's** original contribution to a **company** or the **controlled entity** that granted the conservation easement or fee simple donation of real property pursuant to 26 U.S.C. § 170 upon which such tax deduction was based, and (b) penalties and interest where insurable by law imposed by any **taxing authority** due to such a covered reduction in tax savings."[2]

---

[2] The actual deduction allowable under the IRS Settlement would be $10,300,100, instead of $53,370,000 as originally claimed. This number multiplied by 41% is $4,223,041, which is less than the sum of (i) $10,300,100, representing

Joseph J. Stafford
Wilson Elser
August 27, 2024
Page 4

Thus, if Ashwood Gap accepts the IRS Settlement, the resulting liability would constitute a covered "loss" under the policy.

**III.    Refusal to Consent to the IRS Settlement Would Be Unreasonable**

Due to the reasonableness of the IRS Settlement, the Named Insured demands the Insurer grant their consent to the acceptance of this offer or, alternatively, waive their right to consent under the policy. Two factors confirm the reasonableness of the IRS Settlement.

*First*, recent caselaw from the Tax Court regarding the valuation of conservation easements indicate that Ashwood Gap's deduction was based on a valuation approach that is now disfavored by the Tax Court. As discussed above, in determining the value of the Conservation Easement, Ashwood Gap valued the Property before the donation using a DCF income approach based on the net present value of future cash flows. Specifically, the appraiser determined the FMV of the Property based on the net present value of the cash flows from the operation of a limestone quarry on the Property would be $53,650,000. The IRS's appraiser, however, determined that the FMV of the Property before the donation of the Conservation Easement was $530,000 based on a analysis of comparable sales.

Over the past year, the Tax Court has issued six opinions in cases involving conservation easements that reached the issue of value. Each of these opinions involved so-called "syndicated conservation easement transactions" or SCETs. As you are aware, the Conservation Easement donated by Ashwood Gap is considered an SCET by the IRS.

-    In *Mill Road 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129, the Tax Court found in favor of the taxpayer on multiple technical issues. Nevertheless, the Tax Court determined that the FMV of the subject property before the donation of the easement was approximately 10% of the claimed value based on its application of the comparable sales approach and the principle of substitution. This adjustment resulted in the application of a 40% gross valuation misstatement penalty.

-    In *Oconee Landing Property, LLC v. Commissioner*, T.C. Memo. 2024-25, the Tax Court found in favor of the IRS on multiple technical issues, which resulted in the complete disallowance of the claimed deduction or, in the alternative, limitation of the deduction to the taxpayer's basis in the subject property. In reaching the value of the conservation easement for penalty purposes, the Tax Court determined that the FMV of the subject property before the donation of the easement could not be more than 25.77% of the claimed before value based on its application of the comparable sales methodology. Notably, the Tax Court did not determine that the FMV of the conservation easement was in fact this amount; rather it determined that the FMV

_____

the original capital contribution, and (ii) $2,487,254, representing the penalties and interest to be due under the terms of the IRS Settlement.

Joseph J. Stafford
Wilson Elser
August 27, 2024
Page 5

simply could be no more than this amount. Because the FMV of the easement was less than 50% of the claimed FMV, the adjustment resulted in the application of a 40% gross valuation misstatement penalty.

- In *Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35, the Tax Court again found in favor of the taxpayer on multiple technical issues. Once again, however, Tax Court determined that the FMV of the subject property before the donation of the easement was approximately 2.5% of the claimed before value based on its use of the comparable sales approach and its acceptance the IRS's argument regarding the availability of other properties with similar mineral resources. This adjustment also resulted in the application of a 40% gross valuation misstatement penalty.

- In *Buckelew Farm, LLC v. Commissioner*, T.C. Memo. 2024-52, the Tax Court again found in favor of the taxpayer on multiple technical issues. Once again, however, the Tax Court determined that the FMV of the subject property before the donation of the easement was approximately 14.6% of the claimed before value, based on its acceptance of the IRS's comparable sales methodology and its analysis of other transactions involving the subject property. This adjustment resulted in the application of a 40% gross valuation misstatement penalty.

- In *Excelsior Aggregates v. Commissioner*, T.C. Memo. 2024-60, the Tax Court only addressed the value of two conservation easements and fee simple interests in other property. In valuing the conservation easements, the Tax Court determined the FMVs of the subject properties before the donation of the easements were approximately 4.15% and 5.42% of the claimed before values. The Tax Court arrived at these values by placing substantial weight on the most recent transactions involving the subject properties, which it tested using the comparable sales method. It further rejected the taxpayers' proposed valuations through a detailed critique of the DCF analysis performed by the taxpayer's expert for trial.

- In *Corning Place Ohio, LLC v. Commissioner*, T.C. Memo. 2024-72, the Tax Court found in favor of the IRS on a technical issue, which resulted in the complete disallowance of the claimed deduction for the donation of a façade easement. In reaching the value of the easement for penalty purposes, the Tax Court determined that the FMV of the subject property before the donation of the easement was, at most, 12.63% of the claimed before value. To arrive at this value, the Tax Court once again placed substantial weight on the most recent transaction involving the property, which it tested using the comparable sales method. In reaching this conclusion, the Tax Court once again rejected the taxpayer's proffered valuation through another detailed critique of the DCF analysis performed by the taxpayer's expert for trial. This adjustment resulted in the application of a 40% gross valuation misstatement penalty.

These recent opinions have changed how taxpayers can reasonably expect the Tax Court to value conservation easements, especially SCETs, at trial. The Court has now indicated that it

Joseph J. Stafford
Wilson Elser
August 27, 2024
Page 6

will favor valuing a conservation easement using the comparable sales approach or recent transactions involving the Property, similar to how the IRS appraiser valued the Conservation Easement for purposes of the Preliminary Report. Given this recent line of cases, the Court will likely disfavor any approach to value predicated solely on a DCF income approach. Thus, even assuming that Ashwood Gap prevails on the technical issues raised in the Preliminary Report, it is reasonable to expect the Tax Court to value Ashwood Gap's donation under a methodology that would result in a total liability significantly in excess of the Insureds' liability under the IRS Settlement. See Ex 2. Excel Spreadsheet Explaining Liability to Insured by taking settlement and by refusing settlement.

*Second*, while the IRS has made prior settlement offers to other taxpayers, it has structured its current offer in a manner to make it significantly more favorable for taxpayers. As the following table shows, the reduction the effective tax rate to 21% and the applicable penalty rate to 5% greatly reduces the out-of-pocket liability for the Insureds as compared to any other resolution while also limiting partnership's costs to litigate its case:

| Resolution | Taxes, Penalties, & Interest[3] |
|---|---|
| Acceptance of IRS Position | $33,412,386 – $33,553,282 |
| IRS Counsel Settlement Offer[4] | $21,285,700[5] |
| Current IRS Settlement | $11,531,933 |

To put the IRS Settlement into perspective, to accomplish a similar result through litigation, Ashwood Gap would have to (1) prevail on all of the technical arguments that the IRS may raise, (2) achieve a valuation of the Conservation Easement in excess of $27,500,000 (51.52% of the claimed deduction), and (3) convince the Tax Court that it had reasonable cause for the remaining adjustment to avoid application of a 20% accuracy-related penalty. Alternatively, if the Tax Court does not find that reasonable cause applies, Ashwood Gap would have to achieve a valuation in excess of $31,750,000 (59.49% of the claimed deduction). Even then, the additional interest and litigation costs associated with achieving such outcome would likely result in a total liability that would significantly exceed the Insureds' liability under the IRS Settlement.

Ashwood Gap currently has access to sufficient funds to pay the policy retention of $309,000, the excess liability amount of $922,933, and any additional interest that may accrue after September 9, 2024, provided that the Insurers honor their promises under the policy up to the coverage limit of $10,300,000. In light of the Tax Court's recent opinions, the structure of the IRS's settlement, and the significant time and resources it would take to achieve an equivalent result through litigation (if possible), the IRS Settlement is reasonable. *Johansen v. California*

---

[3] Interest calculated through September 9, 2024.

[4] This settlement offer is only available for certain docketed cases and this calculation is only being offered for demonstrative purposes. Ashwood Gap has not received this settlement offer and cannot reasonably expect to receive it if it rejects the IRS's current offer.

[5] Calculated assuming disallowance of the noncash charitable contribution, allowance of an "other deduction" equal to $10,300,100, computation of the tax liability using the highest marginal tax rate of 37%, application of a 10% gross valuation misstatement penalty, and interest calculated as required by law.

Joseph J. Stafford
Wilson Elser
August 27, 2024
Page 7

*State Auto. Ass'n Inter-Ins. Bureau*, 15 Cal. 3d 9, 16 (1975) (The touchstone of reasonableness is "whether, in light of the victim's injuries and the probable liability of the insured, [the] ultimate judgment is likely to exceed the amount of the settlement offer."). The Insurers should accordingly consent to Ashwood Gap's acceptance of the IRS Settlement or waive its right to consent to the same.

## IV.    Conclusion

Please confirm by the **close of business on September 2, 2024** that the Insurers will consent to Ashwood Gap's acceptance of the IRS Settlement or, in the alternative, waive the consent requirement in the policy for acceptance of the settlement. To the extent the Insurer requires additional information to evaluate this settlement, the Insureds invites the Insurer to make any additional information requests as soon as possible. Should you have any questions, please do not hesitate to call.

Sincerely,

D. Austin Bersinger

Enclosures

**D. Austin Bersinger**
Partner
abersinger@bradley.com
Direct: 404.868.2042



August 30, 2024

**VIA EMAIL ONLY**

Joseph J. Stafford
Wilson Elser
55 West Monroe Street, Suite 3800
Chicago, Illinois 60603
Email: joseph.stafford@wilsonelser.com

Re:    **Response to Information Requests**

|  |  |
|---|---|
| Insured: | Ashwood Gap Partners, LLC ("Ashwood Partners," or "Named Insured") |
| Insurer: | Wesco Insurance Company Interstate Fire & Casualty Co |
| Policy No.: | VFP/FL/13849/2020/1 |

Dear Mr. Stafford:

I am writing in furtherance of our ongoing communications regarding our client, Ashwood Partners, the Named Insured under the above-referenced Policy. Specifically, I am writing in response to various emails and information requests from your firm. Please see our responses below. We are further providing the requested documents that we have in our possession via an access link that will be sent to you in a separate email and will supplement with additional documents as needed.

**1.    The IRS' claims/arguments.**

We are providing a copy of the Letter 5895 dated August 2, 2023 ("Preliminary Report") and the Notice of Proposed Administrative Adjustment dated January 25, 2024 ("NOPPA") that the Internal Revenue Service ("IRS") issued to Ashwood Gap, LLC ("Ashwood Gap"), which detail the IRS's current claims/arguments. We note, however, that the IRS can still raise additional arguments or assert additional penalties, and it has a pattern of doing so in cases, such as this one, that involve a transaction it identifies as syndicated conservation easement transaction ("SCET").

**2.    The Insureds' defenses/arguments.**

As I previously noted, attorney-client privilege and/or the attorney work product doctrine protects the information and materials responsive to this request from disclosure. Waiving such protections as to any information or materials would be detrimental to Ashwood Partners and Ashwood Gap in the ongoing dispute with the IRS. Please provide any authority you have that supports the contention that providing these materials to you would not constitute a waiver of any applicable privilege. Alternatively, we are happy to help arrange a call with tax counsel to discuss the dispute generally and the reasonableness of the IRS's settlement offer.

Joseph J. Stafford
Wilson Elser
August 30, 2024
Page 2

3. **The parties' respective position statements (if any).**

Please see our response to request 2, above.

4. **Any written reports or recommendations provided by tax counsel.**

Please see our response to request 2, above.

5. **Copies of the articles of incorporation, bylaws, operating agreement, and partnership agreements for the Named Insured and any entity which the Named Insured controlled or otherwise had the ability to direct the managerial decisions of at any time during the performance of the business giving rise to any IRS proceeding ("Relevant Entities").**

We are providing copies of the requested organizational documents.

6. **Copies of any information or communications that has been conveyed by the Relevant Entities to the respective investors.**

We are waiting for additional information regarding investor communications and the investor vote and will supplement this response upon receipt of the same.

7. **Copies of any communications, statements, or indication from the principals of (or anyone at) the Relevant Entities, indicating their belief that the IRS settlement offer is reasonable and should be accepted, including the reasoning supporting such positions.**

Please see our letter dated August 27, 2024, for a detailed explanation of why the insureds believe the IRS settlement offer is reasonable.

8. **A listing of each of the investors in connection with each respective transaction, including their equity participation in the any of the Relevant Entities/partnership/conservation easement transaction and whether or not they participated in/paid toward the respective Investor 170(h) Liability insurance policy.**

We are providing a list of the investors in Ashwood Partners. As Ashwood Partners purchased the policy, all investors participated in the insurance policy.

9. **When are the investor voting dates scheduled to take place?**

We are waiting for additional information regarding investor communications and the investor vote and will supplement this response upon receipt of the same.

Joseph J. Stafford
Wilson Elser
August 30, 2024
Page 3

**10.    What is the manner, process, and procedure by which the voting will take place?**

The investor vote will take place remotely.  Ashwood Partners is using DocuSign to send the ballots and will tally the responses in accordance with each investor's interest.

**11.    A listing of all investors that have inquired regarding the Insurers' coverage positions, including the nature, extent, and substance of their respective inquiries.**

Investors have inquired about the insurance policy and the specifics of the applicable coverage; however, such requests have been ongoing and frequently through oral communications.

**12.    Provide the PPM.**

We are providing a copy of the Private Placement Memorandum.

**13.    Provide a calculation of the IRS Settlement Offer vs. not accepting.**

Please see my prior letter dated August 27, 2024, which included the requested pro forma.

**14.    Copies of any interviews of witnesses, independent expert reports or appraisals obtained, and/or any materials related to the evaluation of the conservation easement property valuation for the transaction.**

Please see our response to request 2, above.

**15.    Advise as to whether any of the Insureds have any other potential insurance coverage, as well as any notice and/or correspondence between such other insurer and Insureds.**

Neither Ashwood Gap nor Ashwood Partners have any other potential insurance coverage.

Should you have any additional questions, please do not hesitate to call.

Sincerely,

D. Austin Bersinger

Enclosures provided by separate link

**D. Austin Bersinger**
Partner
abersinger@bradley.com
Direct: 404.868.2042



September 5, 2024

<u>**VIA EMAIL ONLY**</u>

Joseph J. Stafford
Wilson Elser
55 West Monroe Street, Suite 3800
Chicago, Illinois 60603
Email: joseph.stafford@wilsonelser.com

Re:     **Supplemental Response to Information Requests**

|  |  |
|---|---|
| Insured: | Ashwood Gap Partners, LLC ("Ashwood Partners," or "Named Insured") |
| Insurer: | Wesco Insurance Company Interstate Fire & Casualty Co |
| Policy No.: | VFP/FL/13849/2020/1 |

Dear Mr. Stafford:

I am writing in furtherance of our ongoing communications regarding our client, Ashwood Partners, the Named Insured under the above-referenced Policy. Please find enclosed additional documents responsive to your request for information in connection with this matter. If you have any additional questions or need additional information, please do not hesitate to contact me.

Sincerely,

D. Austin Bersinger

Enclosures



**GREEN ROCK**

## <u>ASHWOOD GAP, LLC</u>

August 28, 2024

<u>VIA ELECTRONIC MAIL</u>

**CONFIDENTIAL SETTLEMENT COMMUNICATION**

**<u>Partner Voting Ballot</u>**

Ashwood Gap, LLC ("Partnership") received a settlement offer from the IRS ("Settlement Offer"). The Settlement Offer proposes that the Partnership (i) accept a tax deduction of approximately $10,300,000 instead of approximately $53,370,000 for 2020 (with the disallowed deduction taxed at a more favorable 21% rate), (ii) accept a penalty equal to 5% of the federal income tax liability caused by the significant decrease of the charitable tax deduction, and (iii) pay interest on the amounts owed under subparts (i) and (ii).

Green Rock Management, as the Partnership Representative ("PR") of the Partnership, is holding a vote of the Partners to determine whether to accept or reject the settlement offer. Green Rock Management is voting its ownership interests to <u>accept</u> the settlement offer.

Each partner should complete the information below no later than <u>**September 5, 2024**</u>. If you have any questions regarding the settlement offer or the partner vote, please contact us by email at support@green-rock.com

<u>Select One</u>:

☐    **I vote to <u>accept</u> the Settlement Offer from the IRS (Management's vote)**

☐    **I vote to <u>reject</u> the Settlement Offer from the IRS**

Name: _____

Signature: _____

Page 1 of 1




**GREEN ROCK**

August 26, 2024

<u>**VIA E-MAIL AND INVESTOR PORTAL**</u>

Re:    *Ashwood Gap, LLC – Settlement Offer*

Dear Member:

I am writing to provide you with information regarding a proposed settlement that the IRS recently offered to Ashwood Gap, LLC ("Partnership") in connection with the tax dispute involving its 2020 tax return (particularly the deduction related to its conservation easement donation). I am writing on behalf of Green Rock Management, which is the Partnership Representative ("PR") for the Partnership. In short, the IRS has made an offer to settle the tax controversy involving the Partnership. Accordingly, Green Rock Management is holding a vote of the partners to determine how to respond to the settlement offer. The terms of the settlement offer are described in detail below, along with answers to many questions relating to the offer and the settlement process.

**The Manager is voting its ownership interests to accept the settlement offer.**

You are receiving this letter because you are a partner in the Partnership (either directly or indirectly through Ashwood Gap, LLC). You will also be receiving a voting ballot via email from Docusign following the investor conference call (described on the last page of this letter). Please cast your vote by completing the Docusign ballot as soon as possible.

<u>**Charitable Donation Overview**</u>

In 2020, the Partnership, pursuant to a vote by the majority of the partners, donated a conservation easement on certain property to a charitable organization. As a result, the Partnership claimed a deduction for the conservation easement donation of approximately $53,370,000 on its 2020 Form 1065. This deduction then flowed through to the benefit of the partners based on their ownership interest in the Partnership. You are one of the partners in the Partnership, either directly or indirectly. As you are aware, the IRS is auditing the Partnership and the deduction relating to its conservation easement donation.

<u>**Proposed Settlement Offer**</u>

The IRS recently announced that it will be making time-limited settlement offers to certain partnerships that are still going through the audit process. The Partnership received a settlement offer from the IRS under this new settlement initiative. A copy of the letter is enclosed for your review. The IRS offers to settle the tax controversy on the following general terms:



**GREEN ROCK**

- The Partnership will get a charitable deduction of $0, but instead it will be entitled to a deduction for "out-of-pocket costs." The IRS defines "out-of-pocket costs" as the total amount that the partners paid, in the form of capital contributions or otherwise, to the Partnership or to an investment-tier partnership.

  o As an estimate, the Schedule M-2 (Analysis of Partners' Capital Accounts) for Ashwood Gap Partners, LLC indicates $10,300,000 as the capital contribution amount.

  o Ultimately, the IRS will calculate the allowable deduction.

- After taking into account the decreased tax deduction described above, the IRS will calculate the federal income tax liability at the Partnership level using a tax rate of 21 percent. Taxes are usually owed based on the federal tax rate to which each individual partner is subject during the relevant years, which is often 37 percent.

- The IRS will impose a penalty equal to 5 percent of the federal income tax liability.

- The resulting federal income tax liability, plus penalties, will be subject to interest charges, which started accruing back on the Partnership's initial Form 1065 filing deadline (*i.e.*, March 15, 2021).

- The Partnership must make one payment for the resulting federal income tax liability, penalties, and interest ("Settlement Payment"). As a result, if the settlement offer is accepted by the Partnership, all partners may be required to contribute their pro-rata share of the settlement amount to the Partnership in advance of the payment by the Partnership to the IRS.

The IRS letter states that the IRS will not consider any counteroffers to these terms.

### Draft Settlement Calculation

Several members have requested additional details regarding the terms of the settlement offer. To illustrate the potential consequences associated with the settlement offer, we have attached Appendix I, which includes various tax and penalty liability scenarios for your review.

Please note, the amounts in Appendix I are estimations for discussion purposes only, and do not reflect other key variables such as the fees incurred to defend the deduction in Tax Court or the amount of interest that would accrue between now and a potential Tax Court or other resolution.

The potential range of values identified in Appendix I are illustrative examples that are not representative of any expected outcome and do not take into account any facts or circumstances

2



**GREEN ROCK**

specific to you. The illustrative examples should not be considered tax or legal advice, and we urge you to consult with your accountant or other tax advisor to review your potential exposure under each scenario.

**Manager's Views of the Settlement Offer and Recommendation**

Green Rock Management, as Manager and PR of the Partnership, has evaluated the settlement offer and the current Tax Court litigation environment extensively. In our opinion the merits of our case remain strong. However, given the inherent risks of litigation, the terms of the current settlement offer extended by the IRS, and the current Tax Court litigation environment, our view is that this offer is in the best interest of the Partnership and its partners. As a result, we are voting our interests to accept the settlement offer.

**Frequently Asked Questions**

*How does the Partnership elect to Participate in the settlement offer?*

The Settlement Offer provides the Partnership with a right to elect to participate in the proposed settlement offer from IRS by executing the necessary paperwork and providing certain required information regarding the Partnership's Tax Return for the year at issue to the IRS. The election is non-binding. Once the election is made and such information is provided, the IRS then provides the Partnership with the relevant computation information, including the estimated "out-of-pocket costs," as well as the additional tax, penalties and interest that will be aggregated into the Settlement Payment.

On the other hand, if the Partnership were to reject the settlement offer, the IRS would eventually issue the Partnership a Notice of Final Partnership Adjustment ("FPA"), and the Partnership would need to dispute the FPA in United States Tax Court.

*What is the deadline to respond to the settlement offer?*

The initial settlement offer from the IRS required a response within 30 days. However, the Partnership obtained an additional 30-day response extension in order to facilitate a vote among the partners on this resolution. The Partnership must submit its decision by September 9, 2024.

Once the election is submitted, the IRS will then calculate the Settlement Payment and issue Form 906 (Closing Agreement on Final Determination Covering Specific Matters) ("Closing Agreement") to the Partnership. The Closing Agreement will need to be executed by (i) the PR and (ii) any individual who has power to bind the Partnership under state law. The Partnership must return the executed Closing Agreement to the IRS, and unless the Settlement Payment is satisfied in full within 30 calendar days of the date of the Closing Agreement, the IRS will charge additional interest until the Settlement Payment is fully paid.





**GREEN ROCK**

### *Who decides whether to accept or reject the settlement offer?*

Under the BBA procedures, the PR has sole discretion to make federal income tax decisions on behalf of the Partnership, including the decision of whether to accept the settlement offer. However, the PR intends to put the settlement offer to a vote to understand the partners' interest in the settlement offer. Accordingly, as discussed below, partners will be given the opportunity to vote on the settlement offer.

### *Will the insurance policy pay out if we accept the settlement?*

As you may recall, the Partnership elected to purchase a "Section 170(h) Liability" insurance policy. The purpose of the 170(h) liability policies is to provide coverage in case of an IRS challenge to the deductions taken. The insuring agreement of the insurance policy should cover a large part of the settlement, up to the policy limit, based on the clear language of the policy. However, the policy contains a consent provision that requires us to submit our proposed settlement to the insurer for its consent before the insurer will become obligated to pay any funds in connection with a settlement. We are in communication with the insurer regarding this settlement opportunity. We do not have confirmation of whether the insurer will consent to the settlement at this time. We will update you as soon as we have an answer from the insurer.

### *If the Partnership agrees to settle, who must pay the IRS and when?*

The Partnership, not its direct or indirect partners, is obligated to submit payment to the IRS. Importantly, this must be a complete, one-time payment, of *all* taxes, penalties and interest due. The IRS says the following in this regard:

- "The Partnership must make one payment (Settlement Payment) for all tax, penalties, and interest due as determined under this settlement agreement."

- "A Partnership [subject to the BBA rules] must agree to be liable for an imputed underpayment equal to the Settlement Amount [which includes taxes, penalties and interest]. The Partnership cannot elect modification or push-out."

The letter makes clear that the Partnership *must* make a single payment to resolve the matter. With that said, acceptance of the settlement offer will ultimately require payment from the partners based on their pro-rata ownership interest, direct or indirect, in the Partnership. This single payment from the Partnership to the IRS would be made at a later date after the IRS completes calculations pursuant to the settlement offer and issues a Closing Agreement to the Partnership. A partner's pro-rata payment will *not* be due by the upcoming deadline if the partners vote in favor of settlement. The settlement offer does not provide a set timeline for the issuance of a Closing Agreement or the required Settlement Payment. However, the settlement offer indicates that

4



**GREEN ROCK**

additional interest will begin to accrue if a full payment is not made within 30 days of the Closing Agreement.

### *What if a partner previously made a "deposit" to stop interest accrual?*

An individual partner cannot elect to apply any "deposit" that he or she previously made to the IRS to satisfy a portion of the taxes, penalties and interest due under the settlement program for non-docketed cases. The IRS letter says that the partner must request a refund of the earlier deposit pursuant to the instructions in Revenue Procedure 2005-18.

### *Can partners change their mind later?*

Under the BBA procedures, any adjustments made to partnership-related items are resolved at the partnership level. Therefore, any settlement with the IRS by the Partnership would be binding on the partners.

The settlement offer indicates, "[i]f the Partnership or partners take steps inconsistent with facilitating the resolution, the IRS reserves the right to remove the Partnership from the resolution. The removal determination is final." It is not clear if failure to timely pay the Settlement Payment would result in removal from the resolution, so it is important to understand the payment requirements associated with accepting the settlement offer. It is clear, though, that additional interest would accrue on the liability at the Partnership-level.

### *How would accepting the settlement offer affect my state income taxes?*

The settlement offer only addresses federal income tax and related issues (*i.e.*, issues with the IRS); it does *not* cover state income tax issues. In other words, while accepting the settlement offer might allow the Partnership and its partners to rectify federal income tax issues, it does not rectify any issues with any state tax authority.

### Tax Defense Team

As the PR, Green Rock Management has engaged the law firm of Dentons Sirote to defend the Partnership during the current tax dispute with the IRS. The main point of contact at the firm is Ronald A. Levitt, Esq. who will join the investor conference call described below.

### Conference Call and Vote

You should discuss the effect of the settlement offer with your own tax, legal, or financial advisor in order to determine how you will cast your voting ballot.

To facilitate the decision-making process, I invite you to join a conference call on August 28, 2024 at 4:00 Eastern Time (3:00 Central). You will receive an e-mail with dial-in instructions

5



for the conference call.  The Partnership's tax defense counsel and the Green Rock Management team will participate in the call to discuss the status of the case, next steps, settlement offer, etc. After the call, I plan to distribute ballots via Docusign so that each partner can vote to accept or reject the settlement offer.

In order to make the conference call as efficient as possible, **please submit any questions you might have by e-mail to our general counsel Brian Robbins at brobbins@green-rock.com** by August 27, 2024.

Sincerely,

Clayton Mobley, Manager
Green Rock Management, as Partnership Representative
for Ashwood Gap, LLC

6

**Ashwood Gap, LLC**
## Appendix I

Prepared in Anticipation of Litigation

Calculation of Potential 2020 Additional Tax, Penalties, and Interest

| | | |
|---|---|---|
| Claimed Deduction: | $ | 53,370,000 |
| Capital Raise: | $ | 10,300,000 |
| Insurance Policy Limit: | $ | 10,300,000 |
| Insurance Retention: | $ | 309,000 |

| Percent of Deduction Allowed | Full Denial of Deduction | 25% Allowed | Tax Court ("docketed") Settlement Proposal | 40% Allowed | 51% Allowed | 60% Allowed | Current Settlement Proposal ("non-docketed") | 70% Allowed | 85% Allowed | 100% Allowed |
|---|---|---|---|---|---|---|---|---|---|---|
| Amount of Deduction | $ 53,370,000 | $ 53,370,000 | $ 53,370,000 | $ 53,370,000 | $ 53,370,000 | $ 53,370,000 | $ 53,370,000 | $ 53,370,000 | $ 53,370,000 | $ 53,370,000 |
| Portion of Deduction Allowed | $ - | $ 13,342,500 | $ 10,300,000 | $ 21,348,000 | $ 27,218,700 | $ 32,022,000 | $ 10,300,000 | $ 37,359,000 | $ 45,364,500 | $ 53,370,000 |
| Portion of Deduction Disallowed | $ 53,370,000 | $ 40,027,500 | $ 43,070,000 | $ 32,022,000 | $ 26,151,300 | $ 21,348,000 | $ 43,070,000 | $ 16,011,000 | $ 8,005,500 | $ - |
| Individual Tax Rate^ | 37.0% | 37.0% | 37.0% | 37.0% | 37.0% | 37.0% | 21.0% | 37.0% | 37.0% | 37.0% |
| Additional Tax Proposed | $ 19,746,900 | $ 14,810,175 | $ 15,935,900 | $ 11,848,140 | $ 9,675,981 | $ 7,898,760 | $ 9,044,700 | $ 5,924,070 | $ 2,962,035 | $ - |
| **Penalties:** | | | | | | | | | | |
| Penalty (40%) | $ 7,898,760 | $ 5,924,070 | | $ 4,739,256 | | | | | | |
| Penalty (20%) | | | | | $ 1,935,196 | $ 1,579,752 | | $ 1,184,814 | $ 592,407 | $ - |
| Penalty (10%) | | | $ 1,593,590 | | | | | | | |
| Penalty (5%) | | | | | | | $ 452,235 | | | |
| Total (Tax and Penalty) | $ 27,645,660 | $ 20,734,245 | $ 17,529,490 | $ 16,587,396 | $ 11,611,177 | $ 9,478,512 | $ 9,496,935 | $ 7,108,884 | $ 3,554,442 | $ - |
| Interest (Tax and Penalty) (*to 9/15/2024) | $ 5,971,943 | $ 4,478,957 | $ 3,786,675 | $ 3,583,166 | $ 2,508,216 | $ 2,047,523 | $ 2,051,503 | $ 1,535,642 | $ 767,821 | $ - |
| Total Owed | $ 33,617,603 | $ 25,213,202 | $ 21,316,165 | $ 20,170,562 | $ 14,119,393 | $ 11,526,035 | $ 11,548,438 | $ 8,644,526 | $ 4,322,263 | $ - |
| Percentage of Liability Exposure (w/o insurance payment) | 100% | 75% | 63% | 60% | 42% | 34% | 34% | 26% | 13% | 0% |
| Potential Insurance Coverage | $ 10,300,000 | $ 10,300,000 | $ 10,300,000 | $ 10,300,000 | $ 10,300,000 | $ 10,300,000 | $ 10,300,000 | $ - | $ - | $ - |
| Amount Owed by Pship (after Insurance Payout) | $ 23,317,603 | $ 14,913,202 | $ 11,016,165 | $ 9,870,562 | $ 3,819,393 | $ 1,226,035 | $ 1,248,438 | $ 8,644,526 | $ 4,322,263 | $ - |
| Percentage of Liability Exposure (w/ Insurance Payout) | 100% | 64% | 47% | 42% | 16% | 5% | 5% | 37% | 19% | 0% |

Disclosures:

This illustration is hypothetical and not suggestive of any outcome, either in Tax Court or with respect to whether any insurance policy will provide payment or coverage in any given scenario. The IRS has only offered the "non-docketed" settlement offer to the Partnership at this time.

* Interest is calculated to September 15, 2024, whereas the actual interest will depend upon the timing of any resolution.

^These illustrative calculations assume that an individual partner was subject to taxation at the 37% federal tax rate. The actual tax rate (and the corresponding taxes owed) will depend on your particular situation.



**Department of the Treasury**
**Internal Revenue Service**
**Large Business and International - ECPA**
2888 Woodcock Blvd
Atlanta, GA 30341

Date:
07/11/2024
Taxpayer ID number (last 4 digits):
▮▮▮▮

Tax years:
December 31, 2020
Person to contact:
Name: Melinda Mahoney
ID number: 1000677937
Telephone:216-750-6704

Ashwood Gap
Attn: Clayton Mobley, Partnership Representative
2207 2nd Avenue N
Birmingham, AL 35203-3805

Dear Clayton Mobley:

**Why you're receiving this letter**
This letter is a time-limited offer to resolve the tax consequences related to your syndicated conservation easement transaction. Our proposed resolution is based on the terms outlined in the enclosed Attachment 1, Syndicated Conservation Easement Resolution Terms and Election.

**Why we're proposing this resolution**
We've identified syndicated conservation easement transactions as a significant compliance concern. These transactions have appeared on the IRS "Dirty Dozen" list of tax scams several times.

We've litigated and won syndicated conservation easement cases for failures to meet the requirements of Internal Revenue Code (IRC) Section 170 and overvaluation of the conservation easement. Penalties asserted by the government have been sustained. The U.S. Tax Court and appellate courts have issued opinions favorable to the IRS in syndicated conservation easement cases where the true value of the easement was found to be a small fraction of the claimed value.

We expect we'll continue to prevail in syndicated conservation easement litigation. However, we're offering to resolve your transaction now in the interest of sound tax administration and considering recent legislation.

**What you need to do to accept our offer**
If you wish to accept the terms outlined in Attachment 1 and enter into a resolution for this transaction, please follow the steps outlined in Attachment 1, Section A. **You have 30 days from the date of this letter to confirm your acceptance and to provide the requested documents.**

**What will happen if you don't accept our offer**
We'll continue to examine and litigate the tax consequences of your transaction under our normal procedures.

Examination results may include:
- Full disallowance of your charitable contribution deduction, and
- Imposition of civil penalties, which could include the 40% gross valuation misstatement penalty under IRC Section 6662(h). Some cases may be subject to the 75% fraud penalty under IRC Section 6663.

You will have the right to petition the U.S. Tax Court or file an action in a U.S. District Court or the U.S. Court of Federal Claims if you disagree with the examination results.

**Letter 6532 (12-2023)**
Catalog Number 93125Q

We encourage you to speak with a qualified, independent advisor about this settlement offer.

If you have questions, you can call the contact person shown above.

Sincerely,

*Charles Daniel*

Digitally signed by Charles C.
Daniel
Date: 2024.07.11 09:44:43 -04'00'

Charles Daniel
Team Manager, EPCA; TTY 3

Enclosure:
Attachment 1
Form 875-M

Attachment 1
ASHWOOD GAP, 2207 2nd Avenue N, Birmingham, AL 35203-3805,
█████████

## Syndicated Conservation Easement (Non-Docketed)
## Resolution Terms and Election

Below are the terms of the 2024 Syndicated Conservation Easement (Non-Docketed) Resolution. The Internal Revenue Service (IRS) will not entertain counteroffers to these terms.

This form provides ASHWOOD GAP, ███████(Partnership) an opportunity to elect to participate in a settlement initiative to resolve a transaction described in Section 2 of Notice 2017-10[1], 2017-4 I.R.B. 544, or a substantially similar transaction (collectively, SCE transactions).

This resolution is being offered to the entity listed above and is not available to partners on an individual basis. The terms of the resolution are outlined below.

## A. Election to Participate

1. The election to participate must be received by the IRS within **30 calendar days** of the date of the offer letter.

2. To elect into the resolution:

    a. An Authorized Signer[2] must initial each page and sign the last page of this form in the spaces provided.

    b. Partnership must provide its Form 1065 or, if applicable, the Form 1065 of the entity in which individual investors purchased their interest and from whom the individual investors received a Schedule K-1 (investment-tier partnership) reflecting the claimed charitable contribution deduction.

    c. A Partnership with less than one year remaining on the statute of limitation must sign a consent to extend the statute for no less than one year. A statute extension is enclosed with this letter, if needed, and must be signed and returned within 30 calendar days of this letter to participate in the settlement resolution.

---

[1] A Notice of Proposed Rulemaking (NPRM) was issued on December 8, 2022, providing that certain syndicated conservation easement transactions are listed transactions.

[2] For cases governed by Tax Equity and Fiscal Responsibility Act (TEFRA) of 1982, the Authorized Signer is the Tax Matters Partners (TMP). For cases governed by the Bipartisan Budget Act of 2015 (BBA), the Authorized Signer is the Partnership Representative (PR) (or the Designated Individual of the PR, if the PR is an entity). For Non-TEFRA and BBA elect-out cases, the Authorized Signer is all partners. All partners must sign the supplemental signature page of the form to signal all partners wish to participate. They do not have to initial each page.

Attachment 1
ASHWOOD GAP, 2207 2nd Avenue N, Birmingham, AL 35203-3805,
▮▮▮▮▮▮

3. The items listed in A.2.a. through c. must be timely returned to the IRS by email[3] to sce.settlement@irs.gov or faxed to (855) 579-6647. A courtesy copy must be sent to the contact person listed on the offer letter.

4. Please refer any questions regarding the settlement to the contact person listed on the offer letter. Questions or other communications sent to the mailbox will not be addressed.

5. Failure to satisfy any portion of paragraphs A.1 through 3 will be treated as an invalid election.

6. The Authorized Signer's signature will be treated as a non-binding consent to participate in this resolution. Formal agreement will be memorialized as described in paragraph B.17.

## B. Resolution Terms

### Deduction, Tax, and Penalties

1. Charitable Contribution Deduction: The Partnership is not entitled to a charitable contribution deduction claimed for a conservation easement, donation of a fee simple interest in real property, or other noncash charitable contributions.

2. Allowable Deduction (estimated out-of-pocket costs): The Partnership is entitled to a deduction for estimated out-of-pocket costs (i.e., the estimated amount the investors paid to either the Partnership or an investment-tier entity for an interest in the SCE transaction) allocable to the SCE transaction being settled. The IRS will calculate this amount. In general, the allowable deduction will be the amount reported on the Partnership's (or investment-tier partnership's) Schedule M-2, Capital Contributed (Cash).

3. Tax Rate: The IRS will calculate the tax due at the partnership level using a tax rate of 21%.

4. Penalties: An accuracy-related penalty for a gross valuation misstatement under section 6662(h) applies at a rate of 5%.

5. Amount Due: Once an election to participate is received, the IRS will provide the Authorized Signer with the necessary computational information, including the disallowed charitable contribution deduction, the estimated out-of-pocket costs allowed and the tax, penalties, and interest that will be aggregated into the Settlement Payment (as defined in section B.9.).

### Interest

6. Deficiency interest will be calculated as required by law.

---

[3] Communication by unencrypted email is not secure. Therefore, taxpayers, TMPs, and PRs electing via email should transmit any potentially sensitive information, including personally identifiable information (PII), only via encrypted, password-protected attachments. See IRS User Guide at irs.gov/usingemail for more information on signing and sending documents electronically.

Initials _____

Attachment 1
ASHWOOD GAP, 2207 2nd Avenue N, Birmingham, AL 35203-3805,

7. IRS will compute interest ending 30 calendar days after the date IRS sends the Form 906, Closing Agreement on Final Determination Covering Specific Matters (Closing Agreement). If Partnership fails to sign the Closing Agreement and pay the Settlement Payment within 30 calendar days of the date the IRS sends the Closing Agreement, additional interest will accrue.

8. Interest suspension under section 6404(g) is not permitted.

**Payment**

9. The Partnership must make one payment (Settlement Payment) for all tax, penalties, and interest due as determined under this settlement agreement.

10. If a partner has made a section 6603 deposit, they can request a refund by following Revenue Procedure 2005-18.

11. A Partnership subject to the centralized partnership audit regime enacted by BBA must agree to be liable for an imputed underpayment equal to the Settlement Payment determined under paragraph B.9. For purposes of this resolution, the term Settlement Payment includes the imputed underpayment described in this paragraph. The Partnership cannot elect modification or push-out.

**General**

12. The Partnership and partners must fully cooperate with the IRS, including meeting stringent deadlines, or face removal from the resolution.

13. In the case of an entity governed by TEFRA, all partners must participate in the resolution.

14. The Partnership and partners agree to fully cooperate with the IRS during the resolution, which includes, but is not limited to, providing additional information if requested by the IRS.

15. If the Partnership or partners take steps inconsistent with facilitating the resolution, the IRS reserves the right to remove the Partnership from the resolution. The removal determination is final.

16. The Partnership and partners agree that they are responsible for their own costs and fees associated with participation in this resolution and section 7430 does not apply.

17. To finalize the settlement:

    a. In the case of an entity governed by TEFRA, Non-TEFRA, and BBA Elect-Outs, the Partnership, and all direct partners, including spouses if married filing joint, will be required to execute a Closing Agreement, consistent with terms and conditions outlined herein. Among other terms, the Closing Agreement will provide that the amount paid will not be refundable or deductible for Federal income tax purposes under any circumstance.

    b. In the case of an entity governed by BBA, the Partnership will be required to execute a Closing Agreement, consistent with terms and conditions

Initials _____

Attachment 1
ASHWOOD GAP, 2207 2nd Avenue N, Birmingham, AL 35203-3805,

outlined in this term sheet. The Closing Agreement must be signed by the PR for the taxable year at issue as well as an individual with authority under state law to bind the partnership. Among other terms, the Closing Agreement will also provide that the Settlement Payment will not be refundable or deductible for Federal income tax purposes under any circumstance.

18. Neither this resolution, nor any settlement executed therefrom, will have any effect, limitation or prohibition against the IRS asserting promoter, appraiser, or return preparer penalties or pursuing discipline under Circular 230.

19. The deduction allowed under paragraph B.2. cannot be inferred to represent a value of the property and/or the value of the conservation easement.

20. Nothing in this resolution precludes the IRS from investigating any associated criminal conduct or recommending prosecution of any individual or entity that participated in or assisted or advised others in participating in an SCE transaction for violation of any criminal statute.

21. The terms contained herein do not constitute an interpretation of the law as it applies to SCE transactions.

22. The parties agree that this settlement is limited to this specific case and may not be used in any court proceeding involving the United States and/or the Commissioner of the Internal Revenue Service as a party.

23. Permission to participate in this resolution in no manner indicates, nor should be interpreted as, an opinion as to whether there is fraud with respect to the Partnership's SCE transaction.

_____

Print Name and Title


_____        _____

Signature                                Date


Initials _____

**D. Austin Bersinger**
Partner
abersinger@bradley.com
Direct: 404.868.2042



November 11, 2024

<u>**VIA EMAIL ONLY**</u>

Joseph J. Stafford
Wilson Elser
55 West Monroe Street, Suite 3800
Chicago, Illinois 60603
Email: joseph.stafford@wilsonelser.com

Re:    **Response to Information Requests**

      Insured:      Ashwood Gap Partners, LLC ("Ashwood Partners," or "Named Insured")
      Insurer:      Wesco Insurance Company, Interstate Fire & Casualty Co. ("Insurers")
      Policy No.:   VFP/FL/13849/2020/1

Dear Mr. Stafford:

      I am writing in furtherance of our ongoing communications regarding our client, Ashwood Partners, the Named Insured under the above-referenced Policy. Specifically, I am writing to supplement our prior responses to the various emails and information requests that we have received your firm. Please see our responses below. We are further providing additional requested documents via an access link that will be sent to you in a separate email.

**Prior Request 2: The Insureds' defenses/arguments.**

      We understand from Sarah Adam in your office that this request does not seek any information or documents that would be protected by the attorney-client privilege and/or the attorney work product doctrine. As you are aware, waiving such protections as to any information or materials would be detrimental to Ashwood Partners and Ashwood Gap, LLC ("Ashwood Gap") in the ongoing dispute with the IRS, and the partnerships are in no way waiving such protections by responding to your requests. At this time, there are no Tax Court pleadings or similar documents related to the Insureds' defenses/arguments. We continue to be willing to help arrange a call with tax counsel to discuss this matter and the reasonableness of the IRS's settlement offer.

      The foregoing notwithstanding as you are aware, the ultimate issue in this case remains the FMV of the donated conservation easement ("Conservation Easement"). Ashwood Gap relied on significant due diligence to support the reported fair market value ("FMV") of the donation. The Insurers received and reviewed all such due diligence at the time of binding. This due diligence supported the appraiser's use of the discounted cash flow ("DCF") valuation methodology to determine the FMV of the donated easement, and Ashwood Gap would have to rely on similar due diligence at trial to prevail on the valuation issue. If Ashwood Gap does not prevail on the valuation issue, it will be mathematically impossible for it to secure a result that is better than or even equivalent to the IRS's current settlement offer.

Joseph J. Stafford
Wilson Elser
November 11, 2024
Page 2

Recent caselaw from the Tax Court regarding the valuation of conservation easements indicates that this valuation approach is now disfavored by the Tax Court. These cases are (i) *Mill Road 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129; (ii) *Oconee Landing Property, LLC v. Commissioner*, T.C. Memo. 2024-25; (iii) *Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35; (iv) *Buckelew Farm, LLC v. Commissioner*, T.C. Memo. 2024-52; (v) *Excelsior Aggregates v. Commissioner*, T.C. Memo. 2024-60; (vi) *Corning Place Ohio, LLC v. Commissioner*, T.C. Memo. 2024-72; and (vii) *J L Minerals, LLC v. Commissioner*, T.C. Memo. 2024-93. We are enclosing copies of these opinions with this letter. As explained below, these cases indicate that the Tax Court is unlikely to accept any valuation of a conservation easement that depends on a DCF/income approach absent unique facts that do not appear to be present in Ashwood Gap's case. It would thus be unreasonable for the Insurers to refuse to consent to Ashwood Gap's acceptance of the IRS's settlement offer or waive its right to consent to the same.

> ### a.    *J L Minerals*

The Tax Court's most recent opinion involving the valuation of a conservation easement is *J L Minerals, LLC v. Commissioner*, T.C. Memo. 2024-93, which it issued on October 8, 2024. In this case, the Honorable Patrick J. Urda joined the growing list of Tax Court judges who have rejected the use of the DCF/income valuation methodology in cases involving SCETs.

To value the easement at issue, the court first looked to prior transactions involving the subject property. Specifically, members of the partnership acquired a tract that included the subject property approximately two years before the deduction. This transaction provided a per-acre before value that was approximately 0.95% of the reported value. The court concluded that this transaction provided "strong evidence of the value of the easement property." *J L Minerals, LLC*, T.C. Memo. 2024-93, at *56–57.

The court next reiterated that the comparable sales methodology remains its preferred approach for valuing vacant land. On this point, the taxpayer's experts did not identify any comparable sale that supported the taxpayer's valuation. It instead relied solely on the underlying due diligence regarding the property's mineral reserve to assert that the property was sufficiently unique to value it using the DCF/income methodology. Rejecting this conclusion, the court stated as follows:

> "In the case of vacant, unimproved property . . . the comparable sales approach is 'generally the most reliable method of valuation.'" *Oconee Landing*, T.C. Memo. 2024-25, at *67 (quoting *Estate of Spruill*, 88 T.C. at 1229 n.24); *see also Excelsior Aggregates*, T.C. Memo. 202460, at *38; *Savannah Shoals*, T.C. Memo. 2024-35, at *35. "The comparable sales approach is usually the most reliable indicator of value when sufficient information exists" because "the market place is the best indicator of value, based on the conflicting

Joseph J. Stafford
Wilson Elser
November 11, 2024
Page 3

interests of many buyers and sellers." *Corning Place*, T.C. Memo.
2024-72, at *32 (quoting *Estate of Spruill*, 88 T.C. at 1229 n.24).

*J L Minerals, LLC*, T.C. Memo. 2024-93, at *58. The court thus focused on the comparable sale
analysis that the IRS's expert performed, which resulted in a per-acre before FMV of 0.96% of the
reported value. The court concluded that this analysis was "persuasive," as it "generally
confirm[ed] the results of the actual transactions involving the easement property." *Id.* at *59–60.

After accepting the comparable sales valuation methodology, the court fully explained why
it rejected the partnership's valuation that relied on a DCF/income valuation approach:

> "The income capitalization [approach] is most reliable when used to
> determine the value of an existing business with a track record of
> income, expenses, profits, and growth rates. A historical track
> record provides real-world inputs that supply a plausible basis for
> projecting future revenue." *Excelsior Aggregates*, T.C. Memo.
> 2024-60, at *43–44 (citing *Whitehouse III*, 139 T.C. at 325 (noting
> that the income approach "has been judged an unsatisfactory
> valuation method for property that does not have a track record of
> earnings")).

> "Income valuation methods are not favored when valuing vacant
> land with no income-producing history because they are inherently
> speculative and unreliable." *Savannah Shoals*, T.C. Memo. 2024-
> 35, at *36; *see also Whitehouse Hotel III*, 139 T.C. at 324–25;
> *Ambassador Apartments, Inc. v. Commissioner*, 50 T.C. 236, 243–
> 44 (1968), aff'd per curiam, 406 F.2d 288 (2d Cir. 1969); *Excelsior
> Aggregates*, T.C. Memo. 2024-60, at *33. "The income approach is
> rarely appropriate when seeking to determine the value of
> undeveloped property with no existing cashflow." *Corning Place,*
> T.C. Memo. 2024-72, at *37; *see Excelsior Aggregates*, T.C. Memo.
> 2024-60, at *44 ("[C]ourts have often noted 'the folly of trying to
> estimate the value of undeveloped property by looking to its
> anticipated earnings.'" (quoting *Pittsburgh Terminal Corp v.
> Commissioner*, 60 T.C. 80, 89 (1973), aff'd, 500 F.2d 1400 (3d Cir.
> 1974) (unpublished table decision))); *see also Chapman Glen*, 140
> T.C. at 327; *Whitehouse Hotel III*, 139 T.C. at 324–25; *Ambassador
> Apartments*, 50 T.C. at 243–44; *Savannah Shoals*, T.C. Memo.
> 2024-35, at *36. "Absent a financial track record, every input into
> the DCF analysis necessarily involves speculation." *Excelsior
> Aggregates*, T.C. Memo. 2024-60, at *44; *see also Corning Place*,
> T.C. Memo. 2024-72, at *37 ("Lacking reliable data, the appraiser
> would have to rely on a lengthy series of assumptions, estimates,
> and guesstimates."). "That problem would be at its apogee here—

Joseph J. Stafford
Wilson Elser
November 11, 2024
Page 4

attempting to predict the future revenues and expenses of a nonexistent business for a 30-year period." *Excelsior Aggregates*, T.C. Memo. 2024-60, at *44; *see also Corning Place Ohio*, T.C. Memo. 2024-72, at *37–38.

*J L Minerals, LLC*, T.C. Memo. 2024-93, at *61–62.

Under such circumstances, the court rejected the taxpayer's DCF/income appraisal as it did "not [value] the property at all, but what a speculative business could do with the property. But a discounted cashflow method geared to what a business could earn is of limited utility in determining what a property is worth." *Id.* at *63. The court instead concluded that the FMV of the subject property before the donation of the subject easement was 1.04% of the reported before FMV of the subject property. It further offered the following warning for future litigants on the valuation issue in conservation easement cases:

> That is the point: Use of the discounted cashflow method with so few reliable inputs and so many variables and unknowns is simply an exercise in imagination. *As such it is altogether unreliable, and we would ignore the laughable results it generated even if we thought mining were the easement property's highest and best use. We caution taxpayers in the future who choose to use this method without strong support that we will view the income approach and the discounted cashflow method with skepticism, particularly in the conservation easement context.*

*J L Minerals, LLC*, T.C. Memo. 2024-93, at *64–65 (emphasis added).

### b.   *Savannah Shoals*

The Tax Court issued its opinion in *Savannah Shoals, LLC v. Commissioner* on March 26, 2024. Like the taxpayer in *J L Minerals*, the taxpayer's experts in *Savannah Shoals* utilized a DCF/income valuation to support the reported before FMV of the subject property. This case, however, involved a property in northeast Georgia that the taxpayer identified as having an aggregate mining HBU. As you are aware, this HBU is the same HBU that the appraiser determined in this case to measure the FMV of the Conservation Easement.

Unlike *J L Minerals*, there was no recent transaction of the subject property in *Savannah Shoals*. Without this data point, the Tax Court focused its valuation analysis on identifying the subject property's HBU and the price that membership interests in the partnership sold for as part of the transaction. Specifically, it focused on determining the demand for aggregate material from the proposed quarry. While the parties' experts agreed that an aggregate quarry's market area could be as large as 50 miles, the Tax Court indicated that competition from other quarries in the region effectively limited the market area to 25 miles. *Savannah Shoals*, T.C. Memo. 2024-35, at *38–39. The court then determined this 25-mile market area was relatively

Joseph J. Stafford
Wilson Elser
November 11, 2024
Page 5

rural and would thus not support the taxpayer's demand estimates, as other quarries were located closer to nearby population centers. *Id.* at \*40–41. The court concluded that the taxpayer had not established that existing quarries in the market area failed to meet the available demand. *Id.* at \*41–42.

Based on the foregoing, the Tax Court concluded that development of the subject property as an aggregate quarry was not the property's HBU, as it was not financially feasible. *Id.* at 43. Importantly, the court further concluded that, even if it had determined that aggregate mining was the property's HBU, the valuation result would not change. *Id.* at \*45.

The court further agreed with the IRS's expert, who "opined that there were negligible differences (approximately 1.5%) in prices paid for land with known [mineral] deposits . . . . He explained that there is no price premium for land with known aggregate deposits because aggregate is abundant. He testified that the easement property is not unique and that he would consider property to be unique if the market demonstrated a preference for the property." *Id.* at \*46. While the court ultimately did not rely on the IRS expert's mineral property analysis in its valuation, it indicated that the analysis "confirms that New Shoals claimed an exorbitantly high, baseless value for the unencumbered easement property." *Id.* The court instead placed significant weight on the IRS's comparable sale analysis, which resulted in a before FMV of the subject property of approximately 2.08% of the originally reported value.

   *c.*    ***Excelsior Aggregates***

The Tax Court issued its opinion in *Excelsior Aggregates* on May 30, 2024. These consolidated cases focused on the valuation of two conservation easements and one fee simple interest in Alabama that the taxpayers had valued using a DCF/income valuation. Specifically, the taxpayer valued the properties based on a sand and gravel mining HBU.

In analyzing the value of the subject properties, the Tax Court first looked at recent transactions involving the properties, recognizing that one of the properties involved sold the same year as the donation for between 3% and 5% of the taxpayers' reported before values. The court concluded that "this is the best available evidence as to the 'before' value of [the] parcels on the valuation date." *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*31–32. The court further determined that the properties lacked sufficient sand and gravel reserves to support a mining HBU. *Id.* at \*41–42. Instead, the court determined the IRS correctly valued the subject properties based on the recent transaction and the IRS expert's comparable sales analyses, which were largely consistent with the prior transactions in the subject property.

The court further rejected the taxpayers' arguments that the sand and gravel resources of the subject properties justified a higher FMV or the taxpayers' use of the DCF/income methodology, stating: "The record is replete with reliable historical evidence of the prices that knowledgeable buyers paid to purchase acreage with potential for commercial [sand and gravel] mining. Petitioner does not contend (and could not plausibly contend) that the . . . parcels had any unique features that made them especially valuable." *Id.* at \*40. The court further agreed with the IRS's expert regarding the unreliability of a DCF/income valuation, stating that the lack of reliable

Joseph J. Stafford
Wilson Elser
November 11, 2024
Page 6

data required "the appraiser to . . . rely on a lengthy series of assumptions, estimates, and guesstimates. *Performed under these constraints, the DCF method becomes highly speculative, making it inferior to the sales comparison method, which draws its conclusions from the market.*" *Id.* at \*44 (emphasis added).

###### d.    *Mill Road*; *Oconee Landing*; *Buckelew Farm*; *Corning Place*

*J L Minerals*, *Savannah Shoals*, and *Excelsior Aggregates* have the most direct applicability to the present case, as all three cases involve the Tax Court's analysis of properties with a claimed mining HBU. But, it is important to note that the court in *J L Minerals* also cites its opinions involving easements over vacant properties with proposed development HBUs, including *Mill Road*, *Oconee Landing*, *Buckelew*, and *Corning Place*. These opinions further highlight several of the key principles that the Tax Court has recently applied in valuing conservation easements.

- First, the Tax Court will focus on prior transactions in the subject property, if available, as it has indicated that it believes such transactions are "the best evidence if a property's FMV." *See Corning Place*, T.C. Memo. 2024-72, at \*28–29; *Buckelew*, T.C. Memo. 2024-52, at \*56.

- Second, the comparable sale methodology is the Tax Court's preferred method for vacant property. *See Corning Place*, T.C. Memo. 2024-72, at \*34–35; *Buckelew*, T.C. Memo. 2024-52, at \*54–56; *Oconee Landing*, T.C. Memo. 2024-25, at \*66–67; *Mill Road*, T.C. Memo. 2023-129, at \*50–52.

- Third, the Tax Court expects a taxpayer to present significant unique facts regarding a conserved property to justify the Tax Court's use of the DCF/income valuation approach. *See Corning Place*, T.C. Memo. 2024-72, at \*38; *Buckelew*, T.C. Memo. 2024-52, at \*55–56; *Oconee Landing*, T.C. Memo. 2024-25, at \*70; *Mill Road*, T.C. Memo. 2023-129, at \*15.

###### e.    The IRS's Settlement Offer Remains Reasonable

The foregoing analysis shows why the IRS's offer to settle this case is reasonable. Indeed, the evidence that Ashwood Partners and Ashwood Gap have provided the Insurers further shows that many facts of this case are substantially similar to facts that the Tax Court identified in its opinions as grounds to refuse to value the Property using a DCF/income methodology. These similarities lead to the reasonable expectation that the Tax Court would reach a similar result in this case. Because of this expectation, the terms of the IRS's settlement offer are reasonable. Moreover, as our prior correspondence confirms, the Insurers' refusal to consent to Ashwood Gap's acceptance of the offer or waive the requirement under the Policy for consent would significantly increase the investors' exposure to additional tax, penalties, and interest.

Joseph J. Stafford
Wilson Elser
November 11, 2024
Page 7

**Prior Request 3: The parties' respective position statements (if any).**

Without waiving attorney-client privilege in any respect, there are no documents responsive to this request.

**Prior Request 4: Any written reports or recommendations provided by tax counsel.**

Without waiving attorney-client privilege in any respect, there are no documents responsive to this request.

**Prior Request 6: Copies of any information or communications that has been conveyed by the Relevant Entities to the respective investors.**

We are providing responsive communications with the respective investors regarding the IRS's proposed settlement offer. As we previously noted, the partnership also hosted a remote meeting for the investors to discuss the IRS's settlement offer.

**Prior Request 7: Copies of any communications, statements, or indication from the principals of (or anyone at) the Relevant Entities, indicating their belief that the IRS settlement offer is reasonable and should be accepted, including the reasoning supporting such positions.**

We are providing responsive communications with the respective investors regarding the IRS's proposed settlement offer. As we previously noted, the partnership also hosted a remote meeting for the investors to discuss the IRS's settlement offer.

**Prior Request 11: A listing of all investors that have inquired regarding the Insurers' coverage positions, including the nature, extent, and substance of their respective inquiries.**

We are providing responsive communications with the respective investors regarding insurance policy in this case. As we previously noted, the partnership also hosted a remote meeting for the investors to discuss the IRS's settlement offer. Multiple investors have inquired regarding the insurance policy and the Insurers' coverage positions during the member call and during other conversations.

**Prior Request 14: Copies of any interviews of witnesses, independent expert reports or appraisals obtained, and/or any materials related to the evaluation of the conservation easement property valuation for the transaction.**

Without waiving attorney-client privilege in any respect, there are no documents responsive to this request.

Joseph J. Stafford
Wilson Elser
November 11, 2024
Page 8

Should you have any additional questions, please do not hesitate to call.

Sincerely,

D. Austin Bersinger

Enclosures provided by separate link

Cc. Sarah Adam (Sarah.Adam@wilsonelser.com)

# Exhibit I

| | |
|---|---|
| **From:** | Adam, Sarah <Sarah.Adam@wilsonelser.com> |
| **Sent:** | Monday, February 10, 2025 2:12 PM |
| **To:** | Bersinger, Austin; Mitchum, Lisa |
| **Cc:** | Larkin, Peter J.; Stafford, Joseph J. |
| **Subject:** | RE: Conservation Easements: Ashwood Gap (Green Rock), 25512.00003 (Fidelis) |
| **Attachments:** | RE: Ashwood Gap Partners, LLC; Syndicated Conservation Easement Matters - Acknowledgement of Letters; 2025.01.31 Letter to A.Bersinger Regarding Representation_02_ASHWOOD GAP_vsf.pdf; Ashwood Gap - Prior Correspondence.zip |

Dear Austin,

We are following up on the Ashwood Gap matter, and our below and attached correspondence.  First, please provide an update as to whether the partnership responded to the IRS's settlement calculation, and if so, please provide a copy of the response.  It appears that, when your office provided notice of the calculation on December 11, 2024, the deadline to respond to the IRS had already passed two days prior on December 9.

Second, we reiterate that responses to certain document requests dating back to August 15, 2024 remain outstanding (see below).  Specifically, we have seemingly received incomplete information in response to requests (1), (5), (6-7) and (11); and no documents or information at all in response to request (2).  To the extent that any additional responsive materials exist, please provide them as soon as possible. To the extent they do not, please confirm in writing.  As for request (2) (*i.e.*, the taxpayer's position, defenses and arguments), you have refused to produce any information based on your blanket assertion of privilege.  In this regard, we feel compelled to directly and expressly address an incorrect statement that continues to be reiterated in your letters. In your attached November 11, 2024 letter, you state:

> "We understand from Sarah Adam in your office that this request does not seek any information or documents that would be protected by the attorney-client privilege and/or the attorney work product doctrine."

This is incorrect.  To be clear, our office has always taken the position (both orally and in writing) that any privilege concerns could be adequately addressed by a confidentiality and common interest agreement.  To date, you have ignored this proposal.  We reiterate the offer.  Moreover, this blanket assertion of privilege is problematic because it is not clear what information and documents are actually being withheld.  By way of example, request (2) would encompass, *inter alia*, correspondence between the IRS and Ashwood Gap or the insured (or any person or entity designated or acting on behalf of the taxpayer).  It is unclear how there could be any privilege in such correspondence that would prevent its disclosure. **Accordingly, please advise whether responsive documents exist, and if so, identify those that are being withheld and the rationale for doing so.**  To be clear, we request that you provide __all__ of the requested material as a matter of urgency, without exception, as this information is necessary and essential to the insurers' analysis of the insured's request(s) related to the IRS's non-docketed settlement process.

As for your requests for the insurers' consent, as we have previously advised, there is no actual settlement offer for the insurers to consider at this time.  As you know, the IRS's non-docketed settlement letter offers an invitation to participate in a non-binding process whereby the partnership would, at a future date, receive a settlement offer for consideration.  Further, while the IRS has now provided cost calculations in connection with this non-binding process, there is still not actual settlement/closing agreement presented to the partnership for consideration.  To the extent you disagree or believe our understanding is inaccurate, please advise immediately and provide an explanation.

That said, based on our understanding of the IRS's non-docketed settlement process, at this time, the insurers are willing to conditionally waive the lack of consent defense in a limited manner to allow Ashwood Gap to continue to engage in discussions with the IRS, the Named Insured, and the individual partners solely with respect to the proposal sent by the IRS in its letter dated July 11, 2024. This limited waiver is expressly conditioned on the insurers being provided the relevant and necessary information, documents, communications and materials – as well as sufficient time to review and evaluate such materials. The insurers must consider the reasonableness of the IRS non-docketed proposal, confirm the validity of the partnership voting, understand the proposal intended to be discussed, and adequately evaluate and consider the specific terms and amounts associated with any actual proposed settlement/closing agreement offered by the IRS.

To be clear, the insurers are willing to agree to this limited conditional waiver solely to allow Ashwood Gap to engage in non-binding settlement *discussions* with the IRS in connection with the IRS's July 11, 2024 letter. The insurers are not providing consent to accept any settlement offer or agreement. They are not agreeing not to raise lack of consent as an impediment to coverage for any settlement agreement. They are not waiving (conditionally or otherwise) any consent, voluntary payments, or other related provisions of the Policy as it relates to any actual proposed settlement (or closing) agreement offered or presented by the IRS. They are also not advising as to coverage under the Policy for any settlement. To the extent Ashwood Gap receives an actual settlement offer/closing agreement from the IRS for consideration, written consent (or waiver) must be separately sought and the insurers must be afforded sufficient time to consider such a request – including sufficient time to adequately review, evaluate, and analyze all relevant information, materials, and documents as to the unique history, attributes, transactions, valuations, and due diligence related to the conservation easement at issue – within a realistic and reasonable timeframe prior to providing any position as to coverage or consent under the Policy.

Please let us know if you have any questions, or if you would like to schedule a call to discuss. Please also keep us timely posted as to any and all developments in this matter. In the interim, the insurers continue to respectfully reserve any and all rights, remedies, and defenses under the policy, at law, and in equity.

Thank you,

Sarah Adam
Attorney at Law
Wilson Elser Moskowitz Edelman & Dicker LLP
150 E 42nd Street
New York, NY 10017
212.915.5371 (Direct)
646.575.8486 (Cell)
212.490.3000 (Main)
212.490.3038 (Fax)
sarah.adam@wilsonelser.com

**From:** Adam, Sarah <Sarah.Adam@wilsonelser.com>
**Sent:** Thursday, August 15, 2024 11:11 PM
**To:** abersinger@bradley.com
**Cc:** Stafford, Joseph J. <Joseph.Stafford@wilsonelser.com>; Larkin, Peter J. <Peter.Larkin@wilsonelser.com>
**Subject:** Conservation Easements: Ashwood Gap (Green Rock), 25512.00003 (Fidelis)

Dear Austin,
As you may know, our office has been retained by Fidelis Underwriting Limited as capacity provider for Volante in connection with the IRS settlement proposal received by Ashwood Gap. Please let us know your availability for a

call to discuss this matter. In addition, as a matter of urgency, please provide a copy of the IRS proposal letter and advise as to the partnership's present deadline to respond to the IRS, and whether that deadline is expected to be extended.

Please also advise as to the deadline/date for the partnership members to vote on whether or not to participate in the IRS's non-docketed settlement process. Please be advised that, if the partnership voted/votes to participate, we will also request confirming documentation of the voting process, as well as the below-listed documents and information—which the insurer will need in order to adequately review, evaluate, and analyze prior to providing any position or comment as it relates to the insured's Investor 170(h) Liability insurance policy. If, however, the partnership elected/elects not to participate and the insured is not currently seeking or requesting any response from the insurer, no further information or documents need to be provided at this time.

Please keep us advised as to all further developments on this matter. We look forward to speaking with you. In the interim, the insurer respectfully reserves all rights under the policy, at law, and in equity.

Thank you,

Sarah Adam
Attorney at Law
Wilson Elser Moskowitz Edelman & Dicker LLP
150 E 42nd Street
New York, NY 10017
212.915.5371 (Direct)
646.575.8486 (Cell)
212.490.3000 (Main)
212.490.3038 (Fax)
sarah.adam@wilsonelser.com

List of Additional Documents/Information:

1.    The IRS's claims/arguments, wherever memorialized, including but not limited to any correspondence/ forms/ Notices of Partnership Adjustment sent to the Insureds/taxpayer;
2.    The Insureds' defenses/arguments, wherever memorialized, including but not limited to any correspondence with the IRS;
3.    The parties' respective position statements (if any);
4.    Any written reports or recommendations provided by tax counsel;
5.    Copies of the articles of incorporation, bylaws, operating agreement, and partnership agreements for the Named Insured and any entity which the Named Insured controlled or otherwise had the ability to direct the managerial decisions of at any time during the performance of the business giving rise to any IRS proceeding ("Relevant Entities");
6.    Copies of any information or communications that has been conveyed by the Relevant Entities to the respective investors;
7.    Copies of any communications, statements, or indication from the principals of (or anyone at) the Relevant Entities, indicating their belief that the IRS settlement offer/proposal is reasonable and should be accepted, including the reasoning supporting such positions;
8.    A listing of each of the investors in connection with the transaction, including their equity participation in any of the Relevant Entities/partnership/conservation easement transaction and whether or not they participated in/paid toward the respective Investor 170(h) Liability insurance policy;
9.    The dates that the investor voting is scheduled to take place for consideration of any IRS non-docketed settlement overtures/offers, and when completed, the outcome of the voting, and supporting documentation;
10.    What is the manner, process, and procedure by which the voting will take place;
11.    A listing of all investors that have inquired regarding the Insurers' coverage positions, including the nature, extent, and substance of their respective inquiries;

12.    The PPM or other materials offered to investors;

13.    A pro forma (i.e., calculation of cost of accepting the IRS settlement offer/proposal vs. not accepting);

14.    Copies of any interviews of witnesses, independent expert reports or appraisals obtained, and/or any materials related to the evaluation of the conservation easement property valuation for the transaction;

15.    Advise as to whether any of the Insureds have any other potential insurance coverage, as well as any notice and/or correspondence between such other insurer and Insureds; and

16.    Any other relevant material.

```
IMPORTANT NOTICE: Beware of Cyber Fraud.
You should NEVER wire money to any bank account that Wilson Elser
Moskowitz Edelman & Dicker LLP provides to you either in the body
of this or any email or in an attachment without first speaking
with the attorney in our office who is handling your transaction.
Further, DO NOT accept emailed wire instructions from anyone else
without voice verification. Even if an email looks like it has come
from this office or someone involved in your transaction,
CALL US FIRST AT A NUMBER YOU KNOW TO BE CORRECT FOR THIS OFFICE
to verify the information before wiring any money.
Failure to do so is at your own risk.
Be particularly wary of any request to change wire instructions
you have already received.


CONFIDENTIALITY NOTICE: This electronic message is intended to be
viewed only by the individual or entity to whom it is addressed.
It may contain information that is privileged, confidential and
exempt from disclosure under applicable law. Any dissemination,
distribution or copying of this communication is strictly prohibited
without our prior permission. If the reader of this message is not
the intended recipient, or the employee or agent responsible for
delivering the message to the intended recipient, or if you have
received this communication in error, please notify us immediately by
return e-mail and delete the original message and any copies of it
from your computer system.


For further information about Wilson, Elser, Moskowitz, Edelman &
Dicker LLP, please see our website at www.wilsonelser.com or refer to
any of our offices.


Thank you.
```

# Exhibit J

**D. Austin Bersinger**
Partner
ABersinger@bradley.com
404.868.2042 direct



April 4, 2025

**VIA EMAIL ONLY**

Joseph J. Stafford
Wilson Elser
55 West Monroe Street, Suite 3800
Chicago, Illinois 60603
Email: joseph.stafford@wilsonelser.com

Re:     **Demand for Coverage Position and Consent or Waiver of Consent for Acceptance IRS Closing Agreement**

| | |
|---|---|
| Insured: | Ashwood Gap Partners, LLC ("Ashwood Partners") |
| Insurers: | Wesco Insurance Company, Interstate Fire & Casualty Co., Volante Global, LTD, Volante Specialty Risk LTD, Fidelis Underwriting Limited, Liberty Mutual Insurance Europe SE, AmTrust Financial, Allianz ("Insurers") |
| Policy No.: | VFP/FL/13849/2020/1 |
| Claimant: | Ashwood Gap Partners, LLC |

Dear Mr. Stafford:

I am writing regarding the above-referenced Policy. As you are aware, the IRS extended an offer to Ashwood Gap, LLC ("Ashwood Gap") on July 11, 2024, to resolve its ongoing tax dispute. Based on recent case law from the Tax Court regarding the valuation of conservation easements, we requested that the Insurers either consent to Ashwood Gap's acceptance of the proposed settlement or agree not to raise lack of consent or other related policy provisions as an impediment to coverage. The Insurers determined that the IRS's settlement initiative was an invitation to participate in the non-docketed settlement process and not a settlement offer that required consent under the Policy. The Insurers accordingly allowed the partnership to continue to engage in discussions with the IRS with respect to the non-docketed settlement process.

Ashwood Gap recently received the enclosed from the IRS, which contains, among other documents, a Form 906 (Closing Agreement on Final Determination Covering Specific Matters) for the non-docketed settlement process. The partnership has requested that the IRS extend the deadline for responding to the Form 906, and it anticipates that the IRS will grant this request. We will keep you updated regarding the partnership's extension request. We are further enclosing with this correspondence a copy of the letter sent to the investors regarding the status of the IRS's settlement and will provide you with the partnership's correspondence with the investors regarding the Closing Agreement upon receipt of the same.

Joseph J. Stafford
Wilson Elser
April 4, 2025
Page 2

At this time, as Ashwood Gap is continuing to work with the IRS with respect to the Form 906, the partnership is not making a demand that the Insurers agree to fund amounts due to the IRS under the settlement up to the limit of the Policy. Instead, for the reasons stated in our letter dated August 27, 2024 as supplemented, Ashwood Gap and Ashwood Partners recognize that the IRS's settlement offer remains reasonable. Indeed, since our August 27, 2024 letter, the Tax Court has issued five additional opinions related the valuation of conservation easements that further confirm that the court will likely continue to favor valuing a conservation easement using the comparable sales approach or recent transactions involving the subject property and disfavor any approach to value predicated solely on an Income/Discounted Cash Flow valuation approach. *See J L Minerals, LLC v. Commissioner*, T.C. Memo. 2024-93 (adjusting deduction for conservation easement donation to 0.56% of reported deduction); *Seabrook Property, LLC v. Commissioner*, T.C. Memo. 2025-6 (adjusting deduction for conservation easement donation to 14.48% of reported deduction); *Jackson Crossroads, LLC v. Commissioner*, T.C. Memo. 2024-111 (adjusting deductions for two conservation easement donations to 5.05% and 11.36%, respectively, of reported deductions); *Green Valley Investors, LLC v. Commissioner*, T.C. Memo. 2025-15 (adjusting deduction for conservation easement donation to 5.22% of reported deduction); *Ranch Springs, LLC v. Commissioner*, 164 T.C. No. 6 (2025) (in reviewed opinion, adjusting deduction for conservation easement donation to 1.30% of the reported deduction).

We thus reiterate our demand that the Insurers consent to Ashwood Gap's acceptance of the IRS's proposed settlement set forth in the Form 906. In the event the Insurers cannot commit to providing consent with respect to the IRS settlement, we respectfully request that the Insurers agree not to raise lack of consent or other related policy provisions as an impediment to coverage. We further request that the Insurers provide their coverage position with respect IRS's settlement offer under the terms of the Policy. In order to meet the IRS's deadline, we request that the Insurers provide a written response to this correspondence by April 18, 2025.

Should you have any questions, please do not hesitate to call.

Sincerely,

D. Austin Bersinger

Enclosures

**Department of the Treasury**
**Internal Revenue Service**
**LB&I/Pass Through Entities**
6450 Rockside Woods Blvd. S. Mail Stop 714
Independence, Ohio 44131

March 20, 2025

Ashwood Gap
Attn: Clayton J. Mobley
2207 2nd Ave N
Birmingham, AL 35203-3805

Dear Taxpayer:

Enclosed are three copies of Form 906, Closing Agreement on Final Determination Covering
Specific Matters, reflecting agreement under the terms of the Syndicated Conservation Easement
Resolution Initiative (SCERI). I have also enclosed an examination report for informational
purposes showing the proposed changes to your tax for the periods above, based on the SCERI
terms. This report was prepared in response to your election to participate in the SCERI and is
only for purposes of the SCERI. The Form 906 and payment must be signed and returned within
30 calendar days of the date of this letter. Please sign, date and return all three copies of the
Form 906 to the address shown above.

According to the terms of SCERI, Taxpayers must full pay the tax liability prior to IRS
executing the Form 906. Include payment for the full amount you owe when you return the
signed Forms 906. Make your check or money order payable to the United States Treasury.

If you have any questions, please contact me at 216-750-6704.

Sincerely,

Melinda Mahoney
Internal Revenue Agent
LB&I Pass Through Entities

Enclosures:
Form 906 (3)
Form 14791

Closing Agreement With Ashwood Gap LLC ███████

**Form 906**
(Rev. Aug. 1994)
Department of the Treasury—Internal Revenue Service

## CLOSING AGREEMENT ON FINAL DETERMINATION
## COVERING SPECIFIC MATTERS

Under section 7121 of the Internal Revenue Code ("I.R.C." or "Code"), Ashwood Gap LLC ███████ (the "Partnership"), 2207 2nd Avenue N, Birmingham, AL 35203, and the Commissioner of Internal Revenue (the "Commissioner") (the Commissioner and the Partnership, collectively, the "Parties") make the following Closing Agreement (the "Closing Agreement"):

WHEREAS, the Partnership filed a Form 1065, U.S. Return of Partnership Income, for the partnership year beginning 10/16/2020 and ending 12/31/2020 (the "2020 Partnership Year").

WHEREAS, the Partnership is subject to the centralized partnership provisions of the Bipartisan Budget Act of 2015, codified at I.R.C. §§ 6221 through 6241 ("BBA") as in effect for tax years beginning on or after January 1, 2018, for the 2020 Partnership Year.

WHEREAS, Green Rock Management LLC (the "PR") is the partnership representative (as defined in I.R.C. § 6223) of the Partnership for the 2020 Partnership Year. Clayton J. Mobley is the designated individual of the PR for the 2020 Partnership Year.

WHEREAS, Clayton J. Mobley of Green Rock Management LLC is authorized under Alabama law at the State Law Signatory to act for the Partnership at the time of signature.

WHEREAS, on December 22, 2020, the Partnership donated a conservation easement (the "Easement") on the property located at County Road 104, Stevenson, AL as described in Exhibits A-1 and A-2 of the Deed of Conservation Easement (the "Property") to Heritage Preservation Trust, Inc. (the "Donee").

WHEREAS, the Partnership claimed a non-cash charitable contribution deduction of $53,370,000 for the Easement donation on its Form 1065 for the 2020 Partnership Year;

WHEREAS, the Partnership also made a payment of cash of $68,000 to the Donee for which it claimed an additional charitable contribution deduction on its Form 1065 for the 2020 Partnership Year.

WHEREAS, the Partnership's donation of the Easement described herein for the 2020 Partnership Year is collectively defined as the "Transaction."

WHEREAS, the Commissioner examined the Partnership's Form 1065 for the 2020 Partnership Year under the BBA partnership procedures.

1 of 5

Closing Agreement With Ashwood Gap LLC ▬▬▬▬

WHEREAS, the Parties desire to resolve with finality their dispute involving the federal income tax treatment of the Transaction.

NOW THEREFORE THE PARTIES HEREBY DETERMINE AND AGREE for federal income tax purposes that:

1. The charitable contribution deduction(s) and all other items related to the Transaction are adjusted as follows (the "Adjustments"):

    a. Except as provided herein, no deduction, loss, or other tax benefit arising from or in connection with the Transaction, including the deduction claimed for a non-cash charitable contribution of $53,370,000 for the 2020 Partnership Year, is allowed to the Partnership or its Partners for any taxable years.

    b. The Partnership is allowed a deduction for out-of-pocket costs of $10,300,100 for the 2020 Partnership Year.

2. The Partnership is liable for an imputed underpayment under I.R.C.§ 6225 in the amount of $9,044,679 for the 2025 Partnership Year as a result of the Adjustments in determination clause 1 herein.

3. For the 2025 Partnership Year, the Partnership, pursuant to I.R.C. § 6233, is liable for a penalty under I.R.C. § 6662(h) in the amount of $452,234.

4. Prior to the execution of this Agreement, the Partnership made a lump sum payment of $12,275,750 (the "Settlement Payment") to the U.S. Department of the Treasury ("Treasury") in full settlement of the tax, penalties, and interest that could be assessed and collected against the Partnership as a result of the Adjustments in determination clause 1 herein.

5. The Settlement Payment is not refundable or subject to credit, refund, offset, or otherwise reimbursable by the Partnership or the Partners under any circumstances and may be retained by the Treasury regardless of whether it is assessed.

6. No part of the Settlement Payment is deductible, amortizable, or otherwise recoverable for tax purposes by the Partnership or the Partners for any taxable year.

7. The Partnership waives all restrictions on assessment, including the restrictions under I.R.C. § 6232(b), and collection of the imputed underpayment and penalties (and interest on such amounts) determined under this Closing Agreement.

8. Any of the following amounts received by the Partnership after the execution of this Closing Agreement are reportable as ordinary income for the taxable year of receipt:

Closing Agreement With Ashwood Gap LLC ▮▮▮▮▮▮

    a. Amounts paid from third-party tax-gap or tax result or tax liability [insurance] policies, audit insurance policies, or similar funds or investments purchased by the Partnership in connection with the Transaction;

    b. Amounts received from promoters, appraisers, legal or tax professionals, donees, or any other person associated with the creation, marketing, execution, or implementation of the Transaction, regardless of whether a civil action is filed against those persons; or

    c. Amounts received from any other third party that is paid as a result of participation in the Transaction and the disallowance of non-cash charitable contribution deduction arising from the Transaction.

9. An inspection of records during the consideration of this Closing Agreement does not preclude or impede, pursuant to I.R.C. § 7605(b), Rev. Proc. 2005-32, 2005-1 C.B. 1206, or any administrative provisions adopted by the Commissioner, a later examination of a return or inspection of records with respect to any tax year needed to resolve any issue outside the scope of this Closing Agreement.

10. Execution of this Closing Agreement does not preclude the Commissioner from asserting promoter, appraiser, or return preparer penalties or pursuing discipline under Circular 230.

11. Execution of this Closing Agreement does not preclude the Commissioner from investigating any associated criminal conduct or recommending prosecution of any individual or entity that participated in or assisted or advised others in participating in transactions for violation of any criminal statute.

12. Nothing in this Closing Agreement offers any protection against criminal investigation or prosecution.

13. This Closing Agreement is effective upon execution by the Commissioner or his delegate.

THIS AGREEMENT IS FINAL AND CONCLUSIVE EXCEPT:

(1) The matter it relates to may be reopened in the event of fraud, malfeasance, or misrepresentation of a material fact;

Closing Agreement With Ashwood Gap LLC ███████

(2) it is subject to the Code sections that expressly provide that effect be given to their provisions (including any stated exception for I.R.C. § 7122) notwithstanding any other law or rule of law; and

(3) if it relates to a tax period ending after the date of this agreement, it is subject to any law, enacted after the agreement date, that applies to that tax period.

For the BBA Partnership:

Ashwood Gap LLC

By: _____    _Sign Here_    ____    Date Signed: _____
    Clayton J. Mobley, De                       n Rock Management LLC,
Partnership Representativ

By: _____    _Sign Here_    _____    Date Signed: _____
    Clayton J.                       nagement LLC, State Law Signatory of
Taxpayer

Commissioner of Internal Revenue

By: _____    Date Signed: _____
        Name and Title:

| I have examined the specific matters and recommend the acceptance of the proposed agreement. | I have examined the specific matters and recommend the acceptance of the proposed agreement. |
|---|---|
| (Receiving Officer)         (Date) | (Reviewing Officer)         (Date) |
| (Title) | (Title) |

Closing Agreement With Ashwood Gap LLC ███████

## Instructions

This agreement must be signed and filed in triplicate. (All copies must have original signatures.) The original and copies of the agreement must be identical. The name of the taxpayer must be stated accurately. The agreement may relate to one or more years.

If an attorney or agent signs the agreement for the taxpayer, the power of attorney (or a copy) authorizing that person to sign must be attached to the agreement. If the agreement is made for a year when a joint income tax return was filed by a husband and wife, it should be signed by or for both spouses. One spouse may sign as agent for the other if the document (or a copy) specifically authorizing that spouse to sign is attached to the agreement.

If the fiduciary signs the agreement for a decedent or an estate, an attested copy of the letters testamentary or the court order authorizing the fiduciary to sign, and a certificate of recent date that the authority remains in full force and effect must be attached to the agreement. If a trustee signs, a certified copy of the trust instrument or a certified copy of extracts from that instrument must be attached showing:

(1) the date of the instrument;

(2) that it is or is not of record in any court;

(3) the names of the beneficiaries;

(4) the appointment of the trustee, the authority granted, and other information necessary to show that the authority extends to federal tax matters; and

(5) that the trust has not been terminated, and that the trustee appointed is still acting. If a fiduciary is a party, Form 56, Notice Concerning Fiduciary Relationship, is ordinarily required.

If the taxpayer is a corporation, the agreement must be dated and signed with the name of the corporation, the signature and title of an authorized officer or officers, or the signature of an authorized attorney or agent. It is not necessary that a copy of an enabling corporate resolution be attached.

Use additional pages if necessary and identify them as part of this agreement.

Please see Revenue Procedure 68-16, C.B. 1968-1, page 770, for a detailed description of practices and procedures applicable to most closing agreements.

Closing Agreement With Ashwood Gap LLC ███████

**Form 906**
(Rev. Aug. 1994)
Department of the Treasury—Internal Revenue Service

## CLOSING AGREEMENT ON FINAL DETERMINATION
## <u>COVERING SPECIFIC MATTERS</u>

Under section 7121 of the Internal Revenue Code ("I.R.C." or "Code"), Ashwood Gap LLC ███████ (the "Partnership"), 2207 2nd Avenue N, Birmingham, AL 35203, and the Commissioner of Internal Revenue (the "Commissioner") (the Commissioner and the Partnership, collectively, the "Parties") make the following Closing Agreement (the "Closing Agreement"):

WHEREAS, the Partnership filed a Form 1065, U.S. Return of Partnership Income, for the partnership year beginning 10/16/2020 and ending 12/31/2020 (the "2020 Partnership Year").

WHEREAS, the Partnership is subject to the centralized partnership provisions of the Bipartisan Budget Act of 2015, codified at I.R.C. §§ 6221 through 6241 ("BBA") as in effect for tax years beginning on or after January 1, 2018, for the 2020 Partnership Year.

WHEREAS, Green Rock Management LLC (the "PR") is the partnership representative (as defined in I.R.C. § 6223) of the Partnership for the 2020 Partnership Year. Clayton J. Mobley is the designated individual of the PR for the 2020 Partnership Year.

WHEREAS, Clayton J. Mobley of Green Rock Management LLC is authorized under Alabama law at the State Law Signatory to act for the Partnership at the time of signature.

WHEREAS, on December 22, 2020, the Partnership donated a conservation easement (the "Easement") on the property located at County Road 104, Stevenson, AL as described in Exhibits A-1 and A-2 of the Deed of Conservation Easement (the "Property") to Heritage Preservation Trust, Inc. (the "Donee").

WHEREAS, the Partnership claimed a non-cash charitable contribution deduction of $53,370,000 for the Easement donation on its Form 1065 for the 2020 Partnership Year;

WHEREAS, the Partnership also made a payment of cash of $68,000 to the Donee for which it claimed an additional charitable contribution deduction on its Form 1065 for the 2020 Partnership Year.

WHEREAS, the Partnership's donation of the Easement described herein for the 2020 Partnership Year is collectively defined as the "Transaction."

WHEREAS, the Commissioner examined the Partnership's Form 1065 for the 2020 Partnership Year under the BBA partnership procedures.

Closing Agreement With Ashwood Gap LLC ▇▇▇▇▇

WHEREAS, the Parties desire to resolve with finality their dispute involving the federal income tax treatment of the Transaction.

NOW THEREFORE THE PARTIES HEREBY DETERMINE AND AGREE for federal income tax purposes that:

1. The charitable contribution deduction(s) and all other items related to the Transaction are adjusted as follows (the "Adjustments"):

   a. Except as provided herein, no deduction, loss, or other tax benefit arising from or in connection with the Transaction, including the deduction claimed for a non-cash charitable contribution of $53,370,000 for the 2020 Partnership Year, is allowed to the Partnership or its Partners for any taxable years.

   b. The Partnership is allowed a deduction for out-of-pocket costs of $10,300,100 for the 2020 Partnership Year.

2. The Partnership is liable for an imputed underpayment under I.R.C.§ 6225 in the amount of $9,044,679 for the 2025 Partnership Year as a result of the Adjustments in determination clause 1 herein.

3. For the 2025 Partnership Year, the Partnership, pursuant to I.R.C. § 6233, is liable for a penalty under I.R.C. § 6662(h) in the amount of $452,234.

4. Prior to the execution of this Agreement, the Partnership made a lump sum payment of $12,275,750 (the "Settlement Payment") to the U.S. Department of the Treasury ("Treasury") in full settlement of the tax, penalties, and interest that could be assessed and collected against the Partnership as a result of the Adjustments in determination clause 1 herein.

5. The Settlement Payment is not refundable or subject to credit, refund, offset, or otherwise reimbursable by the Partnership or the Partners under any circumstances and may be retained by the Treasury regardless of whether it is assessed.

6. No part of the Settlement Payment is deductible, amortizable, or otherwise recoverable for tax purposes by the Partnership or the Partners for any taxable year.

7. The Partnership waives all restrictions on assessment, including the restrictions under I.R.C. § 6232(b), and collection of the imputed underpayment and penalties (and interest on such amounts) determined under this Closing Agreement.

8. Any of the following amounts received by the Partnership after the execution of this Closing Agreement are reportable as ordinary income for the taxable year of receipt:

Closing Agreement With Ashwood Gap LLC ████████

    a. Amounts paid from third-party tax-gap or tax result or tax liability [insurance] policies, audit insurance policies, or similar funds or investments purchased by the Partnership in connection with the Transaction;

    b. Amounts received from promoters, appraisers, legal or tax professionals, donees, or any other person associated with the creation, marketing, execution, or implementation of the Transaction, regardless of whether a civil action is filed against those persons; or

    c. Amounts received from any other third party that is paid as a result of participation in the Transaction and the disallowance of non-cash charitable contribution deduction arising from the Transaction.

9. An inspection of records during the consideration of this Closing Agreement does not preclude or impede, pursuant to I.R.C. § 7605(b), Rev. Proc. 2005-32, 2005-1 C.B. 1206, or any administrative provisions adopted by the Commissioner, a later examination of a return or inspection of records with respect to any tax year needed to resolve any issue outside the scope of this Closing Agreement.

10. Execution of this Closing Agreement does not preclude the Commissioner from asserting promoter, appraiser, or return preparer penalties or pursuing discipline under Circular 230.

11. Execution of this Closing Agreement does not preclude the Commissioner from investigating any associated criminal conduct or recommending prosecution of any individual or entity that participated in or assisted or advised others in participating in transactions for violation of any criminal statute.

12. Nothing in this Closing Agreement offers any protection against criminal investigation or prosecution.

13. This Closing Agreement is effective upon execution by the Commissioner or his delegate.

THIS AGREEMENT IS FINAL AND CONCLUSIVE EXCEPT:

(1) The matter it relates to may be reopened in the event of fraud, malfeasance, or misrepresentation of a material fact;

Closing Agreement With Ashwood Gap LLC ███████

(2) it is subject to the Code sections that expressly provide that effect be given to their provisions (including any stated exception for I.R.C. § 7122) notwithstanding any other law or rule of law; and

(3) if it relates to a tax period ending after the date of this agreement, it is subject to any law, enacted after the agreement date, that applies to that tax period.


For the BBA Partnership:

Ashwood Gap LLC

By: _____  *Sign Here*  _____  Date Signed: _____
    Clayton J. Mobley             3reen Rock Management LLC,
Partnership Represen                    3


By: _____  *Sign Here*  _____  Date Signed: _____
    Clayton J. Mc             iement LLC, State Law Signatory of
Taxpayer


Commissioner of Internal Revenue

By: _____    Date Signed: _____
    Name and Title:


| I have examined the specific matters and recommend the acceptance of the proposed agreement. | I have examined the specific matters and recommend the acceptance of the proposed agreement. |
|---|---|
| | |
| (Receiving Officer)      (Date) | (Reviewing Officer)     (Date) |
| (Title) | (Title) |

Closing Agreement With Ashwood Gap LLC █████████

## Instructions

This agreement must be signed and filed in triplicate. (All copies must have original signatures.) The original and copies of the agreement must be identical. The name of the taxpayer must be stated accurately. The agreement may relate to one or more years.

If an attorney or agent signs the agreement for the taxpayer, the power of attorney (or a copy) authorizing that person to sign must be attached to the agreement. If the agreement is made for a year when a joint income tax return was filed by a husband and wife, it should be signed by or for both spouses. One spouse may sign as agent for the other if the document (or a copy) specifically authorizing that spouse to sign is attached to the agreement.

If the fiduciary signs the agreement for a decedent or an estate, an attested copy of the letters testamentary or the court order authorizing the fiduciary to sign, and a certificate of recent date that the authority remains in full force and effect must be attached to the agreement. If a trustee signs, a certified copy of the trust instrument or a certified copy of extracts from that instrument must be attached showing:

(1) the date of the instrument;

(2) that it is or is not of record in any court;

(3) the names of the beneficiaries;

(4) the appointment of the trustee, the authority granted, and other information necessary to show that the authority extends to federal tax matters; and

(5) that the trust has not been terminated, and that the trustee appointed is still acting. If a fiduciary is a party, Form 56, Notice Concerning Fiduciary Relationship, is ordinarily required.

If the taxpayer is a corporation, the agreement must be dated and signed with the name of the corporation, the signature and title of an authorized officer or officers, or the signature of an authorized attorney or agent. It is not necessary that a copy of an enabling corporate resolution be attached.

Use additional pages if necessary and identify them as part of this agreement.

Please see Revenue Procedure 68-16, C.B. 1968-1, page 770, for a detailed description of practices and procedures applicable to most closing agreements.

5 of 5

Closing Agreement With Ashwood Gap LLC ███████████

**Form 906**
(Rev. Aug. 1994)
Department of the Treasury—Internal Revenue Service

## CLOSING AGREEMENT ON FINAL DETERMINATION
## COVERING SPECIFIC MATTERS

Under section 7121 of the Internal Revenue Code ("I.R.C." or "Code"), Ashwood Gap LLC ███████████ (the "Partnership"), 2207 2nd Avenue N, Birmingham, AL 35203, and the Commissioner of Internal Revenue (the "Commissioner") (the Commissioner and the Partnership, collectively, the "Parties") make the following Closing Agreement (the "Closing Agreement"):

WHEREAS, the Partnership filed a Form 1065, U.S. Return of Partnership Income, for the partnership year beginning 10/16/2020 and ending 12/31/2020 (the "2020 Partnership Year").

WHEREAS, the Partnership is subject to the centralized partnership provisions of the Bipartisan Budget Act of 2015, codified at I.R.C. §§ 6221 through 6241 ("BBA") as in effect for tax years beginning on or after January 1, 2018, for the 2020 Partnership Year.

WHEREAS, Green Rock Management LLC (the "PR") is the partnership representative (as defined in I.R.C. § 6223) of the Partnership for the 2020 Partnership Year. Clayton J. Mobley is the designated individual of the PR for the 2020 Partnership Year.

WHEREAS, Clayton J. Mobley of Green Rock Management LLC is authorized under Alabama law at the State Law Signatory to act for the Partnership at the time of signature.

WHEREAS, on December 22, 2020, the Partnership donated a conservation easement (the "Easement") on the property located at County Road 104, Stevenson, AL as described in Exhibits A-1 and A-2 of the Deed of Conservation Easement (the "Property") to Heritage Preservation Trust, Inc. (the "Donee").

WHEREAS, the Partnership claimed a non-cash charitable contribution deduction of $53,370,000 for the Easement donation on its Form 1065 for the 2020 Partnership Year;

WHEREAS, the Partnership also made a payment of cash of $68,000 to the Donee for which it claimed an additional charitable contribution deduction on its Form 1065 for the 2020 Partnership Year.

WHEREAS, the Partnership's donation of the Easement described herein for the 2020 Partnership Year is collectively defined as the "Transaction."

WHEREAS, the Commissioner examined the Partnership's Form 1065 for the 2020 Partnership Year under the BBA partnership procedures.

Closing Agreement With Ashwood Gap LLC ███████

WHEREAS, the Parties desire to resolve with finality their dispute involving the federal income tax treatment of the Transaction.

NOW THEREFORE THE PARTIES HEREBY DETERMINE AND AGREE for federal income tax purposes that:

1. The charitable contribution deduction(s) and all other items related to the Transaction are adjusted as follows (the "Adjustments"):

    a. Except as provided herein, no deduction, loss, or other tax benefit arising from or in connection with the Transaction, including the deduction claimed for a non-cash charitable contribution of $53,370,000 for the 2020 Partnership Year, is allowed to the Partnership or its Partners for any taxable years.

    b. The Partnership is allowed a deduction for out-of-pocket costs of $10,300,100 for the 2020 Partnership Year.

2. The Partnership is liable for an imputed underpayment under I.R.C. § 6225 in the amount of $9,044,679 for the 2025 Partnership Year as a result of the Adjustments in determination clause 1 herein.

3. For the 2025 Partnership Year, the Partnership, pursuant to I.R.C. § 6233, is liable for a penalty under I.R.C. § 6662(h) in the amount of $452,234.

4. Prior to the execution of this Agreement, the Partnership made a lump sum payment of $12,275,750 (the "Settlement Payment") to the U.S. Department of the Treasury ("Treasury") in full settlement of the tax, penalties, and interest that could be assessed and collected against the Partnership as a result of the Adjustments in determination clause 1 herein.

5. The Settlement Payment is not refundable or subject to credit, refund, offset, or otherwise reimbursable by the Partnership or the Partners under any circumstances and may be retained by the Treasury regardless of whether it is assessed.

6. No part of the Settlement Payment is deductible, amortizable, or otherwise recoverable for tax purposes by the Partnership or the Partners for any taxable year.

7. The Partnership waives all restrictions on assessment, including the restrictions under I.R.C. § 6232(b), and collection of the imputed underpayment and penalties (and interest on such amounts) determined under this Closing Agreement.

8. Any of the following amounts received by the Partnership after the execution of this Closing Agreement are reportable as ordinary income for the taxable year of receipt:

Closing Agreement With Ashwood Gap LLC ███████

    a. Amounts paid from third-party tax-gap or tax result or tax liability [insurance] policies, audit insurance policies, or similar funds or investments purchased by the Partnership in connection with the Transaction;

    b. Amounts received from promoters, appraisers, legal or tax professionals, donees, or any other person associated with the creation, marketing, execution, or implementation of the Transaction, regardless of whether a civil action is filed against those persons; or

    c. Amounts received from any other third party that is paid as a result of participation in the Transaction and the disallowance of non-cash charitable contribution deduction arising from the Transaction.

9. An inspection of records during the consideration of this Closing Agreement does not preclude or impede, pursuant to I.R.C. § 7605(b), Rev. Proc. 2005-32, 2005-1 C.B. 1206, or any administrative provisions adopted by the Commissioner, a later examination of a return or inspection of records with respect to any tax year needed to resolve any issue outside the scope of this Closing Agreement.

10. Execution of this Closing Agreement does not preclude the Commissioner from asserting promoter, appraiser, or return preparer penalties or pursuing discipline under Circular 230.

11. Execution of this Closing Agreement does not preclude the Commissioner from investigating any associated criminal conduct or recommending prosecution of any individual or entity that participated in or assisted or advised others in participating in transactions for violation of any criminal statute.

12. Nothing in this Closing Agreement offers any protection against criminal investigation or prosecution.

13. This Closing Agreement is effective upon execution by the Commissioner or his delegate.

THIS AGREEMENT IS FINAL AND CONCLUSIVE EXCEPT:

(1) The matter it relates to may be reopened in the event of fraud, malfeasance, or misrepresentation of a material fact;

Closing Agreement With Ashwood Gap LLC ████████

(2) it is subject to the Code sections that expressly provide that effect be given to their provisions (including any stated exception for I.R.C. § 7122) notwithstanding any other law or rule of law; and

(3) if it relates to a tax period ending after the date of this agreement, it is subject to any law, enacted after the agreement date, that applies to that tax period.

For the BBA Partnership:

Ashwood Gap LLC

By: _____      _____    Date Signed: _____
     Clayton J. Mobley, D                 en Rock Management LLC,
Partnership Representat

By: _____      _____      Date Signed: _____
     Clayton J.                           agement LLC, State Law Signatory of
Taxpayer

Commissioner of Internal Revenue

By: _____      Date Signed: _____
          Name and Title:

| I have examined the specific matters and recommend the acceptance of the proposed agreement. | I have examined the specific matters and recommend the acceptance of the proposed agreement. |
|---|---|
| (Receiving Officer)          (Date) | (Reviewing Officer)          (Date) |
| (Title) | (Title) |

Closing Agreement With Ashwood Gap LLC ███████

## Instructions

This agreement must be signed and filed in triplicate. (All copies must have original signatures.) The original and copies of the agreement must be identical. The name of the taxpayer must be stated accurately. The agreement may relate to one or more years.

If an attorney or agent signs the agreement for the taxpayer, the power of attorney (or a copy) authorizing that person to sign must be attached to the agreement. If the agreement is made for a year when a joint income tax return was filed by a husband and wife, it should be signed by or for both spouses. One spouse may sign as agent for the other if the document (or a copy) specifically authorizing that spouse to sign is attached to the agreement.

If the fiduciary signs the agreement for a decedent or an estate, an attested copy of the letters testamentary or the court order authorizing the fiduciary to sign, and a certificate of recent date that the authority remains in full force and effect must be attached to the agreement. If a trustee signs, a certified copy of the trust instrument or a certified copy of extracts from that instrument must be attached showing:

(1) the date of the instrument;

(2) that it is or is not of record in any court;

(3) the names of the beneficiaries;

(4) the appointment of the trustee, the authority granted, and other information necessary to show that the authority extends to federal tax matters; and

(5) that the trust has not been terminated, and that the trustee appointed is still acting. If a fiduciary is a party, Form 56, Notice Concerning Fiduciary Relationship, is ordinarily required.

If the taxpayer is a corporation, the agreement must be dated and signed with the name of the corporation, the signature and title of an authorized officer or officers, or the signature of an authorized attorney or agent. It is not necessary that a copy of an enabling corporate resolution be attached.

Use additional pages if necessary and identify them as part of this agreement.

Please see Revenue Procedure 68-16, C.B. 1968-1, page 770, for a detailed description of practices and procedures applicable to most closing agreements.

Do not process. This Form 14791 is for computational purposes under
Syndicated Conservation Easement Resolution Initiative only.

# Preliminary Partnership Examination Changes, Imputed Underpayment Computation and Partnership Level Determinations as to Penalties, Additions to Tax and Additional Amounts

| Audit control number | Tax year ended (mm/dd/yyyy) |
|---|---|
| 2012005198 | 12/31/2020 |

## Partnership Information

| Name | | | Taxpayer ID Number (TIN) |
|---|---|---|---|
| Ashwood Gap LLC | | | ■■■■■■■■ |

| Street address (including apartment no.) | City or town | State | ZIP code |
|---|---|---|---|
| 2207 2nd Ave N | Birmingham | AL | 35203 |

## Person with Whom the Changes Were Discussed

| Name | Title |
|---|---|
| Ronald Levitt | POA – Dentons Sirote PC |

## General Imputed Underpayment

| | | Subgroup | Positive Adjustment | Negative Adjustment |
|---|---|---|---|---|
| 1. | Reallocation Grouping | | | |
| A. | | ☒ | | |
| i. | | | | |
| | Subtotal for subgroup | | | |
| 2. | Sum of all net positive Reallocation Grouping adjustments (only include net positive adjustments in the total. See Line 3 for net negative adjustments) | | | |
| 3. | Sum of all net negative Reallocation Grouping Adjustments (only include net negative adjustments in the total. See Line 2 for net positive adjustments) | | | |
| 4. | Residual Grouping | | | |
| A. | SCE – NonCash Contribution Disallowed | ☐ | 53,370,000 | |
| B. | SCE – Investment Costs Allowed | ☐ | (10,300,100) | |
| 5. | Sum of all net positive Residual Grouping adjustments (only include net positive adjustments in the total. See Line 6 for net negative adjustments) | | 43,069,900 | |
| 6. | Sum of all net negative Residual Grouping adjustments (only include net negative adjustments in the total. See Line 5 for net positive adjustments) | | | |
| 7. | Sum of all net positive adjustments from Reallocation and Residual Groupings (add Lines 2 and 5). Total netted partnership adjustments | | 43,069,900 | |
| 8. | Sum of all net negative adjustments from Reallocation and Residual Groupings (add Lines 3 and 6). This amount is ignored for calculating the imputed underpayment | | | |
| 9. | Highest effective tax rate for the tax year ended | | 21% | |
| 10. | Imputed Underpayment before Creditable Expenditures and Credit Groupings (multiply Line 7 by Line 9) | | 9,044,679 | |
| 11. | Creditable Expenditures Grouping (decreases to creditable expenditures are positive adjustments and increases are negative adjustments) | | | |
| A. | | ☒ | | |
| i. | | | | |
| | Subtotal for subgroup | | | |
| 12. | Sum of all net positive adjustments in the Creditable Expenditure Grouping (only include net positive adjustments in the total. See Line 13 for net negative adjustments) | | | |
| 13. | Sum of all net negative adjustments in the Creditable Expenditure Grouping (only include net negative adjustments in the total. See Line 12 for net positive adjustments) | | | |

Form **14791** (Rev. 6-2020)          Catalog Number 69390H          publish.no.irs.gov          Department of the Treasury - Internal Revenue Service

Page 2 of 2

| Name of partnership | Taxpayer ID Number (TIN) | Tax year ended | Audit control number |
|---|---|---|---|
| Ashwood Gap LLC | ███████ | 12/31/2020 | 2012005198 |

| 14. Credit Grouping *(decreases to credits are positive adjustments and increases are negative adjustments)* | Subgroup | Positive Adjustment | Negative Adjustment |
|---|---|---|---|
| A. | ☒ | | |
| i. | | | |
| Subtotal for subgroup | | | |
| 15. Sum of all net positive adjustments in the Credit Grouping *(only include net positive adjustments in the total. See Line 16 for net negative adjustments)* | | | |
| 16. Sum of all net negative adjustments in the Credit Grouping *(only include net negative adjustments in the total. See Line 15 for net positive adjustments)* | | | |

| 17. Imputed Underpayment *(add Lines 10, 12 and 15)* | | | 9,044,679 |
|---|---|---|---|

| 18. Penalties | | Code Section | Penalty Amount |
|---|---|---|---|
| A. | IRC 6662(h) – Accuracy Related Penalty reduced to 5% | 6662(h) | 452,234 |
| B. | | | |
| C. | | | |
| 19. Total Penalties with respect to the Imputed Underpayment *(add all lines in 18)* | | | 452,234 |

20. Estimated interest

| Interest *(IRC § 6233(a)(2))* estimated and computed to *(mm/dd/yyyy)* | Amount of interest |
|---|---|
| 07/06/2025 | 2,778,837 |

Other information

Do not process. This Form 14791 is for computational purposes under Syndicated Conservation Easement Resolution Initiative only.



November 1, 2024

<u>**VIA E-MAIL AND INVESTOR PORTAL**</u>

Re:     *Ashwood Gap, LLC – Amount Owed Under IRS Settlement*

Dear Member:

As you know, Ashwood Gap, LLC (the "Partnership") has voted to resolve the tax dispute involving its 2020 tax return by accepting the recent settlement offer from the IRS. The Partnership has communicated its election to continue to participate in the IRS's settlement program and expects to receive a Closing Agreement from the IRS, formally marking the end of the dispute. I am writing on behalf of Green Rock Management, which serves as the Partnership Representative, to inform you of your share of the tax liability under the accepted settlement.

The terms of the IRS Settlement are as follows:

1. The charitable deduction claimed on the Partnership's 2020 tax return will be disallowed.
2. The Partnership will receive a deduction for estimated out-of-pocket cost (i.e., capital contributions).
3. The disallowed portion of the deduction will be taxed using a tax rate of 21%.
4. The Partnership will pay a penalty equal to 5% of the federal income tax liability caused by the decrease of the allowed tax deduction.
5. The Partnership will pay interest on the amounts owed under 3 and 4 above.

A key requirement is that the Partnership, rather than the Members, is required to make a full, one-time payment of the taxes, penalties and interest owed to the IRS (the "Settlement Payment"). In order for the Partnership to make the Settlement Payment, each partner is now required to contribute their share of the Settlement Payment, based on their pro-rata ownership interest.

To timely submit the Settlement Payment to the IRS, all partners must contribute their share of the Settlement Payment to the Partnership by **January 15, 2025**. Failure to meet this deadline will result in additional interest on the full Settlement Payment. Your portion of the Settlement Payment is shown on the table below. If we receive your payment after the January 15th deadline you will incur additional charges, as shown on the table below:

1



**GREEN ROCK**

| Payment on or before: | Amount Owed: |
|---|---|
| January 15, 2025 | $445,219.84 |
| January 31, 2025 | $466,906.47 |
| February 14, 2025 | $470,520.90 |
| February 28, 2025 | $474,135.34 |
| March 14, 2025 | $477,749.78 |
| March 28, 2025 | $481,364.22 |
| April 14, 2025 | $484,978.65 |
| April 28, 2025 | $488,593.09 |

You may pay the above amount by wire transfer using the instructions set forth below, or by delivery of a check payable to Ashwood Gap Partners, LLC to 2207 2nd Avenue North, Birmingham, Alabama 35203. If the above payment is not received by the Partnership before the deadline, you will be responsible for additional interest as required by law.

Account Name:
Account Number:
Routing Number:

Bank Name:
Bank Address:



Below are responses to some frequently asked questions that may be helpful to you:

*Where will the settlement funds be held before the Settlement Payment is made?*

Green Rock Management has established a separate interest-bearing account in the Partnership's name at First Horizon Bank specifically for the purpose of holding the amounts contributed by partners towards the Settlement Payment. These amounts are being held separately from any other funds of the Partnership or other partnerships managed by Green Rock.

*Will the insurance proceeds or partnership assets be used to pay the tax liability?*

As we have previously communicated, we are continuing to work with outside counsel and the insurer regarding the Partnership's claim on our "Section 170(h) Liability" insurance policy. We believe that the insurance claim should cover a large part of the settlement. We do not expect the insurance claim to be resolved prior to the date the Settlement Payment is due to the IRS. However, any insurance proceeds received from the insurers will be used to reimburse partners for payments made under the IRS Settlement. In addition to any insurance proceeds received from the claim, we are in the process of liquidating assets held in the Partnership, which along with the remaining audit funds will be distributed to the Members to further reimburse each partner's share of the Settlement Payment.

2



**GREEN ROCK**

*What if some partners do not contribute their share of the tax liability?*

Full participation by the Members is crucial for meeting the Partnership's obligations under the Settlement. At this time, the IRS has made it clear that anything less than a complete, one-time payment of the Settlement Payment will not be accepted. Failure to comply with the terms of the IRS's program would likely result in the IRS withdrawing the settlement offer and moving forward with issuing a notice of Final Partnership Adjustment disallowing the Partnership's deduction and proposing a 40% penalty.

There are ongoing negotiations with the IRS to allow the Partnership to "push-out" any adjustments to non-participating Members (*i.e.*, the non-contributing Members would be responsible for paying the IRS directly). If the push-out is allowed, the non-contributing Members should expect that their share of the liability may be three to four times the amount otherwise owed by the Member under the settlement, as (i) the IRS would likely assess the liability at normal tax rates instead of the 21% tax rate offered under the settlement, and (ii) the IRS would likely assess the full 40% penalty instead of the 5% penalty offered under the settlement. In addition, any non-contributing Member would be subjected to the IRS's assessment and collection regime, which could result in tax liens or similar enforcement actions by the IRS.

*Have there been any additional Tax Court rulings since we held the settlement vote?*

The Tax Court recently issued another unfavorable opinion in a conservation easement case (*J. L. Minerals v. Commissioner*). Unfortunately, this was another case where the Tax Court found in favor of the IRS, allowing approximately 0.5% of the claimed value of the deduction. The Tax Court significantly critiqued the use of the discounted cash flow valuation methodology, which continues the recent trend of IRS "wins" in conservation easement disputes.

*Will I have to amend my federal tax return as a result of the settlement or otherwise pay additional federal taxes? Will the Settlement Payment resolve all of my federal tax issues related to the conservation easement donation?*

Under this settlement program, the Settlement Payment is meant to resolve all federal tax issues related to the conservation easement donation. As a result, the settlement will not require amended federal tax returns by the Partnership or partners, and we will not be distributing any amended Forms K-1.

*Who should I contact if I have additional questions?*

The investor relations team is available to answer any questions you may have regarding the settlement and payment of your share of the tax liability. Please feel free to reach the investor relations team by email to **investorrelations@green-rock.com** or by phone call to (205) 580-1180 (ext. 1).

3



We thank you for your continued partnership and cooperation throughout this process.

Sincerely,

Clayton Mobley, Manager
Green Rock Management, as Partnership Representative
for Ashwood Gap, LLC

4



WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

Peter J. Larkin
914.872.7847 (direct)
914.552.3289 (mobile)
Peter.Larkin@wilsonelser.com

April 24, 2025

**VIA EMAIL ONLY**
D. Austin Bersinger
Bradley Arant Boult Cummings LLP
1230 Peachtree Street NE, 20ᵗʰ Floor
Atlanta, GA 30309
ABersinger@bradley.com

Re:     IRS Closing Agreements to Ashwood Gap and Bear Mountain;
        Section 170(h) Policy No. VFP/FL/13849/2020/1 issued to Ashwood Gap Partners ("Ashwood
        Partners"); Policy No. VFP/FL/13843/2020/1 issued to Bear Mountain Partners ("Bear Partners")

Dear Mr. Bersinger:

On behalf of Liberty Mutual Insurance Europe SE ("Liberty"), Fidelis Underwriting Limited ("Fidelis"),
and Interstate Fire & Casualty Company ("Allianz") as capacity providers for Volante Global, Volante
International Limited, and Volante Specialty Risk LLC (collectively, the "Insurers"), please allow this letter
to respond to your letters dated April 4, 2025, regarding the above matters and the settlement offers received
by (1) Ashwood Gap LLC ("Ashwood Gap") and (2) Bear Mountain Holdings, LLC ("Bear Mountain")
(collectively, the "**Taxpayers**" or "**PropCos**"), from the IRS regarding the audit and disallowance of
noncash charitable contribution deductions claimed by each Taxpayer related to conservation easement
donations for properties located in Alabama (the "**Conservation Easements**"). The IRS disallowed the
deductions for not meeting the requirements of Section 170(h) because, *inter alia*, the **Taxpayers** relied on
an unqualified and/or overvalued appraisal.

By way of letters dated March 20, 2025 (Ashwood Gap) and March 27, 2025 (Bear Mountain), the IRS
issued each **Taxpayer/PropCo** a "Form 906, Closing Agreement on Final Determination Covering Specific
Matters" (the "**IRS Settlement Offers**"). The **IRS Settlement Offers** are structured as follows: (1) the
claimed conservation easement deduction will be disallowed; (2) the capital contribution by the investors
will be allowed as "a deduction for out-of-pocket costs"; (3) the IRS will calculate the tax due at the
partnership level using a tax rate of 21%; (4) the gross valuation misstatement penalty will be applied to
any underpayment of tax at a rate of 5%; (5) the **PropCo** must make one payment for all tax, penalties, and
interest due; (6) the entire amount must be paid by the **PropCo** prior to the execution of the settlement
agreement; (7) the IRS is not precluded from asserting promoter, appraiser, or return preparer penalties or
pursuing discipline under Circular 230; and (8) the IRS is not precluded from investigating any criminal
conduct, or pursuing any other investigation or prosecution.

In connection with the foregoing, it is our understanding that your office represents Ashwood Partners and
Bear Partners (*i.e.*, the **Named Insureds**[1] under the respective Policies). In this capacity, your April 4, 2025
letters state, in part, the following:

---

[1] **Bold** terms not otherwise defined herein shall have the meaning ascribed in the respective policies.

1133 Westchester Avenue | White Plains, NY 10604 | p 914.323.7000 | f 914.323.7001 | wilsonelser.com

Albany, NY | Atlanta, GA | Austin, TX | Baltimore, MD | Beaumont, TX | Birmingham, AL | Boston, MA | Charlotte, NC | Chicago, IL | Dallas, TX | Denver, CO
Detroit, MI | Edwardsville, IL | Florham Park, NJ | Garden City, NY | Hartford, CT | Houston, TX | Jackson, MS | Las Vegas, NV | London, England | Los Angeles, CA
Louisville, KY | McLean, VA | Merrillville, IN | Miami, FL | Milwaukee, WI | Nashville, TN | New Orleans, LA | New York, NY | Orlando, FL | Philadelphia, PA | Phoenix, AZ
Raleigh, NC | San Diego, CA | San Francisco, CA | Sarasota, FL | Seattle, WA | Stamford, CT | St. Louis, MO | Washington, DC | West Palm Beach, FL | White Plains, NY



- 2 -

We thus reiterate our demand that the Insurers consent to [the Taxpayers'/PropCos'] acceptance of the IRS's proposed settlement set forth in the Form 906. In the event the Insurers cannot commit to providing consent with respect to the IRS settlement, we respectfully request that the Insurers agree not to raise lack of consent or other related policy provisions as an impediment to coverage. We further request that the Insurers provide their coverage position with respect IRS's settlement offer under the terms of the Policy. In order to meet the IRS's deadline, we request that the Insurers provide a written response to this correspondence by April 18, 2025.

First, it is important to note that the amount sought in connection with each **IRS Settlement Offer** exceeds the limits of liability for each relevant Policy. Thus, there is no current opportunity for the Insurers to settle either of these matters within the available limits of any of the respective Policies.

Additionally, and significantly, in light of the early stage of the IRS proceedings for each of these matters, the absence of any meaningful objective assessment of the due diligence relied upon to value the **Conservation Easements**, the lack of any meaningful evaluation of the feasibility and reasonable probability that the properties could have been developed into the taxpayer-claimed HBU, the criticism of "out of pocket" settlements and their low acceptance levels, and the unique facts that must be applied to the "surprisingly complicated" tax deductions and matters at issue here, the Insurers simply do not have sufficient information to provide consent to accept the **IRS Settlement Offers** at this time.

For the reasons set forth below and in prior correspondence, the ***Insurers respectfully advise that, at this time, they are unable to accommodate your request for consent or agreement not to raise lack of consent as to the IRS Settlement Offers issued to Ashwood Gap and Bear Mountain***.

## BACKGROUND

### A. SYNDICATED CONSERVATION EASEMENT (SCE) TRANSACTIONS AND CLAIMED DEDUCTIONS

Each **Named Insured** was created to raise funds through a private placement and use the proceeds from the capital raise to purchase a controlling interest in a property company (*i.e.*, a PropCo), which would purchase tracts of land in Alabama (Property). The **Named Insured** would then solicit investments through the private placement to purchase an interest in PropCo with the intention of using the Property in one of three ways: (1) develop it to its "highest and best use" (HBU) producing an income stream for the investors and a valuable asset that could be sold; (2) donate a conservation easement to protect certain natural attributes inherent in the Property, producing a tax deduction for the investors; or (3) holding the property while maximizing any income potential and waiting for appreciation to resell. The investors in both cases voted for the second option, and the **PropCos** donated a conservation easement to a qualified charity.

As a result of the donation, the **PropCos** claimed a deduction on their tax returns under Section 170(h), which allows a taxpayer to deduct the value of a "qualified real property interest" donated to a "qualified organization" exclusively for a "conservation purpose." The deductions each relied on an appraisal that first estimated the value of the unencumbered Property (before the donation) based on the fair market value (FMV) if it was developed to its HBU as a crushed stone mining and processing operation then subtracting the FMV of the Property after the donation in its encumbered state to estimate the easement's FMV. Using this "Before and After" HBU valuation, each **PropCo** combined the appraised value of the easement with cash donated and claimed a deduction in that combined amount. The deduction was passed through the **Named Insured**, which elected to be treated as a partnership for tax purposes, to the investors according to their ownership interests.



- 3 -

### B.  IRS ENFORCEMENT EFFORTS AGAINST SCE TRANSACTIONS AND CLAIMED DEDUCTIONS

The IRS and Congress have had a complicated relationship with non-cash charitable donations for a long time, resulting in Section 170 being a lengthy and involved section of the Tax Code. While there is broad support for the social policy of promoting donations to charitable institutions – and that same notion has expanded the social policy aims of the Tax Code to also foster donations that preserve open greenspace – there also have been instances of abuse by overzealous taxpayers that have caused the IRS to be wary of these donations. In or about 2017, the IRS began identifying some SCE transactions as abusive and classifying them as tax avoidance schemes (*i.e.*, tax shelters). At that time, the IRS identified SCE transactions in general as "listed" transactions, requiring that they be specifically identified in any tax return taking such a deduction. *See* Treas. Reg. § 1.6011-4(b)(2) and I.R.C. §§ 6111 and 6112. In 2019, the IRS added SCE transactions to its annual "Dirty Dozen" list of tax scams. As a result, the IRS began auditing 100% of all SCE tax deductions and disallowing most if not all.

### C.  THE NAMED INSURED PPMS AND THE TAXPAYERS'/PROPCOS' CLAIMED DEDUCTIONS

Against this backdrop, the following PPMs were issued: (1) the Ashwood Partners PPM, dated December 15, 2020; and (2) the Bear Partners PPM, dated September 10, 2020. (collectively referred to as the "**Named Insured PPMs**"). Consistent with the **Named Insured PPMs**, each entity solicited investments and raised funds to purchase a controlling interest in each respective **PropCo**. Once the funds were raised, the investors voted for the **PropCo** to donate the Property as a conservation easement to protect certain natural attributes inherent in the Property, producing a tax deduction for the investors.

Significantly, each of the **Named Insured PPMs** provided the following language:

> Only investors who qualify as "**accredited investors**", as defined in Section 501(a) of Regulation D promulgated under the Securities Act may participate in this Offering. No public market currently exists for the Units, and no such market will develop as a result of this Offering. **INVESTORS CONSIDERING AN INVESTMENT IN THE COMPANY SHOULD DO SO ONLY AFTER CAREFULLY CONSIDERING THE RISKS, INCLUDING, BUT NOT LIMITED TO, THE NON-EXCLUSIVE RISK FACTORS DISCLOSED ELSEWHERE IN THIS MEMORANDUM, AND INVESTORS WHO ARE NOT GENERALLY FAMILIAR WITH THE DRILLING AND EXTRACTION OF MINERAL AGGREGATE AND QUALIFIED CONSERVATION CONTRIBUTIONS OF CONSERVATION EASEMENTS UNDER FEDERAL TAX LAW SHOULD DISCUSS THE INVESTMENT RISKS OF THE COMPANY'S PROPOSED BUSINESS PLANS WITH THEIR PERSONAL TRUSTED FINANCIAL AND TAX ADVISORS AND INDUSTRY EXPERTS BEFORE MAKING AN INVESTMENT.**
>
> *                    *                    *
>
> Each prospective Investor, or his, her, or its advisors and representatives, is expected to have familiarity with all of the issues which are found in investments which may involve charitable contributions as a part of their tax and business features.

(Ashwood Partners PPM at p. VII (emphasis in original); *see* Bear Partners PPM at p. VII.)

Stated another way, only sophisticated investors who were familiar with "qualified contributions of conservation easements" were invited to participate in these transactions. Further, the **Named Insured PPMs** also clearly and explicitly outlined the "significant risks" associated with each conservation easement option. Indeed, in relevant part, the **Named Insured PPMs** specifically state:

WILSON ELSER
WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

- 4 -

(2) **IF THE CONSERVATION OPTION IS SELECTED BY THE MEMBERS**, it is estimated that the aggregate charitable contribution deduction that would be allocated to the Company would ... exceed[] an amount of two and one-half times (2.5x) the amount invested by the Members in the Company. **AS SUCH, PURSUANT TO INTERNAL REVENUE SERVICE ("IRS") NOTICE 2017-10, SUCH CHARITABLE CONTRIBUTION OF THE CONSERVATION EASEMENT WOULD, UNDER CURRENT RULES, BE A "LISTED TRANSACTION" FOR PURPOSES OF TREASURY REGULATION SECTION 1.6011-4(B) (2). A "LISTED TRANSACTION" IS A TYPE OF "REPORTABLE TRANSACTION" THAT IS THE SAME AS OR SUBSTANTIALLY SIMILAR TO ONE OF THE TYPES OF TRANSACTIONS THAT THE IRS HAS DETERMINED TO BE A TAX AVOIDANCE TRANSACTION.**

*          *          *

Each Investor is strongly recommended to consult with independent legal, accounting, tax, and other advisors to assure that each Investor understands completely all tax consequences of an investment in the Company, including the implications of Notice 2017-10.

**The IRS routinely audits "qualified conservation contributions" involving conservation easements, and typically attacks the procedures in making such a charitable contribution, as well as the amount of deduction claimed (i.e., the valuation).** Investors should anticipate that if the IRS chooses to audit [the PropCo], the charitable contribution deduction from the Charitable Contribution, and/or the Company, the IRS's initial position will most likely be to disallow such deduction entirely and impose on the Members penalties, increased taxes, and interest attributed to such disallowed deduction and for participating in a listed transaction. See "**IRS POSITIONS CONCERNING THE CHARITABLE CONTRIBUTION OF THE CONSERVATION EASEMENT ON THE REAL PROPERTY**".

(Ashwood Partners PPM at p. VI (emphasis in original); *see* Bear Partners PPM at p. VI-VII.) Additionally, the **Named Insured PPMs** also expressly outline various "RISK FACTORS", including but certainly not limited to:

**21. Potential for Evolution in Case Law.** New case law pertaining to federal income taxation is consistently being released. There can be no assurance that the case law will not evolve in such a manner as to alter the present form of computing the federal income tax liability of Investors, or to otherwise change in a materially adverse way the potential federal income tax consequences of an investment in the Company. **These types of changes, if they come to pass, would have a material adverse effect on the tax benefits which might otherwise arise from an investment in the Company**.

**22. Potential Change in IRS Position.** The IRS is consistently developing new positions as the state of tax law evolves. There can be no assurance that the IRS's position on any issue will not be amended in such a manner as to alter the present form of computing the federal income tax liability of Investors, or to otherwise change in a materially adverse way the potential tax consequences of an investment in the Company. This could potentially include a position that the IRS has not advanced to date in relation to the Company's use of a combination of Code Sections, such as Code Sections 170(e), 170(h), 702(a)(4), 1223(2), and 263(c) of the Code as well as Treasury Regulation Section 1.612-4(a). **These types of changes, if they arise, would have a material adverse effect on the tax benefits which might otherwise arise from an investment in the Company**.



- 5 -

(Bear Partners PPM at p. 71 (emphasis in original); *see* Ashwood Partners PPM at p. 69.)

Significantly, there is likewise an entire "risk factors" section of the **Named Insured PPMs** dedicated to "**ADDITIONAL TAX RISK FACTORS RELATED TO QUALIFIED CONSERVATION CONTRIBUTIONS WITH RESPECT TO THE REAL PROPERTY.**" (Ashwood Partners PPM at pp. 69-73; Bear Partners PPM at pp. 72-75). These sections expressly advise that "[c]onservation easements under Section 170(h) of the Code have received significant attention and scrutiny from the IRS in recent years, including a perceived increase in audit activity." Indeed, the **Named Insured PPMs** expressly advise:

> **Risk of Audit.** ... Recent scrutiny of conservation easement transactions in particular, including, without limitation, the IRS "campaign" announced in September 2018, as well as recent and proposed changes to IRS forms and reporting requirements for these and similar transactions, increase the likelihood that the Company's return and the Members' returns might be reviewed by the IRS.

(Ashwood Partners PPM at p. 70; *see* Bear Partners PPM at p. 73.) This includes an expected IRS challenge to the "[a]ppraiser's 'highest and best use' of the Real Property in questioning the valuation of the Charitable Contribution." (Ashwood Partners PPM at p. 70; Bear Partners PPM at p. 72.) As a result of the "heightened scrutiny on conservation easements," the **Named Insured PPMs** expressly advise the investors that "the IRS is likely to audit" these offerings and that "there can be no assurances that the value of the Conservation Easement will be determined by a court not to result in valuation penalties." (Ashwood Partners PPM at p. 71; *see* Bear Partners PPM at p. 74.) Moreover, the Ashwood Partners PPM also explicitly instructs that in any audit and IRS challenge, "there may not be a final determination on the merits of the conservation value until many years later on appeal." (Ashwood Partners PPM at p. 73.) Accordingly, the **Named Insured PPMs** advise, emphasize, and reiterate in capitalized terms:

> **OUT OF PRUDENCE, [YOU/EACH INVESTOR] SHOULD ASSUME THAT THE IRS WILL AUDIT THE TAX RETURNS OF [THE PROPCO] AND OF THE COMPANY AND THAT SUCH AN AUDIT COULD RESULT IN THE PROPOSED DISALLOWANCE OF SOME OR ALL OF THE TAX BENEFITS ANTICIPATED TO BE DERIVED FROM AN INVESTMENT IN THE COMPANY.**

*        *        *

> **[YOU/EACH INVESTOR] SHOULD CONSULT WITH THEIR OWN TAX ADVISOR CONCERNING WHETHER THE POTENTIAL CHARITABLE DEDUCTION, OR OTHER FEATURES OF THE COMPANY'S BUSINESS PLAN AND TAX OBJECTIVES MAY INVOLVE AN UNACCEPTABLE RISK OF AUDIT OR MAY OTHERWISE CAUSE AN INVESTMENT IN THE COMPANY TO BE INAPPROPRIATE, GIVEN SUCH PARTICULAR INVESTOR'S INDIVIDUAL CIRCUMSTANCES.**

(Ashwood Partners PPM at p. 71 (emphasis in original); *see* Bear Partners PPM at p. 73.)

Furthermore, the **Named Insured PPMs** also contain detailed, lengthy, and explicit sections on "**FEDERAL TAX CONSIDERATIONS.**" (Ashwood Partners PPM at pp. 77-95; Bear Partners PPM at pp. 80-98.) These sections expressly detail recent, anti-syndicated conservation easement developments, including but certainly not limited to IRS "campaigns" and initiatives (including labeling conservation easements on its "dirty dozen" list), Congressional investigations and proposed legislation, administrative enforcement actions and efforts, Department of Justice litigation, and adverse case law development.

They likewise advise as to the impact of IRS Notice 2017-10 on syndicated qualified conservation contributions of property and note that any conservation easement transaction with a claimed deduction greater than 2.5x the amount of the investors' investment in the transaction (*i.e.*, each transaction here) will be disclosed as a "listed transaction" to the IRS and result in an audit. (*See* Ashwood Partners PPM at pp. 79-81; Bear Partners PPM at pp. 83-84). Indeed, the **Named Insured PPMs** state in capitalized, bold terms:

> **IT IS STRONGLY RECOMMENDED THAT EACH PROSPECTIVE INVESTOR CONSULT WITH HIS, HER, OR ITS OWN INDEPENDENT LEGAL, ACCOUNTING, TAX, AND OTHER ADVISORS TO ASSURE THAT HE, SHE, OR IT UNDERSTANDS COMPLETELY THE HIGH TAX RISK OF AN INVESTMENT IN THE COMPANY, INCLUDING THE IMPLICATIONS OF NOTICE 2017-10, THE CONSEQUENCES OF DISCLOSING PARTICIPATION IN A REPORTABLE TRANSACTION ON IRS FORM 8886, BEING SUBJECT TO AN IRS AUDIT, THE POTENTIAL LOSS OF THEIR ENTIRE INVESTMENT INCLUDING A COMPLETE DISALLOWANCE OF POTENTIAL DEDUCTIONS BY THE IRS, AND IMPOSITION OF SIGNIFICANT PENALTIES AND INTEREST, INCLUDING POTENTIAL ELIMINATION OF ANY REASONABLE CAUSE AND GOOD FAITH DEFENSE WITH RESPECT TO THE IMPOSITION OF SUCH PENALTIES, ON THE MEMBERS.**

(Ashwood Partners PPM at p. 81; *see* Bear Partners PPM at pp. 84.)

Finally, the **Named Insured PPMs** also contain specific, relevant sections on "**IRS POSITIONS CONCERNING THE QUALIFIED CONSERVATION CONTRIBUTION OF THE CONSERVATION EASEMENT ON THE REAL PROPERTY.**" (Ashwood Partners PPM at pp. 96-103; Bear Partners PPM at pp. 99-107.) These sections focus on informing the prospective investors that the appraisals relied upon in the PPMs will be challenged by the IRS, and "[t]he IRS will likely maintain that the Real Property's actual fair market value was well below [the PropCo's appraiser's valuation] at the time of the charitable contribution." (Ashwood Partners PPM at pp. 96-97; *see* Bear Partners PPM at p. 100.)

Notably, these sections also advise the investors that "an initial position of the IRS may be based on the valuation by an IRS 'engineer' who does not abide by the Uniform Standards of Professional Appraisal Practice." (Ashwood Partners PPM at p. 96; *see* Bear Partners PPM at p. 99.) Stated a different way, the **Named Insured PPMs** acknowledge the IRS will almost certainly disallow the claimed deductions based on inflated appraisal valuations; however, those IRS positions may themselves be based on unqualified appraisers and subject to challenge by the **PropCos**. Ultimately, these are "factual matter[s] to be resolved by the court 'on the basis of the entire record.'" (*See* Ashwood Partners PPM at pp. 96-103; Bear Partners PPM at pp. 99-107.)

Upon review, consideration, and independent consultation with legal, accounting, tax, and other advisors on the significant tax risks, the inevitability of an audit, and the high likelihood that the IRS would challenge and disallow the deduction on the basis of an alleged inflated appraisal valuation, the investors still decided to participate in the PPM, contribute funds to purchase ownership interests in these partnerships, and voted to donate a conservation easement in exchange for a tax deduction.

Subsequently, as expected, the IRS selected each of the **PropCos'** tax returns for examination and disallowed the deductions as part of the examination, asserting that they were improper for various technical reasons, and grossly overvalued. The IRS had its own appraisers perform a before and after valuation of the FMV of the subject properties before and after being encumbered by the conservation easements—the difference being the value of the conservation easement. As the **Named Insured PPMs** anticipated, the resulting valuations were significantly lower (millions of dollars less) than those relied upon by the

 **WILSON ELSER**
WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

- 7 -

PropCos in taking their deductions. The IRS also assessed a "gross valuation misstatement" penalty of 40% plus interest. It is our understanding that, as to each of these matters, the IRS tax proceedings against the PropCo remain ongoing, and the **Taxpayers** have not yet received Final Partnership Adjustments (FPAs).

### D. THE IRS'S NON-DOCKETED SYNDICATED CONSERVATION EASEMENT RESOLUTION INITIATIVE

As noted above, in or around 2019, the IRS added SCE transactions to its annual "Dirty Dozen" list of tax scams and began auditing all SCE tax deductions and disallowing most, if not all. As more SCE deductions were disallowed, more cases headed to the Tax Courts resulting in a significant backlog of cases. Accordingly, in early-2024, the IRS issued settlement offers to taxpayers that had filed Petitions with the Tax Court challenging the IRS's disallowance of their tax deductions. The terms offered in early 2024 were somewhat more favorable than a series of earlier offers (in 2020) that never gained any traction.

In July 2024, the IRS began its "Syndicated Conservation Easement Resolution Initiative" (SCERI). In connection with this initiative, the IRS issued invitations to certain taxpayers (that were in some phase of the examination process but had not yet filed Tax Court petitions) as "an opportunity to elect to participate in a settlement initiative to resolve a transaction described in Section 2 of Notice 2017-10." By way of letters from the IRS dated July 11, each **PropCo** (Ashwood Gap and Bear Mountain) received an invitation to participate in the IRS's SCERI initiative.

### E. NOTICE TO INSURERS OF SCERI INITIATIVE AND REQUEST FOR INFORMATION

On or about July 31, 2024, Brian Robbins at Green Rock, LLC (as partnership representative for the **Named Insureds** and **PropCos/Taxpayers**) provided notice under the Policies regarding the IRS's SCERI initiative.

Shortly thereafter, our office requested no less than fourteen (14) separate categories of relevant documents and materials necessary for the Insurers to adequately review, evaluate, analyze, and consider the unique history, attributes, transactions, valuations, and due diligence related to Ashwood Gap and Bear Mountain. In response, your office provided some initial documents; however, many of our requests were not addressed and there were significant omissions and/or withholding of materials. Over the next few months, our office continued to follow up on these requests, as well as suggested a common interest agreement to allay any privilege or confidentiality concerns. While these efforts did result in additional, limited, rolling productions by your office, many of our requests remain outstanding. Our prior correspondence detail these requests and our efforts to obtain such necessary and relevant information.

Regardless, in the interest of clarity – as we have continually advised – the Insurers' position is based on the materials provided to date. To the extent additional information exists and has not been provided, the Insurers continue to request such information and expressly reserve their right to consider and evaluate such information, and to the extent necessary, modify their determination at the appropriate time.

### THE POLICIES

The Insurers issued the above-referenced Investor 170(h) Liability Insurance Policies as "indemnity-only" policies, with aggregate limits of liability of: (1) Ashwood Partners – $10,300,000 (excess a $309,000 retention); and (2) Bear Partners – $8,150,000 (excess a $$244,500 retention. The Insurers will refer to certain provisions of the Policies in this letter; however, it is not intended to be exhaustive. The Insurers respectfully direct you to the Policies themselves for a more detailed recitation of the relevant language, conditions, definitions, and provisions.



- 8 -

The Insurers also direct your attention to Section XII. of the Policies, titled: Insurer Participation Provisions, which detail that each respective insurer's liability and obligations under the Policies are several only and not: (i) joint; or (ii) joint and several. Under no circumstance will an insurer be liable for the whole or any part of the participation of any other insurer who for any reason does not satisfy all or part of its liability or obligations under any policy. Further, the "risk of uncollectability" for any reason whatsoever is expressly retained by the **Named Insureds**. In this regard, we reiterate – as we have communicated previously – that undersigned counsel does not represent Amtrust or Wesco Insurance Company.

The Policies' definition of **insured** includes: (i) the **Named Insured**; (ii) any entity created to own and control specific property from which a conservation easement donation is made pursuant to Section 170 that the **Named Insured** controls or has the ability to direct the management decisions of during the performance of the business operations giving rise to the **proceeding** (*i.e.*, a **controlled entity**); and (iii) the individuals or entities that were **members** of the **Named Insured** or any **controlled entity** at any time during the **policy period** (*i.e.*, **investors**).

Relevant to your current requests, the Policies' Insuring Agreement states: "**we** will not pay any **loss** unless such **loss** is determined by the: ... (b) settlement of a **proceeding** with **our** prior written consent."

Further, Section VII. of the Policies provides:

> B.   Settlement
>
> **You** agree not to undertake settlement negotiations or enter into any settlement agreements that would result in a **loss** without **our** prior written consent, which **we** agree not to withhold unreasonably.

Section IX. also sets forth the following relevant provisions:

> B.   Duty to cooperate
>
> **You** agree to provide **us** with such information, assistance, and cooperation as **we** may reasonably require in connection with **our** performance under this policy. **You** also agree not to take any action that increases **our** exposure under this policy, prejudices **our** position, or prejudices **your** rights of recovery from others.
>
> C.   No voluntary payments
>
> Except as it relates to defense of any **proceeding, you** agree not to incur any expense, admit any liability, or assume any obligation without **our** prior written consent. If **you** do so, it will be at **your** own cost and expense. However, this condition does not apply to payments **you** make to avoid or mitigate **loss** under this policy, if such payments are made from an escrow account maintained for the benefit of an **investor** or an **insured organization**.

## CONSIDERATION OF THE IRS SETTLEMENT OFFERS

Given the nature of your current requests (*i.e.*, consent or agreement not to raise lack of consent to accept the **IRS Settlement Offers**) and their time-sensitivity, we do not address any substantive coverage aspects in this letter. That is, we do not address whether the Policies would provide coverage for any portion of the amount sought to be paid in connection with the **IRS Settlement Offers**. The Insurers expressly reserve the right to address any and all such issues at the appropriate time and in the appropriate manner. In the interim, the Insurers continue to expressly reserve all rights under the Policies, at law, and in equity.



### A. *INSURERS' REQUESTS FOR INFORMATION AND RELEVANT MATERIALS*

As noted above, since at least August 2024, we have been working with your office and the partnership representative for the **PropCos/Taxpayers** (Brian Robbins) in an attempt to obtain relevant and necessary information related to the IRS's claims and arguments, the taxpayer's defenses and arguments, the parties' respective position statements, tax counsel's reports and recommendations, the IRS settlement communications, an explanation as to why any settlement offer may be reasonable, any communications between the partnerships and the **investors/members** regarding settlement offers, insurance, or other relevant considerations, and the **investors'/members'** respective initial capital contributions and inquiries related to the IRS proceedings. The Insurers' current position in this letter is based on our receipt and review of this information. To the extent additional information exists and has not been provided, the Insurers reserve all rights under the Policies, at law, and in equity.

### B. *FORMULAIC IRS SETTLEMENT OFFERS EXCEED POLICIES' LIMITS OF LIABILITY*

There is no dispute that the **IRS Settlement Offers** are formulaic and neither treat each **Taxpayer/PropCo** individually nor evaluate each **Conservation Easement** on its own merits. Moreover, we again note that the amount sought in connection with each **IRS Settlement Offer** exceeds the limits of liability (and Retention) for each respective Policy. For reference, we provide the below table.

| MATTER: | POLICY LIMITS: | RETENTION: | SETTLEMENT AMOUNT: | EXCESS AMOUNT: |
|---|---|---|---|---|
| Ashwood Gap | $10,300,000 | $309,000 | $12,275,750 | *$1,666,750* |
| Bear Mountain | $8,150,000 | $244,500 | $9,768,119 | *$1,373,619* |

Thus, regardless of the position of other participating insurer(s) (*i.e.*, AmTrust/Wesco), there is no current or realistic opportunity for the Insurers to settle any one of these proceedings – and resolve all claims and potential liability – within the limits of the Policies.

### C. *DISCUSSION OF RECENT TAX AND FEDERAL COURT DECISIONS*

The main (and seemingly, only) argument offered to support the **Taxpayers'** and **Named Insureds'** position that the **IRS Settlement Offers** are reasonable is the belief that, if litigated, the Tax Court would disallow the Conservation Easement deductions entirely or significantly reduce the amount allowed. These beliefs largely stem from at least eight, post-**Named Insured PPMs** decisions involving SCE deductions: (1) *Oconee Landing Prop. v. Comm'r* (Filed November 17, 2022); (2) *Mill Road 36 Henry, LLC v. Comm'r* (Filed October 26, 2023); (3) *Savannah Shoals, LLC v. Comm'r* (Filed March 26, 2024); (4) *Buckelew Farm v. Comm'r* (Filed April 25, 2024); (5) *Corning Place Ohio LLC v. Comm'r* (Filed July 17, 2024); (6) *JL Minerals, LLC v. Comm'r* (Filed October 8, 2024); (7) *Seabrook Prop. v. Comm'r* (Filed January 21, 2025); and (8) *Green Valley Investors, LLC v. Comm'r* (Filed February 11, 2025).

In *Savannah Shoals*, the key finding by the Tax Court was that the HBU used by the taxpayer's expert was not feasible. The appraiser based his before valuation of the property on an HBU that the property would be used for an aggregate quarry. The IRS's expert opined that the HBU was low-density housing on a speculative hold basis until demand increased. Since there was an abundance of aggregate already coming from active quarries in the area, there was no particular local need for more aggregate, and shipping costs to destinations with demand for aggregate were too great for a quarry to be economically feasible, the Court rejected the HBU selected by the taxpayer's expert. Once that HBU was rejected, the appraisal offered by the IRS' expert was accepted entirely by default, resulting in the deduction being significantly reduced. Thus, the court allowed the deduction but reduced it from $23 million to $480,000.



Similarly, in *Oconee*, when the Tax Court turned to valuation, the question became the taxpayer's selection of the HBU used to underpin the appraisal. The taxpayer's expert assumed the HBU was low density housing for immediate development and sale, but the IRS' expert opined that the HBU should be speculative holding for future development because the housing market was saturated and ongoing developments with available, more desirable lots, were not selling. The Court decided as a matter of fact that there was no market for immediate development and sale of the proposed units, so the Court followed the valuation offered by the IRS' expert instead.

In *Mill Road*, the Court was also faced with disagreement on valuation methodology. The taxpayer's expert utilized immediate development of senior assisted living center, but the IRS expert asserted that there was an abundance of similar undeveloped real estate and no demonstrated need for a senior assisted living center. The Tax Court determined that there was no reason anyone would pay over $200,000 per acre for this undeveloped property when identical property could be acquired and developed in the same way for a fraction of the cost. Thus, the HBU proposed by the IRS that the property should be considered a speculative hold was accepted, and reduced the deduction from $8.9 million to $416,563.

Further, *Buckelew* also turns on a dispute over the correct HBU. The taxpayer's expert proposed development of an upscale residential community with substantial amenities, and the IRS expert countered that there was no demand in the area for such a community and that a speculative hold HBU with the possibility of timber production and limited residential development was more appropriate. Since demographic and economic data supported the IRS' expert, and the property had been marketed unsuccessfully for quite some time at a fraction of the value being proffered by the taxpayer, the Court rejected the taxpayer's HBU and adopted the opinion of the IRS' expert and reduced the deduction from $50.5 million to $4.6 million.[2]

In *Corning Place*, the Tax Court addressed a claimed historic preservation easement; namely, the proposed HBU development was converting an 11-story historic building in downtown Cleveland to a 45-story luxury apartment building. On the issue of valuation, the Tax Court disagreed with the partnership appraisal and expressly stated: "[a]part from being structurally implausible and economically unsound, adding 34 floors of steel and concrete atop the building would have required the partnership to forfeit the federal and Ohio tax credits upon which it relied to finance to renovation." The Court held the taxpayer's appraisal was based on "elaborate drawings for an imaginary 34-story vertical addition, which everyone knew would never be built." As a result, the $22.6 million deduction taken by the taxpayer was reduced to $900,000, and a 40% gross misstatement penalty was awarded.

In *JL Minerals*, the Tax Court focused extensively on the discounted cash flow (DCF) valuation methodology used to determine the FMV submitted by the taxpayer was too high. The Court colorfully expressed its skepticism as a result of a 3-factor approach taken to determine the FMV. In the kaolin mining context, the Tax Court evaluated the behavior of market participants, the history of the property, market factors for the mineral findings, and general mining issues, such as the costs of removing overburden and the ultimate claimed value of the mineral on the property. The Tax Court accepted the FMV proposed by the IRS, which was determined using the Comparable Sales Approach; however, it did not entirely rule out the use of the DCF Income Approach where a track record providing supported inputs existed.

In *Seabrook*, the taxpayer's appraiser proposed a high-end residential development on 622 acres in Liber County, Georgia. Interestingly, Seabrook was unique in that both the Tax Court and the taxpayer agreed that the "before donation" HBU of the Property would be as a residential development. The two diverged, however, on the scale and value of the development itself. First, the Tax Court found the DCF approach

---

[2] The taxpayer in *Buckelew* appealed the Tax Court's decision to the United States Court of Appeals for the Eleventh Circuit, which remains pending as case number 24-12365.



was too speculative and unreliable when valuing vacant land. Accordingly, looking to the comparable sales, the Tax Court found that three sales considered in the IRS' appraisal were the most useful, and ultimately found the "before donation" value was $9,000 per acre, or $5,733,000 total. This was more than double the "before donation" value suggested by the IRS ($2,060,000), but still significantly less than the value claimed as a donation by the taxpayer ($37,750,000).

Most recently, in _Green Valley_, the taxpayer's appraiser proposed HBU was development of an aggregate quarry mine on 141.65 acres in North Carolina, reflecting a FMV of $22,559,000. Interestingly, the Tax Court found there was no genuine dispute that such a mine was both physically and legally possible, and that necessary rezoning to effectuate the HBU was a strong possibility. The decision then came down to a "battle of the experts." Ultimately, the Tax Court found issues and flaws in the taxpayer's experts regarding valuation, market competition, and financial feasibility. The court found the IRS's experts to be more convincing; particularly, the testimony of geologist Martin Messmer who had examined the local market, spoke with market participants, and concluded that abundant competition as well as high transportation costs of aggregate were significant entrance barriers for the taxpayer's proposed HBU. Accordingly, the Tax Court determined taxpayer's appraiser overvalued the property (finding the FMV was under $1,500,000), and held that the HBU was agricultural, residential, and/or recreational use with knowledge of minerals on the site and the opportunity to seek entitlements allow for mining.

Alleged overvaluation is seemingly a central theme of the IRS's enforcement efforts. Historically, however, the IRS has succeeded in challenging deductions largely by scrutinizing the taxpayer's compliance with various technical requirements in the regulations (_i.e._, so called "foot faults"). Notably, not only have taxpayers learned to avoid these "foot faults" in documenting and reporting their donations, but recent court decisions largely reject any continued attempt by the IRS to rely on these types of technical arguments in SCE disputes. Thus, while each of the above Tax Court decisions may be cited as being adverse to the taxpayers in certain regards, such a reading would be too narrow and ignore the favorable aspects.

By way of brief example, while the court ruled against the taxpayer in _Mill Road_ as to valuation, it swiftly rejected a number of arguments relied upon by the IRS, including but not limited to: (1) the IRS's argument that the property company lacked the necessary donative intent because it was primarily motivated to monetize the federal income tax deductions for its investors; (2) the IRS's argument that the conservation purpose was not met or "protected in perpetuity"; and (3) the IRS's argument that the appraiser was not "qualified" because he incompetently or carelessly overstated the value of the appraisal. Ultimately, the Tax Court clarified that the desire to obtain tax benefits does not undermine charitable donation status, the concept of partnership is broad, conservation purposes should be liberally interpreted, reserved rights in a deed do not necessarily eliminate perpetual protection, characterizing an appraiser as unqualified is an uphill battle, and civil fraud is extremely difficult for the IRS to prove, especially when a taxpayer has fully disclosed the easement donation on all tax returns.

Additionally, we also direct your attention to _Kiva Dunes Conservation, LLC v Comm'r_ (filed June 22, 2009) – which was cited, and discussed in some detail, in the **Named Insured PPMs** – where a developer acquired 251 acres of undeveloped property in Alabama and turned it into a golf community, including a golf course, amenities and residential lots for sale. Seven years later, after many of the lots had been sold and built out, the developer donated a conservation easement preserving the golf course from development of more homes. The IRS disallowed the deduction. The Tax Court reviewed the long-standing acceptance of HBU valuation of conservation easements on a before and after basis. After considering the appraisal testimony and evidence submitted by both sides – including public comments by the IRS and certain members of Congress that golf course conservation easements were abusive as a matter of course – the Tax Court found that the FMV was $28,656,004, a slight reduction from the $30,588,235 claimed by the taxpayer. This ruling on valuation by the Tax Court was favorable to taxpayers.

**WILSON ELSER**
WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

- 12 -

Thus, while certain aspects of recent Tax Court decisions may seem like an assault on "Before and After" valuations of SCEs utilizing HBUs to determine FMV, that is not what they actually hold. Each states that, in the absence of comparable sales of conservation easements themselves (which is always the case), valuation should, in fact, utilize both the HBU for the property to determine the "Before" value, and then follow the "Before and After" methodology to arrive at the FMV of the easement. However, these cases also pointedly illustrate that the HBU selected by the taxpayer will be scrutinized to determine if it is in fact physically possible, legally permissible, financially feasible, and maximally productive.

Further, contemporaneous rulings by the U.S. District Court for the Middle District of Georgia in _Townley v. United States_ are instructive as well. There, the Court provided some context and questioned whether the IRS's aggressive positions on all SCE deductions were grounded in legitimate skepticism or had evolved into generalized cynicism – the latter of which is counterproductive to the legal issues involved in evaluating each SCE deduction on a case-by-case basis. More specifically, the Court stated:

> From the heated rhetoric flowing from some of the briefing in this case, it is evident that the IRS and its counsel passionately believe that this worthy conservation scheme has been abused by greedy taxpayers assisted by clever lawyers, crafty accountants, and over-zealous appraisers. That rhetoric, some of which rises to the level of hyperbole, is not particularly helpful in focusing on the precise legal issues to be decided in the present case. Quite frankly, when legitimate skepticism evolves into generalized cynicism, such an attitude is typically counterproductive to assisting the Court to objectively evaluate legal requirements on a case-by-case basis. While Congress certainly expected that these types of deductions would be closely scrutinized, it did not intend for the IRS to create "gotcha traps" to ensnare taxpayers who seek the deductions in good faith. An enforcement attitude tempered by an expectation of _substantial_ compliance should prevent abuse while accomplishing the worthy public purpose of conservation easements. In this order, the Court intends to focus on the legal requirements and not some global accusation that landowners seeking these tax breaks must be treated with great suspicion and are not entitled to any benefit of the doubt.

2024 U.S. Dist. LEXIS 55519, *8-9 (M.D. Ga. Mar. 27, 2024). In denying the IRS's motions to exclude the Townleys' (_i.e._, the taxpayer's) expert testimony as to the HBU of the property, the Court stated:

> The Townleys have certainly not concealed their belief that their property has commercial value beyond the value of its pine trees or hunting rights. The fact that they and their neighbors may have originally purchased their property for prices based upon the value of timberland does not forever establish the fair market value of that property. Circumstances change. And here the Townleys' research and investigation have revealed that their property contains valuable mineral deposits in the nature of granite that can be mined and sold as crushed stone. They are not speculating about the presence of such deposits but have hired well-qualified and experienced persons to investigate the presence and extent of the deposits as well as the feasibility of extracting the stone for commercial use. They have also had persons with special expertise in such mining to evaluate the value of these mineral deposits.

> Suggesting that 1,000 acres of timberland with no such mineral deposits should be valued the same as 1,000 acres with marketable mineral deposits cannot be done with a straight face. Only the most stubborn devil's advocate would argue that property with gold or diamonds beneath the surface has value comparable to the property next door that has nothing but red Georgia clay beneath the topsoil, no matter how fertile that topsoil may be. This of course seems silly, but sometimes zealous advocacy leads to Alice's Wonderland.



It is not surprising or suspicious that one piece of property (with valuable mineral deposits) has a value many times more than another property (without such deposits), even if the two properties appear identical on the surface. It's common sense.

The value placed on this property by the Townleys' experts certainly grabs the attention of the layperson unfamiliar with mining and the commercial value of minerals. But personal astonishment by the layperson or lawyer is not a reliable standard for evaluating the reasonableness of such valuations. Arguably, it justifies why our rules permit persons with special expertise to help explain to juries why their initial astonishment should not necessarily lead them to premature conclusions.

The point is that evidence exists that the Townleys' property has granite beneath it; that the granite is extractable, and that it adds value to the property. There is of course evidence to the contrary. And that's primarily what this fight should be about.

Whether the property here has such mineral deposits, whether they are feasibly extractable, and the extent to which they increase the value of the property are of course all issues upon which reasonable persons may disagree. And in litigation, when a jury has to resolve these issues, it would certainly be helpful for them to be provided with evidence from well-qualified experts who can provide relevant information based on the reasonable application of reliable methodologies…Each of the IRS's motions to exclude fails to fully grasp this distinction between admissibility and weight.

2024 U.S. Dist. LEXIS 51869, *2-5 (M.D. Ga. Mar. 22, 2024).

Based on our review of the above, as well as our discussions with the partnerships' tax and coverage counsel, it seems clear that the Tax Court will scrutinize the HBU put forth by the **Taxpayers** and potentially reduce the amount of any deduction to conform with the Tax Court's view of what a feasible HBU should be under the facts of the case.  That said, while the IRS has a duty to enforce the Tax Code, "it likewise has a responsibility to treat each taxpayer individually and not as part of some imagined grand conspiracy which has as its purpose theft from the United States Treasury using fabricated transactions." *Townley*, 2024 U.S. Dist. LEXIS at *9 n. 3.  Here, relevant and material factors to consider include, but are not limited to: (1) the early stage of the IRS proceedings, where there has been no substantive discovery, investigation, or analysis; (2) the fact that no independent experts or appraisers have provided any valuation analysis or opinions; (3) the sophistication level of the investors that entered into these transactions, and the level of knowledge and disclosures available prior to doing so; (4) the fact that there is not sufficient information to determine whether these "take it or leave it" settlement offers are reasonable on their face; and (5) the fact the IRS has shown (multiple times) that if taxpayers wait, improved settlement terms may be offered in the future. Moreover, the viability of the **PropCos**' HBUs has not been tested. Similarly, the expert testimony that was crucial in *Townley* has not been requested or provided at this stage in any of the taxpayers' proceedings. Ultimately, it is not clear at this point that the Tax Court would reject the specific HBUs used as a basis to appraise the properties at issue.

### D.  *LACK OF INFORMATION TO DETERMINE REASONABLENESS AT THIS STAGE*

As noted above and in prior correspondence, the Insurers have engaged in a detailed investigation of the facts and law in an effort to make an intelligent evaluation and legitimate consideration of the current request. Over the past eight months, the Insurers have continually sought specific information from both counsel for the **Named Insureds** and the partnership representative/tax matters partner for the **PropCos**. The Insurers' positions are based on the information received, and the time afforded for reasonable review of such materials.



It is our understanding that, as to each of these matters, the IRS tax proceedings against the PropCo remain ongoing and the partnerships have not yet received FPAs. There has been no fact discovery. There has been no expert discovery. The expert to be presented by the IRS at trial concerning the FMV of the Conservation Easement for each matter has not been identified, nor has a report from an IRS trial expert concerning the appraisal of the Conservation Easement for each matter been presented. Similarly, to our knowledge, no partnership has engaged a consulting or testifying expert concerning the issue of the FMV of the Conservation Easement for any of these matters. Since none of these matters are currently in petition with the Tax Court and unlikely to go to trial within the next year or two, it may be understandable that experts have not been engaged, but that does not change the fact that the information is not available. In any event, no one qualified as an appraiser has been engaged thus far by the partnership to assess the FMV of the **Conservation Easements** and thereby the defensibility of the amounts claimed as deductions.

The settlement offers presented by the IRS have been a staple in SCE litigation for several years. *See* IRS bulletin IR-2020-130. However, at least some leading tax professionals warned that this type of settlement may not be advisable. *See Questions Remain About the Conservation Easement Settlement Initiative*, by Hale E. Sheppard published in Tax Notes Federal (Sept. 21, 2020). In light of the questions raised about the "out of pocket" settlements proposed by the IRS, it appears that there has been a low rate of acceptance of these offers by the partnerships receiving them. *See Comparing IRS Settlements: Easements and Employee Retention Credits*, by Hale E. Sheppard published in Tax Notes Federal (Feb. 12, 2024). Among other reasons, partnerships presented with these settlement offers may not have taken the offers because their partnerships had conducted substantial due diligence, obtained one or more compelling appraisals, relied on various specialized professionals, and other reasons. *Id.*

### E. EVALUATION OF CONSERVATION EASEMENTS AT ISSUE HERE

Again, we are mindful of recent Tax Court decisions concerning SCEs, and that each was decided after trial and quite properly noted that the FMV of each donated easement was a question of fact to be determined based on the unique facts of each case. Here, we are dealing with donated conservation easements that each have their own unique history and attributes, and the transactions and valuations must be examined and analyzed on an individual basis. This includes, but is not limited to, a detailed evaluation of the market conditions, capacity, appetite, and/or feasibility for the HBU identified and claimed by the taxpayer. As such, the information, detail, and due diligence involved and communicated to the respective **investors** is significant. Likewise, the documents, materials, and due diligence submitted to the Insurers in connection with the underwriting of the Policies is also significant. Based on the information and materials provided to date – and without any notion of trying to be exhaustive – we provide the following for each matter:

#### 1. ASHWOOD GAP

Ashwood Gap involves a 205.39-acre parcel of unimproved real property (*i.e.*, "consisting of mixed pine/hardwood forests and cleared agricultural fields) in Jackson County, Alabama. Ashwood Gap claimed a tax deduction of $53,370,000 for placing a conservation easement on the property instead of pursuing its hypothetical HBU as a crushed stone mine and processing operation.

On March 20, 2025, the IRS presented a Closing Agreement settlement offer to Ashwood Gap that would: (1) disallow the entirety of the claimed deduction; (2) allow a deduction "for out-of-pocket costs" in the amount of $10,300,100 (the amount of the investor capital contributions); (3) result in an imputed underpayment under IRC § 6225 of $9,044,679; and (4) result in penalties under IRC § 6662(h) in the amount of $452,234 plus interest estimated to July 6, 2025 of $2,778,837. In sum, the **IRS Settlement Offer** to Ashwood Gap would require a lump sum payment of $12,275,750 inclusive of tax, penalties, and interest.



At the outset, what is immediately noticeable (and common to all of these matters) is the lack of material, information, analysis, or reasoning to support the IRS's disallowance and valuation. Nor is there any information at all to suggest that the Conservation Easement transaction, the claimed deduction, and the IRS's position regarding disallowance is different in any way from the risks, issues, and considerations expressly and explicitly detailed and disclosed in the Ashwood Partners PPM. The absence of any of these materials is particularly stark when juxtaposed with the significant amount of due diligence that was conducted by Ashwood Partners in advance of claiming the deduction, and which was provided to the Insurers for evaluation and consideration in connection with the underwriting of the Ashwood Partners Policy.

Indeed, this due diligence includes, but is certainly not limited to, the Technical Due Diligence Business Plan and Market Analysis prepared by Burgex Inc. Mining Consultants, the Mine Plan Review Report prepared by Kimley-Horn and Associates, Inc. ; all of which seemingly provides detailed, scientific support for the development of a crushed stone mine in the manner set forth in Ashwood Gap's proposed HBU. Moreover, the appraisal, dated December 5, 2020, was prepared by Rick and Douglas Kenney ("Kenney") of Kenney & Associates, Inc. In determining the value of the Property before any election of a conservation easement, Kenney reviewed a combination of reports, United States Census Data, etc., confirming the HBU of the Property for the development of a crushed stone mine. Kenney concluded that the FMV of the Property before the donation date was $53,650,000 based on a DCF analysis of the expected cash flows of a crushed stone mining operation on the Property. It further indicated that the FMV value of the Property after the donation of the Conservation Easement was $280,000, making the easement value $53,370,000.

Absent some compelling analysis specific to this particular Property, which reviews and evaluates the appraisal and mining reports, it is not possible at this time to conclude that the settlement offered by the IRS is reasonable. All of these materials were presented during the underwriting of the Ashwood Partners Section 170(h) Policy as evidence that the SCE deduction taken by Ashwood Gape was well-founded and would be worthy of defending through to a final determination. Due to the preliminary stage of the proceedings with the IRS, where no consultants or experts have been engaged by the partnership and tax counsel has not undertaken any significant efforts to prepare the dispute for final determination, there is no reasoned basis upon which to evaluate the settlement offer. While the recent decisions by the Tax Court addressing SCEs are an important consideration, they do not by themselves establish a reasonable basis to conclude the settlement offer is reasonable.

### 2. *BEAR MOUNTAIN*

Bear Mountain involves 165.86 acres, more or less, of primarily unimproved real property located in Jackson County, Alabama. Bear Mountain claimed a tax deduction of $42,380,000 for placing a conservation easement on the property instead of pursuing its hypothetical HBU as crushed stone mine. On March 27, 2025, the IRS presented a Closing Agreement settlement offer to Bear Mountain that would: (1) disallow the entirety of the claimed deduction; (2) allow a deduction "for out-of-pocket costs" in the amount of $8,108,204 (the amount of the investor capital contributions); (3) result in an imputed underpayment under IRC § 6225 of $7,197,075; and (4) result in penalties under IRC § 6662(h) in the amount of $359,854 plus interest estimated to July 6, 2025, of $2,211,190. In sum, the **IRS Settlement Offer** to Bear Mountain would require a lump sum payment of $9,768,119 inclusive of tax, penalties, and interest.

Again, what is immediately noticeable is the lack of material, information, analysis, or reasoning to support the IRS's disallowance and valuation. Nor is there any information at all to suggest that the Conservation Easement transaction, the claimed deduction, and the IRS's position regarding disallowance is different in any way from the risks, issues, and considerations expressly and explicitly detailed and disclosed in the Bear Partners PPM. The absence of any of these materials is particularly stark when juxtaposed with the significant amount of due diligence that was conducted by Bear Partners in advance of claiming the



deduction, and which was provided to the Insurers for evaluation and consideration in connection with the underwriting of the Bear Partners Policy.

Indeed, this due diligence includes, but is certainly not limited to, the Technical Due Diligence Business Plan and Market Analysis prepared by Burgex Inc. Mining Consultants, which seemingly provide detailed, scientific support of the development of a crushed stone mining operation in the manner set forth in Bear Mountain's proposed HBU. Moreover, the appraisal, dated July 15, 2020, was prepared by Scot A. Torkelson of Schmidt Financial, Inc. d/b/a Value Consulting Group, Inc. ("Torkelson"). In determining the value of the Property before any election of a conservation easement, Torkelson reviewed a combination of reports, United States Census Data, etc., confirming the HBU of the Property for the development of a crushed stone mine. Torkelson concluded that the FMV of the Property before the donation date was $42,710,000 based on DCF analysis of the expected cash flows of a crushed stone mine on the Property. It further indicated that the FMV value of the Property after the donation of the Conservation Easement was $330,000, making the easement value $42,380,000. In considering the Sales Comparison Approach to value the Property prior to the donation Torkelson tried to find other similar sales either in the Southeast or properties that had similar defining characteristics of the subject Property. Torkelson utilized the Sales Comparison Approach, the Tax Court's favored approach, to determine the FMV of the Property post CE by analyzing comparable CE encumbered land sales in the southeastern region.

Absent some compelling analysis specific to this particular Property, which reviews and evaluates the appraisal and mining reports, it is not possible at this time to conclude that the settlement offered by the IRS is reasonable. These materials were presented during the underwriting of the Bear Partners Section 170(h) Policy as evidence that the SCE deduction taken by Bear Mountain was well-founded and would be worthy of defending through to a final determination. Due to the preliminary stage of the proceedings with the IRS, where no consultants or experts have been engaged by the partnership and tax counsel has not undertaken any significant efforts to prepare the dispute for final determination, there is no reasoned basis upon which to evaluate the settlement offer. While the recent decisions by the Tax Court addressing SCEs are an important consideration, they do not by themselves establish a reasonable basis to conclude the settlement offer is reasonable.

## CONCLUSION

In sum, the Insurers have endeavored to diligently and adequately review the documents and information provided to date as a matter of urgency. As you know, the information we have been provided (and the information that remains outstanding) is highly technical and there is a notable absence of any written recommendations or analysis of any insured or tax counsel reviewing of the IRS's SCERI letters or as to the reasonableness of the **IRS Settlement Offers**. Relying on the information that has been provided to date, the Insurers have engaged in a detailed investigation, analysis, and evaluation of each of the above SCE transactions (including the due diligence materials provided to Insurers in connection with the underwriting of the Policies, such as market conditions, feasibility studies, appraisals, and other materials) and claimed deductions (including recent and historical case law and regulations) in an effort to adequately respond to the requests in your April 4 letters.

Ultimately, there simply is not enough information at this early stage to allow the Insurers to provide consent or agree not to raise lack of consent in connection with acceptance of the **IRS Settlement Offers** to Ashwood Gap and Bear Mountain. Indeed, as to these matters, we have not been presented with any information that suggests the appraisers' valuation approach was incorrectly selected or performed, and we have not been presented with any information that undermines or refutes the substantial due diligence performed by the partnerships (which was provided and material to the underwriting of the Policies) prior to moving forward with the donations and claimed deductions.

 WILSON ELSER

- 17 -

In fact, these matters have proceeded in the exact manner expected and conveyed to the investors in the **Named Insured PPMs** and to the Insurers in connection with the underwriting of the Policies; that is, the investors voted on the "Conservation Option" with full knowledge that their charitable contribution would be a "listed transaction" that would be audited and attacked on valuation. To address those considerations, the investors engaged in significant, costly, and detailed due diligence efforts to support their valuations. The Named Insureds provided all of this due diligence to the Insurers in connection with the underwriting of the Policies and indicated that while an IRS audit and dispute was likely, the due diligence would allow the **PropCos** to properly and adequately defend themselves through a final adjudication on the merits. Here, that has not occurred. In fact, there has been no material change or development since the Named Insureds provided the due diligence to the Insurers. Stated a different way, by engaging in the transaction, the investors knew the **PropCos** would get audited and that the IRS examiner would disagree with their claimed valuations and seek to disallow those amounts. That is exactly what happened; however, the proceedings are at such an early stage that no legitimate defense (based on the due diligence performed) or independent valuation has been set forth. There is nothing to indicate that there has been any material change to the underlying due diligence performed and valuations obtained by the Named Insureds such that the Insurers can deem the **IRS Settlement Offers** reasonable at this stage.

Accordingly, at this time the Insurers are **unable to accommodate your request regarding consent or agreement not to raise lack of consent as to Ashwood Gap and Bear Mountain**. The Insurers' positions herein should in no way be construed as a waiver of any of their rights under any provisions of the Policies or applicable law. Further, to reiterate, we do not address whether the Policies would provide coverage for any portion of the amount sought to be paid in connection with the **IRS Settlement Offers**. The Insurers expressly reserve the right to address any and all such issues at the appropriate time and in the appropriate manner. The Insurers also expressly reserve the right to modify their determination under the relevant Policies if further information warrants. The Insurers expressly reserve (and do not waive) any and all rights, remedies, and defenses at law, in equity and under their Policies including, but not limited to, the right to raise any of the terms, conditions, exclusions and/or provisions as warranted. As we noted at the outset, we invite you to contact us with any additional information or authority that you feel would cause the Insurers to review their position and/or assist in their determination. All such information and authority will be fully and fairly considered. Once you have had an opportunity to review, please feel free to reach out directly to discuss.

Very truly yours,

Wilson Elser Moskowitz Edelman & Dicker LLP

*/s/ Peter J. Larkin*

Peter J. Larkin

cc:  Sarah Adam, Esq.

**D. Austin Bersinger**
Partner
ABersinger@bradley.com
404.868.2042 direct



August 8, 2025

**VIA EMAIL ONLY**

Sarah Adam
Wilson Elser Moskowitz Edelman & Dicker LLP
150 E 42nd Street
New York, NY 10017
Email: sarah.adam@wilsonelser.com

Re:    **Demand for Payment**

      Insured:          Ashwood Gap Partners, LLC ("Ashwood Partners")
      Insurers:         Wesco Insurance Company, Interstate Fire & Casualty Co., Volante Global, LTD, Volante Specialty Risk LTD, Fidelis Underwriting Limited, Liberty Mutual Insurance Europe SE, AmTrust Financial, Allianz ("Insurers")
      Policy No.:      VFP/FL/13849/2020/1

Dear Ms. Adam:

      I am writing regarding the above-referenced Policy. This correspondence serves as Ashwood Partners' formal demand, as the Named Insured under the Policy, that the Insurers (i) consent to Ashwood Gap's acceptance of the IRS settlement offer in this case or waive the consent requirement under the Policy with respect to the same, and (ii) agree to fund amounts due as a result of Ashwood Gap's acceptance of the IRS settlement, up to the policy limit. We request that you provide a written response to this correspondence within 30 days, or by September 8, 2025. Ashwood Partners and Ashwood Gap will accept full payment of this demand in lieu of a written response.

I.      **Demand for Consent or Waiver and Payment of Claim**

      As you are aware, the IRS extended an offer to Ashwood Gap, LLC ("Ashwood Gap") on July 11, 2024, to resolve its ongoing tax dispute. The IRS issued a Form 906 (Closing Agreement on Final Determination Covering Specific Matters) dated March 20, 2025 to finalize this resolution. As you are further aware, the IRS is issuing revised Forms 906 for partnerships like Ashwood Gap that have elected into the IRS's Syndicated Conservation Easement (Nondocketed) Resolution. The revisions between the original Form 906 and the revised Form 906 are immaterial and have no bearing on Ashwood Gap's ability to accept the IRS settlement or its claim under the Policy. Ashwood Gap's deadline for paying its liability resulting under the IRS's settlement offer is October 31, 2025.

      Since the issuance of the IRS's offer over a year ago, we have repeatedly requested that the Insurers (i) either consent to Ashwood Gap's acceptance of the IRS's offer or waive the consent

Sarah Adam
Wilson Elser
August 8, 2025
Page 2

requirement under the Policy, and (ii) provide their coverage position with respect to the IRS settlement offer. By letter dated April 24, 2025, your firm, on behalf of Volante Global LTD, Volante International LTD, Volante Specialty Risk LLC, Fidelis Underwriting Limited, Liberty Mutual Europe SE, and Interstate Fire & Casualty/Allianz, not only refused to provide a coverage position with respect to the IRS settlement but further refused to consent or waive the consent requirement under the Policy. We now understand that you have also undertaken the representation of AmTrust Group and Wesco Insurance Company in this matter, which have not provided a coverage position regarding the IRS settlement.[1]

At this time, Ashwood Gap has access to sufficient funds to pay the Policy retainer and any liability due under the IRS settlement in excess of the aggregate limit of the Policy. The IRS settlement accordingly represents an in-limits settlement opportunity. Ashwood Partners, as the Named Insured under the Policy, demands that the Insurers reconsider their prior position with respect to the IRS settlement and agree to consent to Ashwood Gap's acceptance of the same. To the extent that Insurers cannot commit to giving such consent, Ashwood Partners demands that Insurers agree not to raise lack of consent or other related policy provisions as an impediment to coverage, as such an agreement does not negatively affect the Insurers' rights. *See, e.g., Homeland Ins. Co. of New York v. Health Care Serv. Corp.*, 2022 WL 2828752, at *4–6 (N.D. Ill. July 19, 2022) (allegations of harm from waiver of consent clause are illusory). Finally, Ashwood Partners demands that the Insurers agree to fund amounts due, up to the policy limit, resulting from Ashwood Gap's acceptance of the IRS settlement.

An insurer's right to withhold consent to settlement is constrained by its duty to act reasonably and in good faith. Even where a policy includes a consent-to-settle provision, the insurer must exercise that right in a manner consistent with the covenant of good faith and fair dealing implied in every insurance contract. *See, e.g., Piedmont Office Realty Trust, Inc. v. XL Specialty Ins. Co.*, 297 Ga. 38, 43 (2015); *Waters v. American Cas. Co. of Reading, PA*, 261 Ala. 252, 260–61 (1953). Courts evaluate the insurer's decision by asking whether it gave equal consideration to the interests of the insured and acted as a reasonably prudent insurer would under the circumstances. *See Piedmont Office*, 297 Ga. at 43; *see also Cotton States Mut. Ins. Co. v. Brightman*, 276 Ga. 683, 685 (2003); *First Acceptance Ins. Co. of Ga., Inc. v. Hughes*, 305 Ga. 489, 497 (2019); *State Farm Mut. Auto. Ins. Co. v. Hollis*, 554 So.2d 387, 391–92 (Ala. 1989). That reasonableness standard applies regardless of whether the insurer ultimately consents to or denies coverage; it must respond to requests for consent in a timely and informed manner based on the information available at the time. *See Geico Indemn. Co. v. Whiteside*, 311 Ga. 346, 352 (2021) (reasonableness of an insurer is determined based on information available at the time of the decision).

The Insurers position regarding the IRS settlement is blatantly unreasonable, particularly in light of the Tax Court's uniform rejection of taxpayer valuation positions in similar cases over

---

[1] We requested AmTrust and WesCo's position regarding the IRS settlement by letter dated April 30, 2025, but we have not received a response to this request. We accordingly reiterate our request that such Insurers provide their position with respect to the IRS settlement.

Sarah Adam
Wilson Elser
August 8, 2025
Page 3

its past 15 opinions.  As we have repeatedly explained, even in Tax Court cases where the taxpayer prevailed on alleged technical issues, it nevertheless suffered significant losses of between 86.64% and 99.44% of the claimed deduction, the imposition of the strict liability 40% gross valuation misstatement penalty, and the continued accrual of interest through the litigation process.[2]

The following table confirms the ultimate result in cases where the taxpayer prevailed on all technical issues at trial:

| Case Name | Original Value | Determined Value | Reduction in Value | Penalty Percentage |
|---|---|---|---|---|
| *Mill Road 36 Henry, LLC v. Commissioner,* T.C. Memo. 2023-129 | $8,935,000.00 | $900,000.00 | 89.93% | 40% |
| *Carter v. Commissioner,* T.C. Memo. 2023-133 | $14,175,000.00 | $1,000,000.00 | 92.95% | 40% |
| *Savannah Shoals, LLC v. Commissioner,* T.C. Memo. 2024-35 | $23,000,000.00 | $480,000.00 | 97.91% | 40% |
| *Buckelew Farm, LLC v. Commissioner,* T.C. Memo. 2024-52 | $47,570,000.00 | $4,595,000.00 | 90.34% | 40% |
| *Excelsior Aggregates, LLC v. Commissioner,* T.C. Memo. 2024-60[3] | $16,700,000.00 $14,950,000.00 | $693,000.00 $810,000.00 | 95.85% 94.58% | 40% 40% |
| *J L Minerals, LLC v. Commissioner,* T.C. Memo. 2024-93 | $16,745,000.00 | $93,690.00 | 99.44% | 40% |
| *Jackson Crossroads, LLC v. Commissioner,* T.C. Memo. 2024-111[4] | $23,142,421.00 $13,830,000.00 | $1,169,797.00 $1,571,226.00 | 94.95% 88.64% | 40% 40% |
| *Seabrook Property, LLC v. Commissioner,* T.C. Memo. 2025-6 | $35,850,000.00 | $4,718,000.00 | 86.64% | 40% |

[2] In cases where the Tax Court disallowed the claimed deduction based on technical issues, including *Oconee Landing, Corning Place, Green Valley Investors,* and *Rock Cliff,* the taxpayer received no deduction and was liable for a 40% penalty.  Nevertheless, the Tax Court found in favor of the IRS on the valuation issue in each case, which is what resulted in the assessment of the 40% gross valuation misstatement penalty.

[3] *Excelsior Aggregates* involved five donations: (i) conservation easement over tract 1, (ii) fee simple donation of tract 1, (iii) conservation easement over tract 2, (iv) fee simple donation of tract 2, and (v) fee simple donation of various tracts.  The amounts reflected in this chart reflect the combined reported and determined values on tracts 1 and 2.

[4] *Jackson Crossroads* involved two cases: *Jackson Crossroads, LLC v. Commissioner* and *Long Branch Investments, LLC.*

Sarah Adam
Wilson Elser
August 8, 2025
Page 4

| | | | | |
|---|---|---|---|---|
| *Ranch Springs, LLC v. Commissioner*, 164 T.C. No. 6 (2025) | $25,814,000.00 | $335,500.00 | 98.70% | 40% |
| *Beaverdam Creek Holdings, LLC v. Commissioner*, T.C. Memo. 2025-53 | $21,972,000.00 | $193,250.00 | 99.12% | 40% |
| *Veribest Vesta, LLC v. Commissioner*, Docket No. 9158-23 (Order July 15, 2025) | $20,310,000.00 | $111,000.00 | 99.45% | 40% |

Across its decisions, the Tax Court has fully refuted the arguments that the Insurers' have raised as grounds for refusing to consent to the acceptance of the IRS settlement, which Ashwood Gap's tax counsel confirmed in their discussion with you on July 23, 2025. The Insurers have not rebutted this analysis, identified any expert who contradicts this analysis or the assessments of tax counsel in this and other similarly situated cases, or pointed to any fact or set of facts that would lead a reasonably prudent person to refuse to settle this matter pursuant to the terms of the IRS settlement. *See Cotton States*, 276 G.A. at 685 ("Judged by the standard of the ordinarily prudent insurer, the insurer is negligent in failing to settle if the ordinarily prudent insurer would consider choosing to try the case created an unreasonable risk."); *Waters*, 261 Ala. at 261. Put differently, it appears that in spite of countless tax attorneys, including the tax counsel in this case, directly communicating the reasonableness of the IRS settlement as well as the significant downside risk awaiting the partnership at trial, the Insurers intend to refuse to allow its insureds to protect their interests through accepting the IRS settlement.

To use the Insurers' own example of *Mill Road* as evidence of the reasonableness of the IRS settlement, if Ashwood Gap expected the same outcome as the taxpayer in *Mill Road*, the Tax Court would determine that the Ashwood Gap easement was worth approximately $5,374,359 (10.07% of the claimed deduction), limit the amount of the deduction to the historic landowners' basis in the property, and assert a 40% penalty on the resulting underpayment. The IRS settlement, by contrast, guarantees Ashwood Gap a deduction of $10,300,100, or 19.3% of the claimed contribution, and a reduced penalty rate of 5%. The reduction of the tax rate from a presumed 37% to 21% further allows Ashwood Gap to significantly reduce its losses in a manner that is otherwise impossible under the Tax Code if the Insurers refuse to consent to the IRS settlement. Finally, the settlement offer gives Ashwood Gap the ability to further limit its losses by stopping the accrual of interest and avoiding legal fees and litigation costs.

In short, the IRS settlement is reasonable based on all available facts and circumstances. Ashwood Gap's acceptance of the IRS settlement further significantly reduces the insureds' exposure to losses in this matter. The Insurers accordingly do not have any reasonable basis for (i) continuing to refuse to consent to Ashwood Gap's acceptance of the IRS settlement or waive the consent requirement with respect to the same, or (ii) refusing to fund the amounts due as a result of such acceptance. To the extent that the Insurers refuse either demand, Ashwood Partners further demands that the Insurers identify all supporting documentation, tax authority, consulting

Sarah Adam
Wilson Elser
August 8, 2025
Page 5

expert, or tax practitioner the Insurers are relying on in support of their unreasonable positions that the IRS settlement offer is not reasonable or is not covered under the Policy.

## II.    Insurers' Refusal to Provide a Coverage Position

The Insurers' continued refusal to provide a coverage position concerning the IRS settlement constitutes bad faith. Insurers must act reasonably and in good faith when responding to settlement opportunities. *See S. Gen. Ins. Co. v. Holt*, 262 Ga. 267, 268–69 (1992); *Cotton States*, 276 Ga. at 684–85. That duty includes not only evaluating the terms of a proposed settlement, but also clearly and timely communicating the insurer's position to the insured—particularly where the insurer's position will affect the insured's ability to protect itself in the face of a claim. *See Am. Safety Indem. Co. v. Sto Corp.*, 342 Ga. App. 263, 272–73 (2017) (insurer estopped from denying coverage where it failed to timely and clearly reserve rights); *Lee v. Mercury Ins. Co. of Ga.*, 343 Ga. App. 729, 746–48 (2017) (issues of fact precluded summary judgment where insurer's prolonged silence and generic form letters, despite having sufficient information to deny coverage, could support estoppel based on delay and failure to communicate coverage position).

As stated, the IRS's settlement offer has been pending for nearly a year. Ashwood Gap has repeatedly requested both a coverage determination and the Insurers' consent (or waiver thereof). The failure to respond meaningfully—by either consenting, denying, or stating any position at all—has placed the partnerships in an impossible situation. This refusal to provide clarity cannot be squared with the insurer's duty to act with the "same faithful consideration" it gives to its own interests. *Great Am. Ins. Co. v. Exum*, 123 Ga. App. 515, 519 (1971); *see also Hollis*, 554 So.2d at 391–92.

Moreover, it appears the Insurers may be withholding a formal coverage denial in order to avoid the legal consequence attached to such a denial. As recognized in *Piedmont Office Realty Trust, Inc. v. XL Specialty Ins. Co.*, "an insurer that denies coverage and refuses to defend an action against its insured . . . waives the provisions of the policy against a settlement by the insured and becomes bound to pay the amount of any settlement (within policy limits) made in good faith." 297 Ga. 38, 43 (2015) (quoting *S. Guar. Ins. Co. v. Dowse*, 278 Ga. 674, 676 (2004)). The *Piedmont* court enforced the consent-to-settle clause only because the insurer had not "wholly abandoned" the insured or denied coverage.

In this case, the Insurers' attempted refusal to take any position—despite full knowledge of the material facts and repeated direct requests—strongly suggests they are attempting to preserve a policy defense they might otherwise forfeit if they acted in good faith. Such gamesmanship is prohibited. The partnerships again demand that the Insurers provide a formal, written coverage position regarding the IRS settlement. Continued refusal will be cited as further evidence of bad faith and unreasonable delay.

Sarah Adam
Wilson Elser
August 8, 2025
Page 6

### III.     Common Interest Agreement

As we have previously informed you in other matters, Ashwood Gap and Ashwood Partners are unable to enter into the draft common interest agreement that your firm provided for consideration. This draft agreement confirms the concerns that we have repeatedly raised on this issue. Specifically, the Insurers' express reservation of the right to disclose received information to third parties and to use received information in litigation against the insureds indicates that the parties likely do not have a sufficiently common interest to preserve attorney-client privilege and similar other protections following a voluntary disclosure. *See McKesson Corp. v. Green*, 597 S.E.2d 447, 451 (Ga. App. 2004) (voluntary disclosure of work product to third party regulator with potential adversarial relationship constituted waiver).

Notwithstanding this fact, we reiterate that no information has been withheld from the Insurers based on claims of privilege or other protection. As evidenced by your call with tax counsel in this matter on July 23, 2025, the lack of a common interest agreement has presented no barrier to the Insurers' investigation in this matter.

### IV.     Demand Regarding Notices and Policy Documents

We have repeatedly requested for confirmation that Volante Global, LTD, Volante International, LTD and Volante Specialty Risk, LLC (collectively, "Volante") provided notice to all Insurers regarding the start of the IRS proceeding and the issuance of the IRS settlement. We have further requested copies of any underlying policy in this matter that purport to affect the obligations of any Insurer. To date, we have not received a substantive response to these requests. This refusal is unreasonable, particularly considering Volante's representations. We accordingly reiterate the insureds' demands that the Insurers (i) confirm that each Insurer received notice of the IRS proceeding and the IRS settlement as required under the Policy, and (ii) provide copies of each underlying policy in this matter.

As stated above, the insureds demand that that the Insurers provide a written response to this letter or payment pursuant to the terms of the Policy by the close of business on September 8, 2025. Should you have any questions, please do not hesitate to call.

Sincerely,

D. Austin Bersinger

CC:    Peter J. Larkin (Peter.Larkin@wilsonelser.com)
       Michael O'Malley (Michael.O'Malley@wilsonelser.com)
       John Nail (jnail@bradley.com)

# IN THE SUPERIOR COURT OF FORSYTH COUNTY
## STATE OF GEORGIA

✦ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**25CV-1688-1**

**Judge Jeffrey S. Bagley**
**SEP 19, 2025 07:22 PM**

Greg G. Allen, Clerk
Forsyth County, Georgia

CIVIL ACTION NUMBER  <u>25CV-1688-1</u>

Ashwood Gap Partners, LLC
Ashwood Gap, LLC

_____

**PLAINTIFF**

**VS.**

Wesco Insurance Company
Interstate Fire & Casualty Company
Liberty Mutual Insurance Europe, SE
Fidelis Underwriting Limited
Volante Specialty Risk, LLC

_____

**DEFENDANTS**

### SUMMONS

TO: FIDELIS UNDERWRITING LIMITED

You are hereby required to file with the Clerk of said court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

**D. Austin Bersinger**
**Bradley Arant Boult Cummings LLP**
**Promenade Tower**
**1230 Peachtree Street NE, Suite 2100**
**Atlanta, Georgia 30309**
**abersinger@bradley.com**

an answer to the complaint which is herewith served upon you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

**This 19th day of September, 2025.**

Clerk of Superior Court

_____

Greg G. Allen, Clerk
Forsyth County, Georgia

SC-1
Rev'd 10/24

# IN THE SUPERIOR COURT OF FORSYTH COUNTY
## STATE OF GEORGIA

⚖ **EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**25CV-1688-1**

**Judge Jeffrey S. Bagley**
**SEP 19, 2025 07:22 PM**

Greg G. Allen, Clerk
Forsyth County, Georgia

CIVIL ACTION NUMBER  <u>25CV-1688-1</u>

Ashwood Gap Partners, LLC
Ashwood Gap, LLC

_____

**PLAINTIFF**

**VS.**

Wesco Insurance Company
Interstate Fire & Casualty Company
Liberty Mutual Insurance Europe, SE
Fidelis Underwriting Limited
Volante Specialty Risk, LLC

_____

**DEFENDANTS**

### SUMMONS

TO: INTERSTATE FIRE & CASUALTY COMPANY

You are hereby required to file with the Clerk of said court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

**D. Austin Bersinger**
**Bradley Arant Boult Cummings LLP**
**Promenade Tower**
**1230 Peachtree Street NE, Suite 2100**
**Atlanta, Georgia 30309**
**abersinger@bradley.com**

an answer to the complaint which is herewith served upon you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

**This 19th day of September, 2025.**

Clerk of Superior Court

_____
Greg G. Allen, Clerk
Forsyth County, Georgia

# IN THE SUPERIOR COURT OF FORSYTH COUNTY
## STATE OF GEORGIA

✦ **EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**25CV-1688-1**

**Judge Jeffrey S. Bagley**
**SEP 19, 2025 07:22 PM**

Greg G. Allen, Clerk
Forsyth County, Georgia

CIVIL ACTION NUMBER  <u>25CV-1688-1</u>

Ashwood Gap Partners, LLC
Ashwood Gap, LLC

_____

**PLAINTIFF**

**VS.**

Wesco Insurance Company
Interstate Fire & Casualty Company
Liberty Mutual Insurance Europe, SE
Fidelis Underwriting Limited
Volante Specialty Risk, LLC

_____

**DEFENDANTS**

## SUMMONS

TO: LIBERTY MUTUAL INSURANCE EUROPE, SE

You are hereby required to file with the Clerk of said court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

> **D. Austin Bersinger**
> **Bradley Arant Boult Cummings LLP**
> **Promenade Tower**
> **1230 Peachtree Street NE, Suite 2100**
> **Atlanta, Georgia 30309**
> **abersinger@bradley.com**

an answer to the complaint which is herewith served upon you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

**This 19th day of September, 2025.**

Clerk of Superior Court

_____

Greg G. Allen, Clerk
Forsyth County, Georgia

# IN THE SUPERIOR COURT OF FORSYTH COUNTY
## STATE OF GEORGIA

✤ **EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**25CV-1688-1**

**Judge Jeffrey S. Bagley**
**SEP 19, 2025 07:22 PM**

Greg G. Allen, Clerk
Forsyth County, Georgia

CIVIL ACTION NUMBER  25CV-1688-1

Ashwood Gap Partners, LLC
Ashwood Gap, LLC

_____

**PLAINTIFF**

**VS.**

Wesco Insurance Company
Interstate Fire & Casualty Company
Liberty Mutual Insurance Europe, SE
Fidelis Underwriting Limited
Volante Specialty Risk, LLC

_____

**DEFENDANTS**

### SUMMONS

TO: WESCO INSURANCE COMPANY

      You are hereby required to file with the Clerk of said court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

**D. Austin Bersinger**
**Bradley Arant Boult Cummings LLP**
**Promenade Tower**
**1230 Peachtree Street NE, Suite 2100**
**Atlanta, Georgia 30309**
**abersinger@bradley.com**

an answer to the complaint which is herewith served upon you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

      If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

**This 19th day of September, 2025.**

Clerk of Superior Court

Greg G. Allen, Clerk
Forsyth County, Georgia

# IN THE SUPERIOR COURT OF FORSYTH COUNTY
## STATE OF GEORGIA

✤ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**25CV-1688-1**

**Judge Jeffrey S. Bagley**
**SEP 19, 2025 07:22 PM**

Greg G. Allen, Clerk
Forsyth County, Georgia

CIVIL ACTION NUMBER  <u>25CV-1688-1</u>

Ashwood Gap Partners, LLC
Ashwood Gap, LLC

_____

**PLAINTIFF**

                                        **VS.**

Wesco Insurance Company
Interstate Fire & Casualty Company
Liberty Mutual Insurance Europe, SE
Fidelis Underwriting Limited
Volante Specialty Risk, LLC

_____

**DEFENDANTS**

### SUMMONS

TO: VOLANTE SPECIALTY RISK, LLC

You are hereby required to file with the Clerk of said court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

**D. Austin Bersinger**
**Bradley Arant Boult Cummings LLP**
**Promenade Tower**
**1230 Peachtree Street NE, Suite 2100**
**Atlanta, Georgia 30309**
**abersinger@bradley.com**

an answer to the complaint which is herewith served upon you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

**This 19th day of September, 2025.**

Clerk of Superior Court

_____
Greg G. Allen, Clerk
Forsyth County, Georgia

IN THE SUPERIOR COURT OF FORSYTH COUNTY
STATE OF GEORGIA

✦ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**25CV-1688-1**
**Judge Jeffrey S. Bagley**
SEP 29, 2025 02:28 PM

Greg G. Allen, Clerk
Forsyth County, Georgia

Ashwood Gap Partners, LLC,
Ashwood Gap, LLC

        Plaintiff,

                                CIVIL ACTION
                                FILE NO.: 25CV-1688-1

v.

Wesco Insurance Company,
Interstate Fire & Casualty Company,
Liberty Mutual Insurance Europe, SE,
Fidelis Underwriting Limited,
Volante Specialty Risk, LLC,

        Defendants.

### AFFIDAVIT JEFF DOLBIER

       On Wednesday September 24, 2025 at 11:30 a.m., I served true and correct copies of the SUMMONS and COMPLAINT upon Defendant Wesco Insurance Company's Registered Agent, United Agent Group, Inc., located at 2985 Gordy Parkway, 1st Floor, Marietta, GA 30066. Ms. Anna Moore, a United Agent Group, Inc. representative, accepted service.

This __25__ day of September, 2025

                                         Jeff Dolbier
                                         President, Flash Delivery Inc.

Sworn and Subscribed before
me this __2.5__ day of September, 2025

My Commission Expires: 06/26/2029

IN THE SUPERIOR COURT OF FORSYTH COUNTY
STATE OF GEORGIA

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**25CV-1688-1**

**Judge Jeffrey S. Bagley**
**SEP 29, 2025 02:28 PM**

Greg G. Allen, Clerk
Forsyth County, Georgia

Ashwood Gap Partners, LLC
Ashwood Gap, LLC

        Plaintiff,

                              CIVIL ACTION
                              FILE NO.: 25CV-1688-1

v.

Wesco Insurance Company,
Interstate Fire & Casualty Company,
Liberty Mutual Insurance Europe, SE,
Fidelis Underwriting Limited,
Volante Specialty Risk, LLC,

        Defendants.

## AFFIDAVIT JEFF DOLBIER

On Wednesday September 24, 2025 at 12:15 p.m., I served true and correct copies of the SUMMONS and COMPLAINT upon Defendant Volante Specialty Risk, LLC's Registered Agent, Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, GA 30092. Ms. Alisha Smith, a CSC representative, accepted service.

This __25__ day of September, 2025

                                          Jeff Dolbier
                                          President, Flash Delivery Inc.

Sworn and Subscribed before
me this __25__ day of September, 2025

My Commission Expires: 06/26/2029